UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

SHETEL INDUSTRIES LLC,                         :

                                            17-CV-02505 (LDW) (ARL)

                    Plaintiff,          :

       -against-                               :

ADIN DENTAL IMPLANT SYSTEMS, INC.,             :
ADIN DENTAL SOLUTIONS USA, INC., and
JEREMY DANZER,                                 :

                  Defendants.          :

---------------------------------------------------------------x

## **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

**STORCH AMINI PC**
**2 Grand Central Tower**
**140 East 45th Street, 25th Floor**
**New York, New York, 10017**
**(212) 490-4100**
**Attorneys for Plaintiff, Counterclaim-Defendant**
**and Third-Party Defendants**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................1

RELEVANT FACTUAL ALLEGATIONS ..................................................................2

    A.  The Parties ...................................................................................................2

    B.  Shetel Commences this Action After Defendants Steal its Business ...........4

    C.  Defendants Respond With 47 Counterclaims and Third-Party Claims ........5

ARGUMENT .................................................................................................................8

  I.   DEFENDANTS CANNOT BOOTSTRAP THEIR BREACH OF CONTRACT
      CLAIMS INTO TORT OR QUASI-CONTRACT CLAIMS .............................9

    A.  Adin's Claims ..............................................................................................9

    B.  Danzer's Claims ........................................................................................13

  II.  THE ALLEGEDLY UNAUTHORIZED SALE OF GENUINE ADIN
      PRODUCTS CANNOT GIVE RISE TO A TRADEMARK INFRINGEMENT
      OR UNFAIR COMPETITION CLAIM ..........................................................16

  III.  THE "CYBERSQUATTING" CLAIMS CONTRADICT DEFENDANTS'
       PLEADING AND NO FACTS ARE ALLEGED TO SUPPORT THE CLAIMS ..........18

  IV.  NO FACTS ARE ALLEGED THAT COULD SUPPORT ANY LIABILITY
       AGAINST WEITZ INDIVIDUALLY, ON A VEIL-PIERCING OR ANY
       OTHER THEORY ...........................................................................................20

  V.   NO FACTS ARE ALLEGED THAT COULD SUPPORT ANY LIABILITY
      AGAINST OSSEOGROUP ............................................................................22

CONCLUSION............................................................................................................23

i

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

ARA Auto Group v. Cent. Garage, Inc.,
  124 F.3d 720 (5th Cir. 1997)..................................................................................... 13

Ashcroft v. Iqbal,
  556 U.S. 662 (2009) ................................................................................................... 8

B & M Linen, Corp. v. Kannegiesser, USA, Corp.,
  679 F. Supp. 2d 474 (S.D.N.Y. 2010)...................................................................... 22

Bell Atl. Corp. v. Twombly,
  550 U.S. 544 (2007) ................................................................................................... 8

Beta Holdings, Inc. v. Goldsmith,
  120 A.D.3d 1022 (1st Dep't 2014)........................................................................... 10

Bettan v. Geico Gen. Ins. Co.,
  296 A.D.2d 469 (2d Dep't 2002) .............................................................................. 12

Biro v. Conde Nast,
  807 F.3d 541 (2d Cir. 2015)...............................................................................passim

Brown v. Brown,
  12 A.D.3d 176 (1st Dep't 2004)............................................................................... 10

Cal Distributor, Inc. v. Cadbury Schweppes Americas Beverages, Inc.,
  No. 06 Civ. 0496 (RMB), 2007 WL 54534 (S.D.N.Y. Jan. 5, 2007) ...................... 15

Carlucci v. Owens-Corning Fiberglas Corp.,
  646 F. Supp. 1486 (E.D.N.Y. 1986)......................................................................... 11

Celle v. Barclays Bank,
  48 A.D.3d 301 (1st Dep't 2008)............................................................................... 10

Diamond Supply Co. v. Prudential Paper Prod. Co.,
  589 F. Supp. 470 (S.D.N.Y. 1984)........................................................................... 16

Furniture Consultants, Inc. v. Acme Steel Door Corp.,
  240 A.D.2d 180 (1st Dep't 1997)............................................................................. 13

*Greenberg v. Chrust,*
   198 F. Supp. 2d 578 (S.D.N.Y. 2002) ..................................................... 11

*Kitty Walk Systems, Inc. v. Midnight Pass Inc.,*
   431 F. Supp. 2d 306 (E.D.N.Y. 2006) ..................................................... 17

*Krasnyi Oktyabr, Inc. v. Trilini Imports,*
   578 F. Supp. 2d 455 (E.D.N.Y. 2008) ....................................... 18, 18 n.6

*New York Racing Ass'n, Inc. v. Meganews, Inc.,*
   No. 97 CV 1091(SJ), 2000 WL 307378 (E.D.N.Y. Mar. 21, 2000) ......... 10

*Peters Griffin Woodward, Inc. v. WCSC, Inc.,*
   88 A.D.2d 883 (1st Dep't 1982) ............................................................. 15

*Plair v. City of N.Y.,*
   789 F. Supp. 2d 459 (S.D.N.Y. 2011) ...................................................8-9

*Polymer Tech. Corp. v. Mimran,*
   975 F.2d 58 (2d Cir 1992) ............................................................... 16, 17

*Prestonettes, Inc. v. Coty,*
   264 U.S. 359 (1924) ............................................................................... 17

*Shmueli v. Corcoran Group,*
   9 Misc.3d 589 (Sup. Ct. N.Y. Co. 2005) ................................................ 15

*Sporty's Farm LLC v. Sportman's Market, Inc.,*
   202 F.3d 489 (2d Cir. 2000) ...............................................................18-19

*Strojmaterialintorg v. Russian Am. Commercial Corp.,*
   815 F. Supp. 103 (E.D.N.Y. 1993) ............................................. 15, 21, 22

*TechnoMarine SA v. Jacob Time, Inc.,*
   No. 12 Civ. 0790 (KBF), 2012 WL 2497276 (S.D.N.Y. June 22, 2012)............17-18

*Unitel Telecard Distrib. Corp. v. Nunez,*
   90 A.D.3d 568 (1st Dep't 2011) ............................................................. 12

*Visual Arts v. Kuprewicz,*
   3 Misc.3d 278 (Sup. Ct. N.Y. Co. 2003) ................................................ 12

*Walkovsky v. Carlton,*
   18 N.Y.2d 414 (1966) ............................................................................ 21

**Statutes**

15 U.S.C. § 1125(d) ................................................................................................ 18

**Rules**

Fed. R. Civ. P. 9(b) and 12(b)(6) ............................................................................ 1

iv

Plaintiff/Counterclaim-Defendant Shetel Industries LLC ("Shetel") and Third-Party Defendants Markus Weitz ("Weitz") and Osseogroup LLC ("Osseogroup") respectfully submit this memorandum of law in support of their motion (the "Motion"), pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), to: (a) dismiss 23 of the 27 Counterclaims asserted against Shetel (all except for the First, Fifth, Eighteenth and Twenty-Second Counterclaims); and (b) dismiss the Third-Party Complaint against Weitz and Osseogroup, in its entirety.

## PRELIMINARY STATEMENT

Defendants have attempted to make this litigation complex and confusing by filing <u>47</u> counterclaims and third-party claims. The purpose of this motion is to streamline the case down to the actual claims in dispute and the actual parties.

Defendants have attempted to destroy Shetel's business through theft and misuse of trade secrets after Shetel refused to sell its business to them. Two of the Defendants previously had business dealings with Shetel (one as a supplier and one as an employee) and have counterclaimed alleging breaches of their respective contracts. Shetel will disprove those contract claims on the merits, but does not object to their presence in the litigation (nor the presence of two other counterclaims largely derivative of the contract claims). It is the gratuitous inflation from four claims to 47 that this motion addresses.

The additional 43 claims that fail to state valid causes of action primarily arise from three different well-known (and judicially rejected) pleading tricks, individually or in combination. First, Defendants try to transform straightforward contract claims into a wide array of tort and quasi-contract claims ranging from negligent misrepresentation to unjust enrichment. Second,

Defendants try to turn newly-acquired federal trademark registrations[1] into something the courts uniformly recognize that they are not, i.e. a club to forbid other businesses from selling genuine trademarked goods.

Finally, Defendants try to drag additional parties into this dispute, primarily by asserting individual liability claims against Shetel's co-principal, Weitz, in a cynical attempt to gratuitously personalize a business dispute. Defendants knew at all times that they were doing business with Shetel as an entity—not Weitz as an individual—and Weitz is not alleged to have ever acted individually outside the scope of his role as a principal and agent of Shetel. Further, Defendants have failed to plead any facts that could give rise to a veil-piercing claim or any other valid basis to impose individual liability on Weitz.

As detailed below, 23 of the 27 Counterclaims and all 20 claims in the Third-Party Complaint lack merit on the face of the pleadings and should be dismissed. Clearing them away will allow the parties and the Court to proceed efficiently toward a just and appropriate resolution of the much more limited claims and defenses actually necessary and relevant to the parties' dispute.

## RELEVANT FACTUAL ALLEGATIONS

**A. The Parties**

Plaintiff Shetel is a distributor of dental implants and related products in the United States. AC ¶ 16; CC ¶¶ 8-9.[2] Defendant Adin Dental Implant Systems, Inc. ("Adin") is an

---

[1] For the purposes of this motion only, and without prejudice or waiver, movants assume the validity of Adin's purported trademarks.

[2] Plaintiff's Amended Complaint ("AC") is docket item 7 and is attached for the Court's convenience as Exhibit A to the Declaration of Jason Levin ("Levin Decl.") submitted herewith. Defendants' Counterclaims ("CC") and Third-Party Complaint ("TPC"), each with its own separate numbering of paragraphs, were filed as a single document together with Defendants'

Israel-based manufacturer of dental implants and related products. CC ¶ 15. Prior to 2012, Adin had virtually no sales or business activity in the United States. AC ¶ 2 (and Defendants' answer thereto). Adin turned to Shetel to help "penetrate" the United States market. AC ¶ 22 (and Defendants' answer thereto). From 2012 to 2016, Shetel served as the exclusive United States distributor for Adin. CC ¶¶ 25, 79. During that time, Shetel was often referred to by the parties as "Adin USA." (e.g., CC, Ex. A).

All parties agree that despite numerous proposals, counter-proposals and discussions over the years, the business arrangements between Adin and Shetel were never reduced to a single integrated written contract. The parties also agree that Adin repeatedly attempted to purchase Shetel's business, but a final agreement was never reached. AC ¶ 2 (and Defendants' answer thereto); CC ¶¶ 80, 81.

After the business relationship between Adin and Shetel soured in 2016, Adin founded a United States subsidiary, defendant Adin Dental Solutions USA, Inc. ("Adin Newco"). AC ¶ 43 (and Defendants' answer thereto). Adin and Adin Newco hired defendant Jeremy Danzer ("Danzer"), who previously worked for Shetel (CC ¶¶ 99, 109), to distribute Adin products in the United States.

Third-Party Defendant Weitz is one of the two principals of Shetel, along with non-party Jeremy Frenkel. CC ¶¶ 98, 105. Weitz is also a principal of Osseogroup, a company that was incorporated in March 2016. CC ¶¶ 5-6.

---

answer to the Amended Complaint as docket item 9, which is attached as Exhibit B to the Levin Decl. The well-pled factual allegations in the Counterclaims and the Third-Party Complaint are treated as true for the purposes of this motion only. Allegations in the Amended Complaint, to the extent not admitted in Defendants' Answer, may not be entitled to the same treatment for purposes of this motion, but are referenced here not for their truth but to give the Court a full sense of the context in which the allegations of the Counterclaims and the Third-Party Complaint are being made.

**B.    Shetel Commences this Action After Defendants Steal its Business**

During its unsuccessful attempts to purchase Shetel's business, Adin repeatedly expressed keen interest in acquiring Shetel's confidential, proprietary and trade secret information, including customer information, order history, and sales terms.  AC ¶ 29.  Shetel repeatedly declined to provide Adin with that information prior to executing a definitive contract, which never occurred.  *Id.*  Undeterred, Adin secretly enlisted Danzer, then an Executive Director at Shetel, to steal the information from Shetel and use it to build a competing business.  AC ¶¶ 32-33.  By the time Danzer's employment with Shetel ended in July 2016 and his access to his work email was cut off by changing the password, Danzer was already in discussions with Adin.  AC ¶¶ 34-35.

Approximately six weeks after his termination, Danzer hacked into his former Shetel email account despite the password having been changed.  AC ¶ 36.  Danzer sent eighteen emails from that account to his personal email account, which collectively contained some of Shetel's most competitively-sensitive proprietary information, including information related to customers with whom Danzer had not personally worked.  AC ¶¶ 36-37.

The very next day, September 14, 2016, Adin Newco was incorporated to carry out Defendants' scheme to take away Shetel's business by using the stolen information.  AC ¶ 43.  Adin Newco formally hired Danzer as its regional sales director and Defendants proceeded to use the stolen information to contact Shetel's customers and try to convince them to stop doing business with Shetel and start doing business with them.  AC ¶ 44.  Danzer also helped Adin and/or Adin Newco hire several other employees away from Shetel, in violation of restrictive covenants (of which Danzer was aware) contained in their employment contracts with Shetel.  AC ¶¶ 25-27, 46-47.  After Defendants doubled down by falsely telling multiple Shetel

4

customers that Shetel was out of business altogether (AC ¶¶ 49-57), Shetel had no alternative but to institute a lawsuit to protect its business from destruction.

## C.     Defendants Respond With 47 Counterclaims and Third-Party Claims

Shetel's entire Amended Complaint is 23 pages long and asserts nine separate causes of action.  Defendants' Counterclaims and Third-Party Complaint, by contrast (not counting the 33 pages devoted to answering the complaint and asserting 36 purported affirmative defenses), are over 80 pages long and assert 47 separate causes of action.

The Third-Party Complaint is based on no independent factual allegations of its own. Rather, it simply incorporates by reference (at ¶ 14) the allegations on which the Counterclaims are based, and recycles 20 of the 27 Counterclaims against Shetel by seeking to assert them against Weitz individually (and, in some instances, Osseogroup).  Given the substantial duplication between the Counterclaims and the Third-Party Complaint, we attach for the Court's convenience as Exhibit C to the Levin Decl. a chart showing which cause of action in the Third-Party Complaint corresponds to which Counterclaim.  Moreover, the bulk of the pleading's length is not so much its substantive factual allegations but the boilerplate verbiage in the extraordinarily large number of duplicative causes of action that are all purportedly premised on the same alleged facts.

Adin's (and, to the extent relevant, Adin Newco's) substantive allegations are contained in paragraphs 15-89 of the Counterclaim.[3]  Those allegations confirm that Shetel served as Adin's exclusive US distributor through 2016 and that, despite discussions over the years, no formal integrated written contract setting forth the distributorship arrangement was ever agreed

---

[3] Adin Newco joins in some, but not all, of Adin's claims.  Since Adin Newco cannot succeed on any claim that does not state a claim upon which relief could be granted to Adin, we will refer solely to Adin in the balance of this memorandum, in order to simplify the presentation.

to. CC ¶ 41. Adin acknowledges that negotiations took place over a potential purchase by Adin of Shetel, and acknowledges that no such deal was ever reached. CC ¶¶ 80-81. Adin alleges that Shetel was over the years variously late on paying for goods Adin had supplied, owed more money to Adin than the maximum of amount of credit Adin had agreed to extend it, and failed to fully and timely report its sales of Adin-supplied goods. CC ¶ 67. Adin states that it terminated Shetel's status as its exclusive distributor on or about September 21, 2016, and that Shetel has not yet paid it the balance allegedly due for products Adin sold Shetel prior to that date. CC ¶¶ 75, 79. Adin states it repeatedly demanded that Shetel "cease and desist marketing and selling Adin products" (CC ¶ 85) but that Shetel did not do so.

Adin also claims that Shetel has refused to "cease … holding itself out as a distributor of Adin products, and using Adin's trademarks." CC ¶ 88. No allegation is made that Shetel has, post-termination, ever "held itself out" as Adin's *exclusive* U.S. distributor, or an *authorized* distributor, or that it has in any way acted as a "distributor" other than by continuing to sell genuine Adin-manufactured goods bearing Adin's trademarks to customers willing to buy them. Nor is any allegation made that Shetel has "used" Adin's trademarks other than by continuing to sell genuine Adin-manufactured goods bearing Adin's trademarks. Adin does not point to any contractual commitment by Shetel to refrain from selling genuine Adin-manufactured goods bearing Adin's trademarks after the end of the exclusive-distributor relationship.

Adin separately alleges that Shetel registered the website URL [www.adinimplants.com](www.adinimplants.com) in 2010 (CC ¶ 171) and used that domain throughout the parties' business relationship (with Adin's knowledge and acquiescence), but refused to turn over the website URL to Adin after the parties' exclusive distributor relationship ceased (CC ¶¶ 174-177). However, Adin attaches to its pleading as Exhibit C a July 26, 2014 email that Adin claims is part of the agreements between

6

the parties. CC ¶¶ 48-51, 117-118. In that email, Shetel wrote: "We own our phone number and our website" and Adin wrote: "Agreed." CC ¶ 49 and Exhibit C, ¶ 8. Adin does not allege that the parties modified this agreement. Adin alleges that it demanded that Shetel stop using the domain name (CC ¶¶ 176-177), and that Shetel changed the URL so it would not lead to an active website, but instead to a 404 "Not Found" error message (CC ¶ 180).

Danzer's allegations are found in paragraphs 92-112 of the Counterclaims. He claims that he was induced to come work for Shetel in 2012 on terms that included a salary, commissions, and certain fringe benefits such as insurance and 401k contributions that he never received. CC ¶ 98. Danzer alleges that following his termination in July 2016 he did not receive all commissions he was due. CC ¶ 111. Danzer does not identify the amount of commissions he is supposedly owed or the sales that supposedly triggered the commissions. Nor does he allege any pre-litigation demand for such amounts that was refused. Nor does he explain why he apparently worked without protest for over four years without the insurance and other fringe benefits he had allegedly been promised at the outset of his employment.

Danzer does not dispute that he never had a written employment contract with Shetel. He claims that the only time a written contract was tendered to him he refused to sign it because it contained a non-compete provision not to his liking. CC ¶¶ 104-07. He does not allege that he objected to the tendered contract because it failed to acknowledge the fringe benefits he claims to have been promised years earlier, nor does he allege that he objected to the tendered contract because it failed to set forth the formula for his commissions that he now claims should have been reduced to writing.

Danzer claims that when Shetel hired him in 2012, he brought with him customer lists (in the form of business cards and spreadsheets) and training materials from his previous experience

7

selling dental products and that Shetel benefited economically from this information.  CC ¶¶ 100-01.  Danzer claims that after his termination Shetel "retained" the customer lists he brought with him in 2012.  CC ¶ 110.  He does not allege that he does not have his own copies of the list, that Shetel ever agreed contractually to stop using such list if Danzer ceased to be employed there, or that Shetel ever agreed contractually to stop doing business with customers Danzer might have introduced to Shetel.

Importantly, neither Adin nor Danzer alleges any actions by Weitz acting on his own behalf rather than as a principal or agent of Shetel.  Nor are any specific facts pled regarding a disregard of corporate formalities or any other actions inconsistent with the ordinary behavior of a principal or agent of a limited liability company.  Further, Defendants do not allege that a personal guarantee by Weitz of Shetel's contractual obligations to either Adin or Danzer was ever requested or discussed, much less agreed to.

## ARGUMENT

The 12(b)(6) standard is well-established.  To survive a motion to dismiss, a pleading "must contain 'enough facts to state a claim to relief that is plausible on its face.'"  *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is "plausible" when it "'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Neither "naked assertions" nor "conclusory statements" can substitute for the absence of the required factual allegations.  *Id*. (quotations and citations omitted).  It is thus not sufficient to survive dismissal to merely recite the boilerplate formula for liability under a particular legal theory without alleging specific factual detail that supports a reasonable inference that the defendants' acts and omissions fit that theory.  *Plair v.*

8

*City of N.Y.*, 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011) (collecting cases). Nor can a claim that fails to meet the *Twombly/Iqbal* standard be allowed to proceed in the hope that facts might surface in discovery that would allow it to be fleshed out. *Biro*, 807 F.3d at 546.

## I. DEFENDANTS CANNOT BOOTSTRAP THEIR BREACH OF CONTRACT CLAIMS INTO TORT OR QUASI-CONTRACT CLAIMS

### A. Adin's Claims

In its First Counterclaim, Adin alleges that Shetel breached the parties' contracts by, among other things: failing to pay Adin for products; failing to report sales of implants and accessories to Adin; failing to meet minimum purchase volumes; failing to expend the time, money and effort necessary to expand Plaintiff's sales and marketing activities throughout the United States; and after termination of the agreements, continuing to use the Adin Marks in connection with the sale, offering for sale, distribution and/or advertising of goods and services. CC ¶¶ 115-121.

Shetel denies liability on Adin's First Counterclaim for breach of contract. Further, even if Adin prevailed on all or a portion of this claim, the total amount in dispute ($490,000 based on Adin's fuzzy math) is substantially less than the damage caused to Shetel by Adin through its theft of trade secrets and other misconduct addressed in the Amended Complaint. Nonetheless, for Rule 12(b)(6) purposes, Shetel does not seek dismissal of the First Counterclaim for breach of contract, but will at the appropriate time join issue and defend that claim on the merits.

However, Adin has engaged in the common stratagem of trying to transform a bare contract claim into a dizzying array of tort and quasi-contract claims. This stratagem is often

tried by desperate litigants and equally often rejected by the courts. Here, virtually all of Adin's non-contract claims fail under well-established New York precedent.[4]

For example, Adin's promissory estoppel claims (the Second Counterclaim and Third TPC claim) are impermissibly duplicative of the breach of contract claim. The "promises" allegedly relied on (CC ¶ 127, TPC ¶ 34) are nothing more than Adin's characterization of the terms of the parties' agreements and Shetel's alleged breach of those terms. These claims should be dismissed because Adin does not allege a "legal duty independent of the contract … one arising out of circumstances extraneous to, and not constituting elements of the contract itself." *Brown v. Brown*, 12 A.D.3d 176, 176 (1st Dep't 2004) (affirming dismissal of promissory estoppel claim); *Celle v. Barclays Bank*, 48 A.D.3d 301, 303 (1st Dep't 2008) (likewise affirming dismissal because "[i]n the absence of a duty independent of the agreement, the promissory estoppel claim was duplicative of the breach of contract claim").

Adin's fraud theory (the Third Counterclaim and First TPC claim) is largely an insinuation that Shetel was not honest when it originally agreed to live up to its contractual obligations to Adin. Such claims are inevitably rejected because they are duplicative of the contract claim and because alleged misstatements of future intention to perform the contract are not the sort of misrepresentations of present material fact collateral to the contract that a fraud claim requires. *See, e.g., Beta Holdings, Inc. v. Goldsmith,* 120 A.D.3d 1022, 1023 (1st Dep't 2014); *New York Racing Ass'n, Inc. v. Meganews, Inc.*, No. 97 CV 1091(SJ), 2000 WL 307378 (E.D.N.Y. Mar. 21, 2000) (dismissing fraud and conversion claims that did not allege conduct collateral or extraneous to the contract, and were reducible to nonperformance or poor

---

[4] Whether all or merely most of Adin's conversion theory (the Fifth Counterclaim) is impermissibly duplicative of the contract claim may be subject to dispute, so Shetel is not moving against that counterclaim at present, while reserving all of its rights.

performance of the contract); *Carlucci v. Owens-Corning Fiberglas Corp.,* 646 F. Supp. 1486, 1491 (E.D.N.Y. 1986) ("a claim predicated upon a breach of a contractual arrangement cannot be converted into a fraud claim simply by allegations that a defendant never intended to adhere to its obligations under the agreement").

To the extent Adin even attempts to allege any such "collateral" representations, it does *not* actually allege that they were false when made, contending for example (CC ¶ 136, emphasis added) that Adin and Weitz "*either* lacked sufficient connections, funds, time and effort to develop" the business as promised *or* (after the fact) "did not use sufficient connections, funds, time and effort to develop" that business. Indeed, there is not even an allegation that Adin or Weitz had planned, at the time these alleged representations were made, not to follow through, only that they (allegedly) did not, after the fact, follow through. This is not a "plausible" fraud claim; it is not even an implausible one.

Adin's negligent misrepresentation claims (the Fourth Counterclaim and Second TPC claim) likewise must be dismissed for failure to allege a false representation of present fact, without even addressing the lack of a plausible basis for the requisite "special relationship." *See Greenberg v. Chrust*, 198 F. Supp. 2d 578, 584-85 (S.D.N.Y. 2002) (dismissing negligent misrepresentation claim where the alleged misrepresentations concerned promises to raise money and build a business rather than misrepresentations of present fact, and no facts were alleged supporting the existence of the "special relationship" required by New York law).

Adin's unjust enrichment claims (the Thirteenth Counterclaim and Eleventh TPC claim) are premised on, for example, the allegations that (CC ¶ 214) Shetel "received the benefit of credit and goods advanced without repaying same" and Shetel used the Adin Marks without permission. This is thus yet another impermissible repackaging of the contract claim. *See*

11

*Bettan v. Geico Gen. Ins. Co.*, 296 A.D.2d 469, 470 (2d Dep't 2002) (dismissing unjust

enrichment claim as duplicative of contract claim); *Allenby, LLC v. Credit Suisse, AG*, 134

A.D.3d 577, 579 (1st Dep't 2015) ("The unjust enrichment claim was correctly dismissed

because there are express contracts governing the subject of that claim."); *Clark-Fitzpatrick v.*

*Long Island R. R. Co.,* 70 N.Y.2d 382, 388 (1987) (valid contract "precludes recovery in quasi

contract for events arising out of the same subject matter").

Adin's trespass-to-chattels claim (Fifteenth Counterclaim) goes totally unexplained.  The

crucial element of such a claim would be an allegation that Shetel "intentionally, and without

justification or consent, physically interfered with the use and enjoyment of personal property in

[Adin's] possession." *Visual Arts v. Kuprewicz*, 3 Misc.3d 278, 281 (Sup. Ct. N.Y. Co. 2003).

No such physical interference by Shetel with any property in Adin's possession is alleged

anywhere in the pleading.  Similarly, Adin fails to allege that Shetel's alleged interference

resulted in harm to Adin's "materially valuable interest in the physical condition, quality or value

of the chattel" or that Adin was "deprived of the use of the chattel for a substantial time.  *Id.*

(citations omitted).

Adin's accounting claim (Seventeenth Counterclaim) seeks an equitable remedy for

which "a claimant must demonstrate that he or she has no adequate remedy at law."  *Unitel*

*Telecard Distrib. Corp. v. Nunez*, 90 A.D.3d 568, 569 (1st Dep't 2011).  No facts plausibly

supporting such an allegation are made here.  Although Adin claims that it has no adequate

remedy at law (CC ¶ 242), it does not explain why monetary damages would be inadequate.  To

the contrary, if Adin prevails on its breach of contract claim, it would be entitled to recover the

money it proves Shetel owes to it.  Moreover, no facts are pled that support Adin's conclusory

assertion (CC ¶ 235) that Shetel was its fiduciary, another necessary element of an accounting

claim.  That Shetel "repeatedly represented to the public that it was Adin's corporate entity in the United States" (*id.*) is nothing more than a rephrasing of the undisputed fact that Shetel was Adin's U.S. distributor.  But a manufacturer-distributor relationship is not presumptively a fiduciary one, and no facts are alleged that make any other conclusion plausible here.  *See ARA Auto Group v. Cent. Garage, Inc.*, 124 F.3d 720, 726 (5th Cir. 1997) (noting that neither parties' briefing or the court's own research had found a case finding a distributor to be a manufacturer's fiduciary and "We decline to be the first"); *Furniture Consultants, Inc. v. Acme Steel Door Corp.*, 240 A.D.2d 180, 180 (1st Dep't 1997) (dismissing breach of fiduciary duty claim in the distributor/manufacturer context because their dealings were arms-length).

### B.    Danzer's Claims

In the Eighteenth Counterclaim, Danzer alleges that Shetel breached oral promises to pay him commissions, provide health and dental insurance, make matching contributions to his 401k account, and provide him with ownership of a percentage of Shetel's stock.  CC ¶¶ 245-47.

Shetel denies liability on Danzer's Eighteenth Counterclaim for breach of contract. Nonetheless, for Rule 12(b)(6) purposes, Shetel does not seek dismissal of this claim, but will at the appropriate time join issue and defend the claim on the merits.  To the extent the Twenty-Second Counterclaim simply recasts a portion of the contract claim as a statutory claim under New York Labor Law, Shetel will likewise defend that on the merits.[5]

---

[5] Shetel does seek dismissal of the Twenty-Second Counterclaim to the extent it seeks additional statutory damages for alleged wilfullness and lack of good faith.  Especially given Danzer's conspicuous failure to allege any pre-litigation demand for unpaid compensation to draw Shetel's attention to any alleged miscalculation of commissions due, no facts have been alleged that make the conclusory allegation about Shetel's culpable state of mind "plausible," and state-of-mind elements are equally subject to the *Twombly/Iqbal* plausibility standard.  *Biro*, 807 F.3d at 545.

But Danzer's attempt to go beyond that and conjure up multiple torts and quasi-contract claims fails for the reasons already given. For example, the "misrepresentations" alleged (CC ¶¶ 276, 283) in Danzer's fraud and negligent misrepresentation claims (the Twenty-Third and Twenty-Fourth Counterclaims and the Fifteenth and Sixteenth TPC claims) and the "promises" alleged (CC ¶ 253) in his promissory estoppel claims (the Nineteenth Counterclaim and the Fourteenth TPC claim) are all identical to the "contractual terms" alleged in paragraphs 245-47 in the contract counterclaim. Similarly, Danzer's unjust enrichment claims (the Twenty-First Counterclaim and the Seventeenth TPC claim) are premised entirely (CC ¶ 264; TPC ¶ 134) on Shetel's alleged failure to honor those same contractual terms, and the quantum meruit claim (the Twentieth Counterclaim), which is simply the application of unjust enrichment to the employment context, is based (CC ¶ 259) on Danzer's purported "reasonable expectation" that those same alleged contractual terms would be honored.

However, fraud, negligent misrepresentation, promissory estoppel, unjust enrichment and quantum meruit claims cannot properly be based on the same allegations underlying a breach of contract claim. *See* Argument I.A., *supra*, at pp. 9-13.

Danzer's accounting claim (the Twenty-Seventh Counterclaim) also fails for the reasons given above. Danzer does not even purport to allege that Shetel owed him any fiduciary duties. Danzer's trespass to chattels claim (the Twenty-Sixth Counterclaim) likewise fails for the reasons given above – he simply does not plead any chattels in his possession that Shetel interfered with. Nor does his conversion claim (the Twenty-Fifth Counterclaim) fare any better. It is at least in part duplicative of his contract claim insofar as it seeks payment of money allegedly due him as commissions or otherwise (CC ¶ 288). "Under New York law, 'an action for conversion cannot be validly maintained where damages are merely being sought for breach

14

of contract.'" *Strojmaterialintorg v. Russian Am. Commercial Corp.*, 815 F. Supp. 103, 106

(E.D.N.Y. 1993) (*quoting Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d 883 (1st

Dep't 1982)). In addition, Danzer fails to allege "specific and identifiable funds" and instead

simply alleges that he is owed "fees, reimbursement or commissions from various sales" (CC ¶

288), which is independently a fatal flaw in a conversion claim even if an "actionable wrong

other than a breach of contract" had been alleged. *See Cal Distributor, Inc. v. Cadbury

Schweppes Americas Beverages, Inc.*, No. 06 Civ. 0496 (RMB), 2007 WL 54534, *11 (S.D.N.Y.

Jan. 5, 2007).

     Nor does Danzer fare any better by claiming that Shetel has "converted" the customer list

(business cards) he brought with him when he was hired. Nowhere does Danzer allege that

because Shetel "retained" this information he does not have his own copy. The leading case

holding that a customer list being withheld from a plaintiff on a computer system to which the

plaintiff no longer has access may give rise to a conversion claim, *Shmueli v. Corcoran Group*, 9

Misc.3d 589 (Sup. Ct. N.Y. Co. 2005), involved a situation where plaintiff did not have her own

copy of the customer list and, furthermore, where plaintiff was an independent contractor using

defendant's office space for convenience rather than (like Danzer) an employee. Nothing in

*Shmueli* suggests that it would have been a tort for Corcoran to have retained its own copy of the

customer list relating to transactions entered into while plaintiff was associated with Corcoran.

     Moreover, Danzer does not allege that Shetel is under any legal duty, contractual or

otherwise, to refrain from making business use of the customer list Danzer claims to have shared

with it once Danzer ceased to be its employee. Such a "reverse non-compete" agreement,

barring an employer from doing business with its own customers if its former employee had

worked on the relevant accounts and/or initially developed the relationship with such customers,

would be extraordinarily unusual, perhaps unprecedented, in an employer-employee relationship, and unsurprisingly no facts have been alleged that permit a "plausible" inference that any such agreement was made here.

## II.   THE ALLEGEDLY UNAUTHORIZED SALE OF GENUINE ADIN PRODUCTS CANNOT GIVE RISE TO A TRADEMARK INFRINGEMENT OR UNFAIR COMPETITION CLAIM

Adin asserts numerous liability theories based on trademark infringement or similar statutory claims under the Lanham Act (the Sixth and Seventh Counterclaims and the Fourth and Fifth TPC claims) and New York's General Business Law (the Ninth, Tenth, Eleventh, and Twelfth Counterclaims and the Seventh, Eighth, Ninth, and Tenth TPC claims). Two more common law claims for tortious interference with prospective business advantage and unfair competition are based on the same allegations (the Fourteenth and Sixteenth Counterclaims and the Twelfth and Thirteenth TPC claims). But nowhere are there any factual allegations to support any of these theories of trademark infringement, false designation of origin, etc., other than the allegation that Shetel continued to sell genuine Adin-branded products after Adin purported to tell it not to.

But "[a]s a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner. … Thus, a distributor who resells trademarked goods without change is not liable for trademark infringement." *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir 1992). This is because the sale of genuine goods, whether or not authorized, does not cause confusion or involve deception. *Diamond Supply Co. v. Prudential Paper Prod. Co.*, 589 F. Supp. 470, 475 (S.D.N.Y. 1984).

16

In *Kitty Walk Systems, Inc. v. Midnight Pass Inc.,* 431 F. Supp. 2d 306, 309-10 (E.D.N.Y. 2006) (Wexler, J.), this Court dismissed trademark infringement claims relating to genuine goods at the pleading stage, explaining:

> A Lanham Act claim does not generally lie following the unauthorized sale of genuine goods. *Polymer Tech. Corp. v. Mimran,* 975 F.2d 58, 61–62 (2d Cir.1992). Instead, success on such a claim requires a showing that customers will be misled or confused as to the source of goods purchased. *Polymer,* 975 F.2d at 63. Such confusion occurs when a consumer purchases goods on the mistaken belief that the goods are those of a competitor. Here, there is no question but that any goods purchased are precisely what they purport to be—the only question is which party has the right to sell products and the apportionment of any profit. As such, this case is not one of consumer confusion that can be relied upon to support a Lanham Act claim, but a case alleging breach of contract as to authentic goods. Under these circumstances, no claim for trademark or copyright infringement or unfair competition will lie.

Indeed, the purpose of the Lanham Act is to protect customers from being misled, and a customer who is being sold a genuine trademarked good is not misled whether or not the mark owner has specifically blessed the sale. And anyone selling genuine trademarked goods may refer to the mark or brand name as a way of truthfully informing customers what is being sold. As the Supreme Court put it almost a century ago, "When the mark is used [without authorization from its owner] in a way that does not deceive the public, we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo." *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924).

Defendants' conclusory allegation that Shetel continues to use the Adin Marks "and/or counterfeits, copies, reproductions, or colorable imitations thereof" (CC ¶¶ 119-120, 155, 157, 163; TPC ¶¶ 40, 42, 48) is insufficient as a matter of law to survive dismissal. Absent specific factual allegations (versus conclusory assertions) to permit a reasonable inference that the products at issue are counterfeit, non-genuine or are likely to cause confusion as to their source or affiliation, the claims must be dismissed. *TechnoMarine SA v. Jacob Time, Inc.,* No. 12 Civ.

17

0790 (KBF), 2012 WL 2497276, at *4 (S.D.N.Y. June 22, 2012) (dismissing Lanham Act claims relating to goods that "may" be counterfeit because "[i]t is equally plausible that defendant…lawfully acquired the [products] and is simply reselling them, as it has a right to do. That might not be the transactional path envisioned by plaintiff, but such a scenario is not necessarily or even evidently unlawful.").

Similarly, the unauthorized sale of genuine trademarked goods that do not differ in quality from those sold through authorized channels does not create any likelihood of consumer confusion as to the ultimate nature, quality, and source of the goods, and thus does not constitute a violation of the General Business Law or common law unfair competition. *Krasnyi Oktyabr, Inc. v. Trilini Imports*, 578 F. Supp. 2d 455, 470-71 (E.D.N.Y. 2008).[6] Judge Trager in that case likewise held that selling genuine trademark goods to prospective clients at lower prices was not tortious interference with prospective business relations, even if it cost the mark owner's authorized distributor potential sales. *Id*. at 471-72.

## III. THE "CYBERSQUATTING" CLAIMS CONTRADICT DEFENDANTS' PLEADING AND NO FACTS ARE ALLEGED TO SUPPORT THE CLAIMS

The Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), was enacted in 1999 to protect consumers and holders of distinctive trademarks from "cybersquatting," which "involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners." *Sporty's Farm LLC v. Sportman's*

---

[6] *Krasnyi Oktyabr* involved the same sections (349, 350, and 360-1) of the General Business Law that are invoked in three of Adin's GBL claims here. The other section invoked by Adin (133) applies only to deceptive use of another's name or mark in a trade name. There are no factual allegations that Shetel has continued to use "Adin" as part of any d/b/a name after the end of the exclusive distributor relationship, so that section cannot help Adin.

*Market, Inc.*, 202 F.3d 489, 493 (2d Cir. 2000).  The elements of a statutory cybersquatting claim are that (1) the claimant's trademark was "famous" or at a minimum distinctive at the time the domain name was registered; (2) the allegedly infringing domain name is identical or confusingly similar to that mark; and (3) the infringer has registered, trafficked in, or used the domain name with "a bad faith intent to profit from that mark."  *Id.*, 202 F.3d at 496.

As a preliminary matter, Adin's cybersquatting claims (the Eighth Counterclaim and Sixth TPC claim) are materially contradicted by Adin's own pleading and should be dismissed. Adin attaches to its pleading as Exhibit C a July 26, 2014 email between Adin and Shetel, which Adin alleges is part of the "agreements" between the parties.  CC ¶¶ 48-51 and Exhibit C.  In that email, Shetel wrote: "We own our phone number and our website" and Adin wrote: "Agreed." CC ¶ 49 and Exhibit C, ¶ 8.  To drive the point home, Shetel further wrote: "We all agreed that I own Adinimplants.com, not Adin Israel and that Adin Israel owns the trademark of their name." *Id.*  Having agreed in 2014 that Shetel owns its own website, www.adinimplants.com, Adin should not be permitted to completely reverse course and now claim that Shetel's use of that website constitutes cybersquatting or is otherwise actionable.

Separately, the cybersquatting claims should be dismissed because the first and third elements are insufficiently pled.  No allegation is made that the "Adin" brand had any recognition at all in the United States when Shetel registered the www.adinimplants.com URL in 2010 (CC ¶ 171).  Indeed, at that time Adin had no or virtually no sales or business activity in the United States.  AC ¶ 2 (and Defendants' answer thereto).  Adin also admits that it did not seek to register any trademarks in the United States until 2016 and in doing so claimed a "priority date" for the marks only dating back to 2015.  CC ¶¶ 90-91.

Nor has bad faith been adequately pled. It is undisputed that Shetel used the URL for several years with Adin's full knowledge and consent, and a defendant's "prior use … of the domain name in connection with the bona fide offering of any goods or services," is one of the statutory factors enumerated in section 1125(d)(1)(B)(i) that cuts against any inference of bad faith. Similarly, there is no allegation that Shetel made any offer to "transfer, sell, or otherwise assign the domain name to the mark owner … for financial gain without having used … the domain name in the bona fide offering of any goods or services," the statutory factor which is the classic hallmark of a bad-faith "cybersquatter." Nor do any of the other statutory factors support a plausible inference of bad faith here.[7]

Finally, Adin complains that Shetel has not complied with a demand to *transfer* to Adin the URL it had long operated with Adin's consent, but neither the cybersquatting statute nor any other source of law identified by Adin obligates Shetel, or anyone else, to do so.

## IV.    NO FACTS ARE ALLEGED THAT COULD SUPPORT ANY LIABILITY AGAINST WEITZ INDIVIDUALLY, ON A VEIL-PIERCING OR ANY OTHER THEORY

Weitz is named as a Third-Party Defendant in 17 of the 20 claims asserted in the Third-Party Complaint, but that pleading should be dismissed, in its entirety, for the reasons discussed above. Additionally, the Counterclaims and the Third-Party Complaint fail to adequately allege facts that give rise to veil piercing or any other theory of individual liability against Weitz.

---

[7] Again, under the *Twombly/Iqbal* standard, Adin must allege facts, not merely self-serving conclusions, that support a plausible inference of the requisite bad faith. *Biro*, 807 F.3d at 545. It has not done so.

The New York Court of Appeals has explained veil piercing as follows:

The law permits the incorporation of business for the very purpose of enabling its proprietors to escape personal liability but, manifestly, the privilege is not without its limits.  Broadly speaking, the courts will disregard the corporate form, or, to use accepted terminology, 'pierce the corporate veil', whenever necessary to prevent fraud or to achieve equity.  In determining whether liability should be extended to reach assets beyond those belonging to the corporation, we are guided, as Judge Cardozo noted, by general rules of agency.  <u>In other words, whenever anyone uses control of the corporation to further his own rather than the corporation's business, he will be liable for the corporation's acts upon the principle of Respondeat superior applicable even where the agent is a natural person.</u>

*Walkovsky v. Carlton,* 18 N.Y.2d 414, 417 (1966) (internal citations and quotations omitted)

(emphasis added).

Thus, in order to properly allege a cause of action against a shareholder or officer, "a plaintiff must do more than conclusorily state that the shareholder or officer exercises dominion and control over the corporation.  Rather, a plaintiff must allege specific facts showing that the shareholder or officer is doing business in his or her individual capacity without regard to corporate formality."  *Strojmaterialintorg v. Russian Am. Commercial Corp.*, 815 F. Supp. 103 (E.D.N.Y. 1993).  Such allegations could consist of, for example, "sufficiently particular(ized) statements" that the defendant is actually doing business in his individual capacity, shuttling his personal funds in and out of the corporation "without regard to formality and to suit [his] immediate convenience."  *Walkovsky*, 18 N.Y.2d at 420.

Here, Defendants do not even attempt to plead specific allegations regarding Weitz allegedly doing business for himself, allegedly disregarding Shetel's corporate form, or allegedly commingling personal and corporate assets.  In fact, Defendants readily concede that Weitz was acting "on behalf of Plaintiff" when he made the alleged "promises" for which they seek to sue him individually.  CC ¶¶ 52, 112.

Beyond that, Defendants merely assert various iterations of the same boilerplate conclusion that "Weitz exercised complete dominion and control over Shetel and used the corporation as an alter ego." *See* CC ¶¶ 6, 7, 24, 112; TPC ¶¶ 6, 7. Thus, just as in *Strojmaterialintorg*, "[t]he present complaint [] merely restates the appropriate legal standard to pierce the corporate veil and is absolutely devoid of any particularized allegation indicating how [defendant] disregarded the corporate formalities." 815 F.Supp. at 105 (dismissing veil-piercing claims).

Finally, "[a] corporate officer acting in his official capacity is not personally liable for the corporation's breach of a contract." *B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474 (S.D.N.Y. 2010) (granting motion to dismiss all individual claims). Here, even assuming any contracts were breached, Defendants do not allege that Weitz acted outside the scope of his authority as an agent or principal of Shetel or, for that matter, Osseogroup. Thus, the Court should reject Defendants' after-the-fact attempt to get a de facto personal guarantee of corporate allegations that they neither requested nor obtained while negotiating their respective agreements.[8]

## V. NO FACTS ARE ALLEGED THAT COULD SUPPORT ANY LIABILITY AGAINST OSSEOGROUP

The only factual allegation specific to Osseogroup is that the www.adinimplants.com URL, after it stopped directing users to Shetel's website, redirected users to Osseogroup's website and later to a "Not Found" error message on Osseogroup's top-level domain name

---

[8] It appears from Defendants' pleading that Adin Newco (and not just Adin) is a Third-Party Plaintiff with respect to the First, Second and Third claims against Weitz in the Third-Party Complaint. *See* TPC ¶¶ 15, 22 and 33. However, those claims are based on events that allegedly took place several years prior to the incorporation of Adin Newco. Thus, Adin Newco cannot assert those three claims, which is an additional basis for their dismissal.

([www.osseogroup.com/aaa.html](www.osseogroup.com/aaa.html)).  CC ¶¶ 178-80; TPC ¶¶ 61-63.  For the reasons set forth above, these alleged acts do not constitute "cybersquatting" or any other act of infringement by Osseogroup.  Moreover, to the extent the Third-Party Complaint could be read to imply that Osseogroup has, like Shetel, sold genuine Adin-branded goods after the end of Shetel's tenure as exclusive distributor, that is neither trademark infringement nor any other statutory violation or tort for the reasons also set forth above.

## CONCLUSION

For the foregoing reasons, movants respectfully request that the Court grant their motion: (a) dismissing with prejudice 23 of the 27 Counterclaims asserted against Shetel (all except for the First, Fifth, Eighteenth and Twenty-Second Counterclaims); (b) dismissing with prejudice the Third-Party Complaint against Weitz and Osseogroup, in its entirety; and (c) for such other and further relief as this Court deems just and proper.


Dated: New York, New York
        January 4, 2018

                                    STORCH AMINI PC

                                    By:  _s/ Jason Levin_____
                                          Bijan Amini
                                          Jason Levin
                                          John W. Brewer
                                    Two Grand Central Tower, 25th Floor
                                    140 East 45th Street
                                    New York, NY  10017
                                    (212) 490-4100
                                    *Attorneys for Shetel Industries LLC,*
                                    *Osseogroup LLC and Markus Weitz*