UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
SHETEL INDUSTRIES LLC,

                Plaintiff,

 -against-

ADIN DENTAL IMPLANT SYSTEMS, INC.,
ADIN DENTAL SOLUTIONS USA, INC., and
JEREMY DANZER,

                Defendants.
-----------------------------------------------------------------x

17-CV-02505 (LDW) (ARL)

# REPLY MEMORANDUM OF LAW IN FURTHER
# SUPPORT OF MOTION TO DISMISS

**STORCH AMINI PC**
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
**Attorneys for Plaintiff, Counterclaim-Defendant
and Third-Party Defendants**

**TABLE OF CONTENTS**

|  |  | **PAGE** |
|---|---|---|
| I. | DEFENDANTS CANNOT BOOTSTRAP THEIR BREACH OF CONTRACT CLAIMS INTO TORT OR QUASI-CONTRACT CLAIMS | 1 |
| II. | THE SALE OF GENUINE ADIN PRODUCTS CANNOT GIVE RISE TO A TRADEMARK INFRINGEMENT OR UNFAIR COMPETITION CLAIM | 4 |
| III. | THE CYBERSQUATTING CAUSES OF ACTION FAIL TO STATE A CLAIM | 6 |
| IV. | NO BASIS IS ALLEGED FOR ANY LIABILITY AGAINST OSSEOGROUP | 7 |
| V. | WEITZ HAS NO INDIVIDUAL LIABILITY AND SHOULD BE DISMISSED | 8 |
| CONCLUSION | | 10 |

# **TABLE OF AUTHORITIES**

**Cases**                                                                        **Page(s)**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................. 3, 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................. 3, 10

*Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*,
448 F.3d 573 (2d Cir. 2006) ..................................................................................... 1, 2

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
70 N.Y.2d 382 (1987) .................................................................................................... 1

*Cyberchron Corp. v. Calldata Sys. Dev.*,
831 F. Supp. 94 (E.D.N.Y. 1993) ................................................................................. 2

*Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, 1:04-cv-04971-NG-MDG,
2006 WL 2802092 (E.D.N.Y. 2006) .......................................................................... 10

*First Bank of the Ams. v. Motor Car Funding, Inc.*,
257 A.D.2d 287 (1st Dep't 1999) ................................................................................. 3

*Fischer v. Forrest*, 14 Civ. 1304 (PAE)(AJP),
2017 WL 2992663 (S.D.N.Y. 2017) ............................................................................ 8

*Hwang v. Grace Road Church*,
No. 14-CV-7187 (KAM) (RML), 2016 WL 1060247 (E.D.N.Y. 2016) .................... 9

*Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*,
326 F.3d 687 (6th Cir. 2003) ........................................................................................ 8

*Kitty Walk Sys., Inc. v. Midnight Pass Inc.*,
431 F. Supp. 2d 306 (E.D.N.Y. 2006) ......................................................................... 4

*LC Footwear, LLC v. L.C. Licensing, Inc.*,
No. 651907/2010, 2011 WL 11085363 (Sup. Ct. N.Y. Co. 2011) ............................. 3

*Morales v. Grand Cru Assoc.*,
305 A.D.2d 647 (2d Dep't 2003) ................................................................................. 1

*Nagler v. Garcia*,
   370 Fed. Appx. 678 (6th Cir. 2010) .................................................................................... 8

*NCC Sunday Inserts, Inc. v. World Color Press, Inc.*,
   759 F. Supp. 1004 (S.D.N.Y. 1991) ..................................................................................... 2

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
   98 F.3d 2 (2d Cir. 1996) ....................................................................................................... 3

*Patmont Motor Werks, Inc. v. Gateway Marine, Inc.*,
   No. C96-2703, 1997 WL 811770 n.6 (N.D. Cal. 1997) ....................................................... 8

*Polymer Tech. Corp. v. Mimran*,
   975 F.2d 58 (2d Cir. 1992) ............................................................................................ 4, 5, 6

*Rolls-Royce Motor Cars, Inc. v. Schudroff*,
   929 F. Supp. 117 (S.D.N.Y. 1996) ..................................................................................... 10

*Shmueli v. Corcoran Grp.*,
   9 Misc.3d 589 (Sup. Ct. N.Y. Co. 2005) .............................................................................. 4

**Statutes**

15 U.S.C. § 1125(d)(1)(B)(i) ..................................................................................................... 6

Section 1125(d) .......................................................................................................................... 7

Plaintiff/Counterclaim-Defendant Shetel and Third-Party Defendants Weitz and Osseogroup respectfully submit this reply memorandum of law in further support of their Motion to: (a) dismiss 23 of the 27 Counterclaims asserted against Shetel (all except for the First, Fifth, Eighteenth and Twenty-Second Counterclaims); and (b) dismiss the Third-Party Complaint against Weitz and Osseogroup in its entirety.

## I. DEFENDANTS CANNOT BOOTSTRAP THEIR BREACH OF CONTRACT CLAIMS INTO TORT OR QUASI-CONTRACT CLAIMS

It is black letter law that "[t]he existence of a valid and enforceable contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388-89 (1987). In their memorandum of law in opposition to the motion to dismiss ("Opp."), Defendants try to avoid application of the *Clark-Fitzpatrick* rule by suggesting that the parties had more than one contract and that at least some of those contracts were oral, but Defendants fail to cite a single case in which the rule was held not to apply on either of those grounds.

Instead, *Clark-Fitzpatrick* applies regardless of whether the parties entered into one or more enforceable contracts, and regardless of whether the contracts were written or oral. *See Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) ("*Clark-Fitzpatrick* precludes unjust enrichment claims whenever there is a valid and enforceable contract governing a particular subject matter, whether that contract is written, oral, or implied-in-fact"); *see also Morales v. Grand Cru Assoc.*, 305 A.D.2d 647 (2d Dep't 2003) ("The existence of an express agreement, whether oral or written, governing a particular subject matter precludes recovery in quasi-contract for events arising out of the same subject matter").

Here, Defendants allege that Shetel breached valid and enforceable contracts between Adin and Shetel, on the one hand, and Danzer and Shetel, on the other hand. Shetel has not

moved to dismiss those contract-based counterclaims. Thus, there is no bona fide dispute as to the existence or enforceability of the parties' agreements, nor is there any allegation that Adin shipped Shetel goods, or Danzer worked for Adin, outside the scope of *any* contract.

Defendants may now for litigation purposes try to contend that the terms of those contracts were more favorable to them than the terms of the actual contracts Shetel agreed to be bound by. But that does not allow them to assert rights broader or different than whatever the terms of their contract are ultimately adjudicated to be, possibly, as in *Beth Israel*, 448 F.3d at 582, giving effect to the parties' course of dealing as well as their oral and written statements as evidence of the terms of their binding agreement.

Defendants' cases are not to the contrary. In *NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 759 F. Supp. 1004 (S.D.N.Y. 1991) (applying Illinois law), the court dismissed a promissory estoppel claim because there was an enforceable contract. In *Cyberchron Corp. v. Calldata Sys. Dev.*, 831 F. Supp. 94, 112 (E.D.N.Y. 1993), the court agreed that "promissory estoppel [is] applicable only in the absence of an enforceable contract." After finding no enforceable contract because the parties failed to agree on two material terms (*id.* at 108-09), and that defendant led plaintiff to believe that it would be paid for work in the absence of a contract (*id.* at 105-07), the court determined that "[t]his is one of the rare cases in which the equitable doctrine of promissory estoppel has been made out." *Id.*, at 116. This litigation, however, is not one of the "rare cases" in which promissory estoppel is appropriate—here there are enforceable contracts and there is no allegation of a promise to pay for work in the absence of a contract.

Defendants attempt to salvage their promissory estoppel, fraud and negligent misrepresentation claims by arguing that prior to entering into the contracts, Shetel and Weitz represented they would use "sufficient" time, money and connections to develop a dental implant

2

distribution business throughout the United States. *See* CC at ¶¶ 19, 127, 136, 141. But this is nothing more than alleging that Shetel and Weitz misrepresented their future intention to perform the agreements, which is not actionable. *See First Bank of the Ams. v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 291 (1st Dep't 1999); *see also LC Footwear, LLC v. L.C. Licensing, Inc.*, No. 651907/2010, 2011 WL 11085363, at *21 (Sup. Ct. N.Y. Co. 2011) (fraud claim must allege a representation separate and distinct from the promises contained in the parties' agreement).

Adin is unable to explain away its allegation (CC ¶ 136) that Shetel and Weitz "*either* lacked sufficient connections, funds, time and effort to develop" the business as promised *or*, after the fact, "did not use sufficient connections, funds, time and effort to develop" that business. In other words, the key factual allegation that allegedly supports the claim that Shetel never intended to perform its contractual promises when they were made is that, subsequently, it allegedly did not perform.[1] This is not enough (nor is it true). *See Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 9 (2d Cir. 1996) ("Fraud by hindsight alone will not sustain a complaint").

The accounting claims likewise fail because, among other things, Defendants' defense of them is again based on the same claim (Opp. at 9, 14) that Defendants are unsure whether the contracts they claim Shetel breached are enforceable.[2]

---

[1] Moreover, Defendants cite no cases finding that a representation to use "sufficient money, time and effort" to develop a business is a clear and unambiguous promise on which one can reasonably rely and a court can objectively measure, particularly when made by someone like Weitz who also operates a private dental practice at the same time (CC ¶ 18).

[2] For the accounting and negligent misrepresentation claims, Defendants' only response to their failure to plead plausible factual grounds for the requisite fiduciary or special relationship is that older case law permitted that element to be "sparsely pled." Opp. at 8 (citing no authority more recent than 2004). Defendants do not explain how that alleged leniency survives *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), although the Court need not reach that issue given that those claims fail on other grounds.

3

Finally, as to Danzer's conversion and trespass to chattels claims, he essentially admits (Opp. at 13) that he possesses his own copies of the materials he allegedly shared with Shetel during his employment and that he has been able to make use of such materials.[3] Thus, unlike in *Shmueli v. Corcoran Grp.*, 9 Misc.3d 589 (Sup. Ct. N.Y. Co. 2005), Danzer has suffered no damage unless he has some right, contractual or otherwise, not only to use the information himself post-employment but to bar Shetel from using it—which he does not.

## II. THE SALE OF GENUINE ADIN PRODUCTS CANNOT GIVE RISE TO A TRADEMARK INFRINGEMENT OR UNFAIR COMPETITION CLAIM

Adin does not dispute the case law cited by Shetel (at 16-18) establishing that the allegedly unauthorized sale of genuine trademarked goods is not, without more, trademark infringement or any other kind of unfair competition under state or federal law. As this court held in *Kitty Walk Sys., Inc. v. Midnight Pass Inc.*, 431 F. Supp. 2d 306 (E.D.N.Y. 2006), when dealing with authentic goods:

> this case is not one of consumer confusion that can be relied upon to support a Lanham Act claim, but a case alleging breach of contract as to authentic goods. Under these circumstances, no claim for trademark or copyright infringement or unfair competition will lie.

Adin asserts only that its claims fall within a narrow exception recognized by *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58 (2d Cir. 1992). They do not. *Polymer* noted that a "distributor's failure to observe a restrictive covenant on the type or class of customers with whom it may deal can constitute trademark infringement, but more is required than unauthorized sales standing alone … The element of customer confusion must also be present."

---

[3] As to Adin's trespass to chattels counterclaim, it essentially asserts (Opp. at 9) that paragraph 227 of its Counterclaims, incorporating by reference all 226 prior paragraphs, was sufficient to put Shetel on fair notice of the factual basis for this cause of action. This claim is simply an impermissible recast of the contract claim that Shetel purportedly failed to pay for certain goods.

4

The "more" that *Polymer* requires is not alleged to be present here. *Polymer* involved the alleged unauthorized sale to ordinary retail customers of the "professional" version (i.e. intended for sale only to optometrists) of products for cleaning contact lenses that were not approved for retail sale, and materially differed (due to lack of warning labels and tamper-resistant packaging) from the same manufacturer's trademarked products intended for retail sale. There was thus, the court found, a risk of consumer confusion if customers were sold non-compliant products that lacked the very features specifically intended to protect consumers who might lack the sophistication of "professional" purchasers.

This dispute does not involve material differences in the products sold. Here, the allegedly "unauthorized" sales are sales of the same product in the same packaging to the same customers as Shetel had been selling to with Adin's blessing when it was still Adin's authorized distributor. No facts supporting a plausible inference of customer confusion have been alleged. Although Adin claims (Opp. at 17) that Shetel alleged customer confusion in the Amended Complaint, this is comparing apples to oranges. The customer confusion Shetel pled occurred as a result of Adin and Danzer making false statements in the marketplace about Shetel, claiming variously that Shetel was either out of business or that Adin's new venture was a continuation of Shetel rather than a competitor of Shetel. *See* Am. Cmplt. ¶¶ 102-103. This is clearly different than the customer confusion caused by, for example, the sale of counterfeit goods.

Moreover, no facts are alleged that support a plausible inference that Shetel ever agreed to a "restrictive covenant" that would trigger the narrow exception recognized in *Polymer*. In fact, there is no restrictive covenant regarding Shetel's ability to sell Adin products following the end of the business arrangement. Defendants' only response is a strained and incorrect interpretation of paragraph 8 of the email attached to the Counterclaims as Exhibit C, which

5

paragraph is prefaced by the statement: "[t]he below terms were for **negotiation only** during our meeting." (emphasis added). At the time of the email in Exhibit C, the "d/b/a" of Shetel Industries was "Adin Implants." In paragraph 8 of the email, Plaintiff's principal, Weitz, writes:

> We own our phone number and our website []. We all agreed that I own Adinimplants.com, not Adin Israel and that Adin Israel owns the trademark of their name. Adin Israel is allowing Shetel to use their name. Upon Termination, it is clear that Adin Israel will not allow Shetel to continue using their name.

Thus, at most, paragraph 8 memorializes a discussion that Shetel would not use the **name** Adin Implants after termination of the parties' business relationship, but Shetel would continue to own its website and its domain (www.adinimplants.com). Defendants contort paragraph 8 to say that Shetel would not be permitted to **sell** genuine Adin products post-termination. But paragraph 8 plainly concerns the business name Adin Implants, not a restrictive covenant that Shetel would stop selling Adin products. Accordingly, the rule articulated in *Polymer* and its progeny mandates dismissal of the Lanham Act and General Business Law claims.

### III. THE CYBERSQUATTING CAUSES OF ACTION FAIL TO STATE A CLAIM

Shetel's opening brief (at 19-20) explained among other things why the necessary bad-faith element of a statutory cybersquatting claim had not been pled, given that Shetel had used www.adinimplants.com for years with Adin's knowledge "in connection with the bona fide offering of … goods or services," which is one of the statutory factors enumerated in 15 U.S.C. § 1125(d)(1)(B)(i) cutting against a finding of bad faith and had never made any offer to "transfer, sell, or otherwise assign the domain name to the mark owner … for financial gain without having used … the domain name in the bona fide offering of any goods or services." Adin responds only by pointing out (Opp. at 20) that Shetel offered to sell its entire ongoing business, including the website and URL, to Adin, although no agreement was ultimately reached. But the statutory language makes clear that an offer to sell a domain name is suggestive of bad faith only when the

6

offer is made *without* the seller having previously used the domain "in the bona fide offering of any goods and services," making this argument a non-sequitur with no applicability to this case.[4]

Moreover, Adin offers no response whatsoever to the showing (Opening Brief at 19) that it *agreed* in the 2014 correspondence that it relies on (CC ¶¶ 48-51 and Exhibit C) that Shetel, not Adin, owned Shetel's website and the associated www.adinimplants.com URL.[5] Adin does not and cannot explain away its prior acknowledgement that Shetel's ownership of the URL was not in conflict with its trademark rights. That concession is fatal to its cybersquatting claim.[6]

### IV. NO BASIS IS ALLEGED FOR ANY LIABILITY AGAINST OSSEOGROUP

Adin concedes (Opp. at 24-25) that it has alleged no act or omission by Osseogroup other than the redirection of the www.adinimplants.com URL to Osseogroup's website, and that that website was modified to accommodate Adin's concerns in August 2017. While it quotes the language allegedly found at www.Osseogroup.com/adin.html prior to that date, it does not explain how that language constituted an infringement of any of Adin's rights. The Osseogroup website stated (truthfully) only that "OSSEOGROUP CARRIES VARIOUS LINES OF DENTAL IMPLANTS." It made no specific mention of Adin products and did not state that Osseogroup was an authorized or exclusive distributor of Adin products. Moreover, the law is

---

[4] Likewise, the allegation (Opp. at 20) that Shetel sold genuine products at competitive prices (thus benefiting consumers), even if true, is not bad faith and is irrelevant to cybersquatting.

[5] In paragraph 8 of Exhibit C to the Counterclaims, Weitz refers to "our" website but also uses the pronoun "I" when referring to ownership of the URL www.adinimplants.com. The URL is a corporate asset, but ownership of the domain is irrelevant on this motion because the point is that Adin knew *it* had no claim to the website after cessation of the business relationship with Shetel.

[6] Adin separately devotes extensive space to contending that even in 2010 "Adin Implants" was "distinctive," even though not "famous," within the meaning of section 1125(d) – an argument that would apparently require the Court to take judicial notice of the meaning of "Adin" in Hebrew in order to understand. The Court need not reach that issue in light of the failure to allege a factual basis for the necessary bad-faith element of the claim.

7

clear that use of the word "Adin" in the URL www.Osseogroup.com/adin.html was not infringing, because website owners routinely and legitimately refer to trademarks owned by others in that "post-domain" (i.e. following the ".com" portion of the address) context.[7]

The separate conclusory allegation that sales have been "diverted" from Adin to Osseogroup (TPC ¶ 43) is supported by no factual allegations of any such "diverted" sales. That entire paragraph is a boilerplate allegation of irreparable injury when seeking injunctive relief against ongoing conduct, but Adin does not dispute that the aspects of Osseogroup's website it objected to were discontinued at its request (although there was no legal obligation to do so).

## V. WEITZ HAS NO INDIVIDUAL LIABILITY AND SHOULD BE DISMISSED

As noted in our opening brief (at 20) none of the causes of action Adin and Danzer seek to assert against Weitz individually state a viable claim against anyone, including Shetel or Osseogroup, so the Court need not even reach the issue of Weitz's alleged derivative individual liability to dismiss the Third-Party Complaint in its entirety. That said, nowhere do Adin and Danzer respond to the authority cited in our opening brief (at 22) that there can be no individual liability for acts concededly taken by Weitz in his capacity as a corporate officer and representative. Adin and Danzer do not allege they ever thought they were contracting with or doing business with Weitz individually rather than with what they knew to be a limited liability

---

[7] *See Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 698 (6th Cir. 2003) (no likelihood of confusion where "Lap Traveler" mark was contained in the URL a2zsolutions.com/desks/floor/laptraveler/dkfl-lt.htm, noting "[b]ecause post-domain paths do not typically signify source, it is unlikely that the presence of another's trademark in a post-domain path of a URL would ever violate trademark law"); *Nagler v. Garcia*, 370 Fed. Appx. 678 (6th Cir. 2010) (use of trademark "Diet Results" in http://www.beautyinaflash.com/dietresults.html) not infringing); *Patmont Motor Werks, Inc. v. Gateway Marine, Inc.*, No. C96-2703, 1997 WL 811770, at *4 n.6 (N.D. Cal. 1997) (use of trademark "Go-Ped" in www.idiosync.com/goped not infringing); *Fischer v. Forrest*, 14 Civ. 1304 (PAE)(AJP), 2017 WL 2992663, at *23-24 (S.D.N.Y. 2017) (report and rec.) (no likelihood of confusion from use of various trademarks in post-domain paths of web pages).

8

corporate entity of which Weitz was one of the principals, nor do they contend that Weitz ever acted outside the scope of his role as an officer or principal of the corporation. Indeed, they reiterate (Opp. at 23), as their pleading repeatedly does, that Weitz acted "on behalf of Plaintiff."

Adin[8] points out that some of the statements of Weitz were allegedly made before Shetel had actually been incorporated (because the proposed business of Shetel had not yet actually commenced), but fails to cite any authority for why that should give rise to individual liability. Adin itself characterizes these alleged pre-incorporation statements of Weitz as "promises" and "representations" of Shetel (e.g. CC ¶¶ 127, 136), confirming that it understood Weitz to be speaking on behalf of the to-be-formed entity through which the business was to be conducted.[9]

Adin also points out (Opp. at 21-22) that there are special rules for the individual liability of corporate officers for statutory federal trademark infringement by the corporation, but since, as shown above, no trademark claim has been asserted against either Shetel or Osseogroup, no individual liability can flow from that. Adin notes that Weitz registered the www.adinimplants.com domain in his own name before Shetel's incorporation. But, again, no viable cause of action has been stated for any misuse of that URL, nor does Adin allege that the website was ever used for Weitz's personal business rather than the business of Shetel.

Adin and Danzer do not seriously dispute that the law requires them to plead facts supporting their veil-piercing claims, not merely recitations of the boilerplate legal standard. But

---

[8] Danzer's claims are not alleged to be based on any pre-incorporation statements.

[9] Adin alludes (Opp. at 7) to promoter liability, citing *Hwang v. Grace Road Church*, No. 14-CV-7187 (KAM) (RML), 2016 WL 1060247 (E.D.N.Y. 2016). But as stated there, promoter liability is about when a *corporation* is liable for the pre-incorporation commitments made on its behalf by those planning to incorporate it, as Adin claims Shetel is bound by Weitz's pre-incorporation statements. Adin cites no authority for the different proposition that an individual is liable after incorporation for the pre-incorporation commitments he made on behalf of the entity when all parties understood it would be the entity that would honor the commitments.

they have not done so, as a comparison of their pleading to the pleadings in the cases they rely upon underscores. For example, in *Rolls-Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117 (S.D.N.Y. 1996), the principals were alleged to have abused their control over one corporate entity to shift sales proceeds to a different entity in order to defraud the first entity's creditors. No such allegations of looting or concealment are present here. In *Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, 1:04-cv-04971-NG-MDG, 2006 WL 2802092 (E.D.N.Y. 2006), the principals were alleged to have failed to observe corporate formalities, disbursed corporate funds for personal purposes, and used corporate property as if it were personal property. No such allegations are present here. Nor do Defendants allege that Weitz dominated Plaintiff to the exclusion of his co-principal, whom Defendants knew (*see* CC ¶¶ 64, 105).

Adin alleges (e.g. CC ¶¶ 29, 30) that Shetel had cash flow issues causing it to fall behind on payments and/or exceed targeted credit limits. Assuming that is true, the credit risk to Adin from continuing to do business with Shetel was thus obvious. But from 2012 to 2016, Adin kept deciding, presumably weighing risk against reward, to continue the business relationship and ship additional product to Shetel.[10] It cannot now use a veil-piercing claim unsupported by any factual allegations that make it plausible under *Twombly* and *Iqbal* to get the de facto equivalent of the personal guarantee it failed to negotiate for itself.

## CONCLUSION

For the foregoing reasons and those set forth in their opening papers, movants respectfully request that the Court grant their motion: (a) dismissing with prejudice 23 of the 27 Counterclaims asserted against Shetel (all but the First, Fifth, Eighteenth and Twenty-Second

---

[10] Indeed, Adin allegedly told Shetel (CC ¶ 31) it would refuse to ship product on credit and would require upfront payment, but chose not to, again confirming it understood the credit risk.

10

Counterclaims); (b) dismissing with prejudice the Third-Party Complaint against Weitz and Osseogroup, in its entirety; and (c) for such other and further relief as this Court deems just and proper.

Dated: New York, New York
      February 22, 2018                    STORCH AMINI PC

                                         By: /s/ Jason Levin
                                               Bijan Amini
                                               Jason Levin
                                               John W. Brewer
                                       Two Grand Central Tower, 25th Floor
                                       140 East 45th Street
                                       New York, NY 10017
                                       (212) 490-4100
                                       *Attorneys for Shetel Industries LLC,*
                                       *Osseogroup LLC and Markus Weitz*