UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
SHETEL INDUSTRIES LLC,

                                        Plaintiff,

                    -against-

ADIN DENTAL IMPLANT SYSTEMS, INC.,
ADIN DENTAL SOLUTIONS USA, INC.,
and JEREMY DANZER,

                                        Defendants.
----------------------------------------------------------------X
ADIN DENTAL IMPLANT SYSTEMS, INC.,
ADIN DENTAL SOLUTIONS USA, INC.,
and JEREMY DANZER,

                    Counterclaimants and Third-Party Plaintiffs,

                    -against-

SHETEL INDUSTRIES LLC, OSSEOGROUP LLC,
and DR. MARKUS WEITZ as Director and President
of SHETEL INDUSTRIES LLC, and Individually,

                    Counterclaim and Third-Party Defendants.
----------------------------------------------------------------X

**FILED**
**CLERK**

2:49 pm, Sep 30, 2020

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**ORDER**
17-CV-2505(SJF)(ARL)

FEUERSTEIN, District Judge:

I.      Introduction

        On or about April 26, 2017, plaintiff Shetel Industries LLC ("plaintiff" or "Shetel")

commenced this action against defendants Adin Dental Implant Systems, Inc. ("Adin"), Adin

Dental Solutions USA, Inc. ("Adin USA Newco"), and Jeremy Danzer ("Danzer") (collectively,

"defendants" or the "Adin Parties"), alleging, *inter alia*, unfair competition and false advertising

in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); and unfair

competition, defamation *per se*, tortious interference with contract and tortious interference with

1

prospective business relations under New York state law. On July 12, 2017, Shetel filed an amended complaint, *inter alia*, asserting additional claims against the Adin Parties for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, and New York state law; and for trespass to chattels and unjust enrichment under New York state law.

On August 9, 2017, the Adin Parties filed an answer to the amended complaint, asserting thirty-six (36) affirmative defenses and twenty-seven (27) counterclaims against Shetel for breach of contract; promissory estoppel; fraud; negligent misrepresentation; conversion; trademark infringement in violation of the Lanham Act, 15 U.S.C, § 1114; false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a); cybersquatting in violation of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d); injury to business reputation and trademark dilution in violation of Section 360-*l* of the New York General Business Law; deceptive business acts and practices in violation of Section 349 of the New York General Business Law; false advertising in violation of Section 350 of the New York General Business Law; use of name with intent to deceive in violation of Section 133 of the New York General Business Law; unjust enrichment; tortious interference with a prospective economic advantage; trespass to chattels; common law unfair competition; an accounting; quantum meruit; and commissions due and owing pursuant to Section 191(c) of the New York State Labor Law. The Adin Parties also filed a third-party complaint against third-party defendants Osseogroup LLC ("Osseogroup") and Dr. Markus Weitz ("Weitz") (collectively, "third-party defendants") asserting claims: (i) for fraud, negligent misrepresentation, promissory estoppel and unjust enrichment against Weitz; (ii) for false advertising in violation of Section 350 of the New York

General Business Law, use of name with intent to deceive in violation of Section 133 of the New York General Business Law, and an accounting against Osseogroup; and (iii) for trademark infringement and false designation of origin in violation of the Lanham Act, cybersquatting in violation of the ACPA, violations of Sections 349 and 360-*l* of the New York General Business Law, unjust enrichment, tortious interference with a prospective economic advantage, common law unfair competition, conversion, and trespass to chattels against both third-party defendants.

Pending before the Court is the motion of Shetel and the third-party defendants (collectively, the "Shetel Parties") seeking to dismiss twenty-three (23) of the twenty-seven (27) counterclaims against Shetel, and the third-party claims in their entirety, with prejudice pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, which, by order entered February 12, 2019, this Court converted to a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] For the reasons set forth below, the motion is granted to the extent set forth below.

---

[1] The Shetel Parties have not moved for dismissal of the Adin Parties' counterclaims for breach of contract (first and eighteenth counterclaims), conversion (fifth counterclaim) or violation of the New York Labor Law (twenty-second counterclaim); and the Adin Parties have affirmatively withdrawn their counterclaims for trespass to chattel (fifteenth and twenty-sixth counterclaims) and accounting (seventeenth and twenty-seventh counterclaims), as well as Danzer's counterclaim for fraud (twenty-third counterclaim) and third-party claims for trespass to chattel (nineteenth third-party claim) and accounting (twentieth third-party claim). (*See* the Adin Parties' Memorandum of Law in Response to the Shetel Parties' Motion for Summary Judgment ["Adin SJ Mem."] at 1 n. 1). In addition, the Adin Parties have seemingly abandoned Danzer's counterclaim for quantum meruit (twentieth counterclaim) and conversion (twenty-fifth counterclaim) by failing to address those claims in their response to the Shetel Parties' motion for summary judgment.

II.     Background

    A.     Factual Allegations[2].

        1.     The Parties

Shetel was formed on May 12, 2011 and is a distributor of dental implants and related products in the United States. (56.1, ¶ 1; Supp. 56.1, ¶ 1)[3]. Weitz is one of the two principals of Shetel, along with non-party Jeremy Frenkel ("Frenkel"). (56.1, ¶ 11; Supp. 56.1, ¶ 107). Frenkel "ran the day-to-day operations" of Shetel. (Declaration of Noam Besdin in Further Support of Motion for Summary Judgment ["Besdin Decl."], Ex. H at 24:2-4; Ex. M at 46:5-23, 53:1-4).

Weitz and Frenkel are also principals of Osseogroup, which was incorporated in March 2016. (56.1, ¶ 12; Declaration of Matthew J. Ross, Esq., in Support of Defendants' Brief in Response to the Motion for Summary Judgment ["Ross Decl."], Ex. 80; Ex. 35 at 15:21-16:20).

---

[2] The factual allegations are taken from the materials in the record that would be admissible in evidence, *see*, Fed. R. Civ. P. 56(c)(1), and the parties' statements and counterstatements pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Civil Rule 56.1"), to the extent that they are properly supported pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. *See* Local Civil Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."); *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 305 (S.D.N.Y. 2015) ("[I]f a party fails to properly support a statement by an adequate citation to the record, the Court may properly disregard that assertion."); *F.D.I.C. v. Hodge*, 50 F. Supp. 3d 327, 343, n. 2 (E.D.N.Y. 2014) ("Statements without citation to evidence may be properly ignored by the court."); *Kaur v. New York City Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 322 (S.D.N.Y. 2010) ("Where there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion.") Moreover, only those facts that are material to the disposition of the motion, *i.e.*, that "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), are set forth herein. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" (brackets in original) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505)). The facts are undisputed unless otherwise indicated.

[3] Where the facts are undisputed, the parties' respective Statements of Material Facts pursuant to Local Civil Rule 56.1 are collectively cited as "56.1" and "Supp. 56.1," respectively. Where the facts are disputed and properly supported pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the Adin Parties' 56.1 Statement is cited as "Adin 56.1" or "Adin Supp. 56.1," and the Shetel Parties' 56.1 Statement is cited as "Shetel 56.1."

Frenkel testified that he has been a fifty percent (50%) owner of both Shetel and Osseogroup since their inception; and that he did not purchase his interest in those companies, but obtained his interest when the companies were formed. (Ross Decl., Ex. 35 at 14:13-16:20).

The Adin Parties submit two (2) documents designating the same address, 657 Central Avenue, Cedarhurst, New York 11516, for both Shetel, upon its formation, and Weitz's dental practice, South Island Periodontics and Implants ("SiPi"). (Ross Decl., Ex. 109 and 110). The commercial property at 657 Central Avenue, Cedarhurst, New York, is owned by 657 Central Owner LLC, and Weitz is identified by the New York Department of State as that company's agent for service. (Supp. 56.1, ¶ 122).

In addition, the Adin Parties contend that Weitz intermingled the funds of his dental practice, SiPi, with the funds of Shetel. (*See* Ross Decl., Ex. 76 [email Weitz sent to Frenkel on September 18, 2016 indicating, in relevant part, "BTW - I ordered Ti-Oss - I wired $$ from SiPi. If we sell it - then SiPi will get paid back. If not then SiPi will take the product. That way, we could keep Jack and Dani for now - to liquidate implants. . . ."]; Ex. 77 and 78 [Shetel's Balance Sheets as of February 10, 2017 and January 18, 2019, respectively, indicating, *inter alia*, a current liability "Due to/from SiPi."]).

However, Weitz asserts, in pertinent part:

> "In the early months prior to Shetel's formation and in the immediate months following, SIPI essentially loaned that amount to Shetel, in that it paid for a host of necessary startup costs such as, but not limited to, travel expenses to, from and in Israel, legal fees and initial inventory purchases. This amount was booked as a liability of Shetel's, and appears as such on Shetel's 2012 Form 1065 . . . [which] indicates a $33,539 'liability' that was 'due to' SIPI. Furthermore, that amount was never paid to SIPI or anyone else. The attached tax records reflect that liability staying on Shetel's books through 2018; each of those Form 1065s has a nearly identical amount, each listed as a liability due to SIPI on Statement 4 of those

documents. To this day, that remains a liability of Shetel, and has never been paid to SIPI."[4]

(Declaration of Markus Weitz in Further Support of Motion For Summary Judgment ["Weitz Decl."], ¶¶ 11-12).

Shetel and Osseogroup use the same address at 123 Grove Avenue, Suite 109, Cedarhurst, New York 11516, (Amended Complaint ["Am. Compl."], ¶ 12; Third-Party Complaint ["TPC"], ¶ 8; Ross Decl., Ex. 104, 105); and those premises are owned by an entity named 123 Grove LLC. (Ross Decl., Ex. 73). Weitz is a member of 123 Grove LLC, and that company identifies Weitz's post office box, P.O. Box 423, Cedarhurst, New York 11516, as its address. (Supp. 56.1, ¶ 124). In addition, Weitz used 123 Grove LLC as the organization that registered the website URL, [www.adinimplants.com](www.adinimplants.com). (*Id.*, ¶ 125). Shetel and Osseogroup also shared a telephone number and a facsimile number. (Ross Decl. at Ex. 104, 105 and 107).

However, Weitz asserts that he and Frenkel founded Osseogroup in March 2016 for the purpose of forming a marketing company, but "those plans never took off the ground, and [he] cannot think of anything that entity has done beyond formally existing since that time." (Weitz Decl., ¶ 13). According to Weitz, "[a]ll of the finances, inventory, staff and assets connected to Shetel in any way have always been maintained on Shetel's books." (*Id.*).

Weitz also asserts that "[i]n 2017, as Shetel's relationship with Adin had terminated, Shetel began ordering certain dental components from manufacturers for sale under the Osseogroup brand name[,]" and he and Frenkel "began to rebrand Shetel's activities away from an association with Adin[,]" by, *inter alia*, "using the Osseogroup and Osseo-related brands,

---

[4] According to Weitz, for reasons he does not recall, the debt to SiPi increased by three hundred thirty-five dollars ($335.00), to thirty-three thousand eight hundred seventy-four dollars ($33,874.00), in 2014. (Weitz Decl., ¶ 12 n. 1).

which is how Shetel's staff began referring to it in phone and email communications." (Weitz Decl., ¶ 14). Weitz maintains that "[t]his shift reflected the change in Shetel's relationship with Adin, as well as Shetel's venture into its own branded products[;]" and that "[t]he use of the Osseogroup brand does not change the fact that all operations continued to run in and out of Shetel, not Osseogroup." (*Id.*, ¶ 15).

The Adin Parties submit, *inter alia*, (i) an email Jenna Riservato ("Riservato"), née Bertini, sent from the email address jenna.bertini@osseogroup.com to Weitz at the email address markus.weitz@osseogroup.com on April 5, 2017, in which her title is designated as "Office Manager │ OsseoGroup," and her contact information includes the internet address, "osseogroup.com," (Ross Decl., Ex. 104); and (ii) an email Riservato sent from the same email address to a customer on June 2, 2017, which was signed "OsseoGroup," and to which a statement from Shetel, requesting that payment be remitted, was attached. (*Id.* at 107 and Ex. 70 at 55:8-56:9).

With respect to the relationship between Shetel and Osseogroup, Jacek Wollocko ("Wollocko"), Shetel's Director of Development and Technology, testified:

> "Osseogroup was the replacement of the Adin implant's name. So that was the new operation. So Shetel is my employer. Osseogroup is an underling. I don't know what the business structure is, but Osseogroup is how we answer the phones. . . . I work for Shetel. . . . But Osseogroup is the company that sells the products."

(Ross Decl., Ex. 47 at 28:9-24; *see also Id.* at 27:17-28:4). According to Wollocko, Osseogroup sells Adin products. (*Id.* at 67:3-12).

Adin is an Israel-based manufacturer of dental implants and related products, (56.1, ¶ 2), which engaged Shetel in 2012 to serve as the exclusive distributor of its dental products throughout the United States. (Am. Compl., ¶ 2; Answer ["Ans."], ¶ 2). Prior to 2012, Adin had

limited sales or business activity in the United States' market. (Am. Compl., ¶ 2; Ans., ¶ 2;
Counterclaims ["CC"], ¶ 25).

### 2.       The Parties' Relationship

During his deposition, Yechiam Hantman ("Hantman"), Adin's senior vice president,
testified that in 2010, Adin's regional desk manager for the Americas, Eyal Boneh, brought
Weitz to a meeting with Adin because Weitz wanted Adin "to produce for him a line of implants
. . . and to label it under his name as a private label," but Adin did not agree to that. (Ross Decl.,
Ex. 38 at 119:14-120:7, 123:25-125:2). Instead, according to Hantman, Weitz and Adin
discussed Weitz distributing Adin's implants, and Weitz indicated that he "wanted to do it." (*Id.*
at 125:3-14; *see also* CC, ¶¶ 18-19 [alleging that "[i]n 2010, Dr. Weitz . . . approached Adin,
presented himself as a wealthy dentist who has significant assets both in New York and Israel,
and indicated an interest in selling Adin's dental implants[;]" and that "[d]uring said
conversations in 2010 and 2011, Dr. Weitz offered to serve as Adin's distributor throughout the
United States"]).

Weitz and Danzer, who began working for Shetel in February 2012, also met with
representatives of Adin in Israel in October 2011. (Supp. 56.1, ¶¶ 36, 41).

From 2012 to 2016, Shetel served as the exclusive United States distributor for Adin.
(56.1, ¶ 5). The Adin Parties allege that Weitz made several misrepresentations in order "to
induce Adin to enter into an agreement with him," and to give Shetel exclusive rights to
distribute throughout the United States, including that: "he possessed and would invest sufficient
money, time and effort to develop such a business; he had sufficient connections to develop a

distribution business throughout the United States; and he had the ability to invest the money required to establish a business selling dental implants throughout the United States." (CC, ¶¶ 19, 23). According to the Adin Parties,

> "Adin reasonably relied upon Dr. Weitz's representations that he was able to assist Adin in penetrating the United States' market. However, Dr. Weitz failed to adequately invest in or otherwise grow the distribution network properly. Dr. Weitz's promises and plan were illusory as he failed to fulfill same. Dr. Weitz's purported connections were limited to the Greater-New York City area. As a result, Dr. Weitz impeded Adin's progress throughout the United States' market rather than advancing it."

(CC, ¶ 22).

Hantman testified that Weitz "used [Adin] in order to finance his business when he promised [Adin] to achieve targets and he didn't do it." (Ross Decl., Ex. 38 at 178:3-16). According to Hantman, the issue was not the amount of money invested; rather it was about performance, *i.e.*, achieving targets, and Weitz gave "a plan according to years with targets of purchase from [Adin] and selling. . . . And he figured that he can sell the first year, this sum, later on, this sum, and so on. . . . And, of course, from time to time, we accepted some corrections in these targets." (*Id.* at 169:6-170:20). Hantman further testified that a "[t]arget is a commitment" to purchase, and that "Shetel didn't say he [*sic*] will try. Shetel says they are going to do it." (*Id.* at 170:21-171:8). In addition, Hantman testified, in relevant part, as follows:

> Q.     What's different about this case?
>
> A.     In this case, Moti[5] approached us and asked us to be a distributor. Okay? He wanted to be a partner, but -- he -- he regret he is a distributor.
>
> When he asked us, he put some targets in the -- the mail that he wrote to me I think in 2010, 2011.
>
> He had targets for -- for four years targets. And he didn't switch.

---

[5] "Moti" is allegedly a nickname for Weitz.

Q.      Okay. . . . I understand your testimony to be that you don't always sue for failure to meet targets. Is that correct?

A.      Of course not.

Q.      Of course not. So in this case you are suing.

So I'm trying to understand the difference. And you told me, well, Dr. Weitz approached you.

So is it your testimony that when a distributor approaches the manufacturer at the start of the relationship, that means he has to hit his targets such that it's grounds for a lawsuit if he doesn't?

A.      I will -- I will explain myself. I will take the responsibility that I didn't express myself well.

Moti approached us and asked for special prices, special terms. He changed all the time the terms, and we agreed. And we gave him a lot of things that we don't give to other distributors. . . .

* * *

A.      So we put a lot of money in this business. He led -- misled us that he is going at the end of the pace to --

THE INTERPRETER: The road.

A.      At the end of the road . . . to get the targets. So we invested in him because he lived – he lived on our credit all the time.

We -- he -- we were like a bank for him, okay, because he asked for consignment, and later on he -- he didn't pay.

So -- and we gave him, and we gave him, because we knew that at the end he will reach certain amount of volume, of -- of sales that will justify it.

Q.      And you were wrong.

A.      He was wrong.

Q.      You were wrong.

A.      No, no. He was wrong.

10

* * *

Q.      My understanding is that you described the relationship as you, acting as a bank, investing in him.

A.      In a way we acted as a -- how do you say it in English? -- a creditor for him. We gave him supply. We supplied him our products.

He sold it, received money, and this money was the -- the capital that he worked on it. It was the working capital of the company.

We gave him a -- a -- a credit of supplier, and this is only -- the only credit that probably he used, because he didn't put money to invest in the company.

Q.      He didn't put money to invest in the company?

A.      He didn't put money in order -- otherwise, he could pay us. He didn't pay us.

Q.      So –

A.      Why he didn't pay us? Because he -- he -- in -- in the certain point, the – the credit, we stopped the credit so he couldn't pay us. So if he had money in the company . . .  internal capital that he could use, he could pay us. But he couldn't pay us. This is this the whole thing here.

THE INTERPRETER: Actually, it's "equity." "Equity."

Q.      My understanding is you're saying that the whole case is based on the debt for – the alleged debt for implants that were -- he held on consignment and that he owed you for?

A.      No, no. The whole case is -- hold -- that all the time he managed this business on the capital that was produced from our supplies, that he didn't -- he didn't pay to us.

(Besdin Decl., Ex. B at 286:3-287:20; Ross Decl., Ex. 38 at 287:16-290:22).

In an email sent to Adin on July 5, 2011, Weitz indicated, *inter alia*,

". . . While I know [Adin's] contract is a fine document and I do understand that you have used it successfully in other regions . . . I feel strongly that anyone of credibility who was investing a substantial amount of time and cash in the US would require the changes we have requested.

11

> We are ready to enter the implant market in the US immediately as you suggested. We would prefer to brand the Adin line but need to protect our investment. . . . It is worth considering deviating from your standard contract because we are ready to go, staffed, researched and funded with a well thought out business plan. We know and understand the US market and we will 'conquer' it. It will take you much time, money and effort to get to where we already are in terms of the US market. You have little to loose [*sic*] and much to gain. If we do not make the agreed to sales targets, you will have every option of dismissing us and exercising your other options. . . ."

(Ross Decl., Ex. 67).

Erez Cohen ("Cohen"), Adin's senior executive vice president, testified that Weitz often repeated the phrase, "We know and understand the U.S. market and we will conquer it," or a similar sentiment about conquering the United States market, (Ross Decl., Ex. 37 at 82:10-83:15, 116:18-117:8; *see also Id.*, Ex. 67), and misled Adin "about how much effort he puts in . . . to expand business . . . in the United States." (*Id.*, Ex. 37 at 82:20-23).

In addition, Eyal Milman ("Milman"), Adin's president, testified that in late 2010 or early 2011, Weitz promised to invest a million dollars on marketing and sales in the first year or two and "said he had the money to invest."[6] (Ross Decl., Ex. 68 at 85:8-87:6, 99:8-100:11, 101:2-7). Milman also testified that Weitz represented that "[h]e would bring in more salespeople on [Danzer's] level;" that he "had connections in all of the United States;" that he would "conquer the U.S.;" and that "he knew the United States, [and] he had enough money." (*Id.* at 139:5-11, 140:4-141:2). According to Milman, Weitz "personally promised to repay the money" on several occasions; frequently "boasted about his investments in real estate in the United States[;]" and

---

[6] Although Milman testified that Weitz did not react when he told him that he "should spend half a million dollars a year," and "[c]ertainly he didn't agree," (Ross Decl., Ex. 68 at 98:14-24), Milman further testified that "at the beginning," Weitz agreed to pay half a million dollars a year, and that Weitz "came and he said he would invest, but later on he did not agree to invest." (*Id.* at 98:25-99:7).

told Milman that "he had an expensive house in Jerusalem, that he makes over a million and a half dollars per year, and he would pay back every shekel he takes from us. Sorry, dollar." (*Id.* at 60:25-61:24). Moreover, Milman testified that Shetel was given a larger discount on the sale of products than it otherwise would have received "as a result of the large investment that Moti committed to make here in marketing in the United States and he did not do." (*Id.* at 59:4-20).

Cohen likewise testified that Weitz told him "more than once" that he would be personally responsible for the debts of Shetel. (Besdin Decl., Ex. E at 56:4-23). Cohen testified, in pertinent part, that Weitz told him:

> "all the time don't worry, I'm . . . personally responsible for . . . the debt of . . . Shetel. He did it couple times. He told me that. And in some point we -- after he didn't pay or Shetel didn't pay the debts, we agreed that he's going to do -- then when Shetel will place an order, then they will have to prepay it in advance, to pay in advance. And more than once he called me, he told me, listen, send the . . . shipment, you know it's me, I personally responsible for paying it. So we took [Weitz] as personally responsible for . . . the debt of Shetel. . . . He didn't . . . tell us the truth about his intentions."

(Ross Decl., Ex. 37 at 53:25-55:3).

Cohen also testified that as Shetel's debt grew, Weitz promised to bring a letter of credit and did not do so, "then [they] started to have discussions" and Weitz said: "You know it's me, it's Moti. You . . . can trust me. . . . I will pay you." (Ross Decl., Ex. 37 at 57:4-20; *see also Id.* at 58:8-20; 61:6-11). However, according to Cohen, Weitz did not put any such commitment in writing. (Besdin Decl., Ex. E at 56:12-20). Cohen testified, in pertinent part:

> Q.     . . . [L]et's go back before 2016 since you seem to indicate that there was such an agreement prior to 2016. When was the -- before 2016 when did he make such an agreement?
>
> A.     I told you I don't remember the exact dates. But I guess that if I'll have the e-mails that we were sending to each other during 2015 and 2014 and talking about

the obligo [*sic*] and was talking about the credit line, then I can more specifically recall or remember when and where.

Q.      Okay. And so in these e-mails, did he agree in any of these e-mails that he would be personally liable for the debt, to your recollection?

A.      I think that he thought we'll go over the e-mails, then we can find -- you know, Moti was very cautious about what he's writing. He didn't want to put much of his obligation in writing. I can tell you it was very hard. We send [*sic*] him drafts and e-mails saying, Listen, we send you a draft. Put your comments. Tell us what you think.

        It was very hard to get it -- to get response in writing.

        Let's talk. Let's talk. And we talked and we kept sending e-mails and he kept not answering in writing.

        And so I guess we won't -- we won't find a specific commitment, Listen, Erez, here I give you my personal responsibility, but we can find, you know, the -- how to call it? – the atmosphere of, listen, you can count on me.

(Besdin Decl., Ex. E at 61:12-62:21).

Hantman similarly testified that he heard Weitz promise that he would personally pay for the debts of Shetel, (Ross Decl., Ex. 38 at 100:19-101:4; Besdin Decl., Ex. B at 104:5-10); and that he and his colleagues made "many" requests for Weitz to sign a document to that effect so they had "some guarantee" of payment. (Besdin Decl., Ex. B at 104:11-105:6). According to Hantman, after he explained to Weitz that the distribution of medical devices is a "Sisyphic business," and that "you have to work very hard" for a return on your investment and "[i]t takes time," Weitz described to him the resources that he had and said, "I have money to give you back." (Ross Decl., Ex. 38 at 101:10-102:25).

Although the Shetel Parties admit that "Weitz generally confirmed that he had capital that could be invested as needed in what became Shetel," (Shetel 56.1, ¶ 10), Weitz denies that he ever told anyone from Adin that he would be personally responsible for the debts of Shetel.

14

(Besdin Decl., Ex. H at 134:14-135:9). In an email sent to Adin on February 5, 2013, Weitz

expressly indicated that he did "not agree or accept" the terms of an email sent to him from

Hadas Davidson ("Davidson"), on behalf of Adin, that same date, which included the following

term:

> "Guarantees and collateral: Adin asks that Moti will arrange guarantees and
> collateral for the products that were supplied. It can be a bank guarantee or property
> collateral. Also a personal collateral guarantee to secure the debt owed is required.
> You asked for a short period of time to examine the possibilities. We expect your
> answer regarding the personal collateral guarantee to secure the debt in a short time.
> We agreed that this issue will be finalized within 90 days."

(Besdin Decl., Ex. N).

Weitz also does not recall ever telling Milman that he planned to invest a million dollars

in the marketing and sales, or ever committing to spending any money on marketing and sales, in

the first year or two that Shetel was a distributor of Adin's products. (Besdin Decl., Ex. H at

19:17-20:14). Weitz testified, in pertinent part, as follows:

> Q.      Did you ever tell Eyal Milman you planned to invest a million dollars in the
> marketing and sales in the first year or two of Shetel?
>
> A.      No.
>
> Q.      You never did?
>
> A.      Not that I recall.
>
> Q.      Is it no or not that you recall?
>
> A.      It has to be not that I recall.
>
> Q.      You don't recall having that conversation?
>
> A.      I don't recall any conversations with specific monetary.
>
> Q.      Do you have a recollection of committing to Ayel [*sic*] to spend money on
> marketing and sales in the first year or two of his products?

15

* * *

A.      I don't have specific recollection of any conversation.

Q.      And notwithstanding that, did you make any commitments otherwise in conversation to Adin regarding spending money in the first year or two of Shetel's distribution of Adin's products?

A.      Nothing.

(Besdin Decl., Ex. H at 19:17-20:3).

The Adin Parties also contend that after the formation of Shetel, "Weitz made further misrepresentations to Adin regarding his investment in and capitalization of Shetel," (Adin Supp. 56.1, ¶ 13), and cite to an email Weitz sent to Milman and Davidson on October 23, 2012, wherein he asserted, *inter alia*, "In our 8 months, we have spent over $500,000 and made Adin a recognizable name in the markets we have targeted." (Ross Decl., Ex. 81). With respect to that email, Weitz testified, in pertinent part:

Q.      Why were you telling [Milman] that 500,000 dollars had been invested in the first eight months of Shetel's operations?

A.      I really don't recall. I have to look at the e-mail.

Q.      Take a look.

A.      I really don't have recollection exactly looking at the e-mail. It appears we're having conversation, negotiation over the phone and I want to include what we have accomplished.

Q.      Did you invest 500,000 that had spent spent [*sic*] over the prior eight months?

* * *

A.      I really don't remember. Again, an e-mail from a long time ago. I really don't remember.

16

Q.      You don't remember whether or not you invested a half million dollars in Shetel at that point?

            * * *

A.      I certainly didn't write what I invested. The answer is I don't remember. I invest half a million dollars in products at that point, I may have. I have to check records. Half a million dollars on all these other things, again, I didn't spend enough time on the e-mail. If I quickly look through the e-mail, we accomplished a lot in 2012. We were paying reps, training reps. We were busy. I have to defer to the records and documents for the exact numbers.

Q.      Do you have a recollection of investing a half million in the company?

            * * *

A.      I really [sic] answered you. I believe the documents reflect accurately.

Q.      I'm not interested in what the documents say. I'm interested what you recall personally if you have any recollection of investing half, half a million dollars in Shetel?

A.      I want to read it, the document you gave me. "In the eight months we have spent over 500,000 dollars.["] If that's what I wrote, again, I have to defer to the documents. I don't know exactly. I really don't remember. I imagine we probably did spend in that vicinity.

Q.      Is it possible that in the eight months that Shetel was operating, it had spent its profits amounting to 500,000 dollars?

A.      Of course.

Q.      Is it possible that Shetel had not received an investment during those eight months or prior of half million dollars?

            * * *

A.      It's possible.

Q.      But sitting here today you have no recollection of where that money came from?

            * * *

17

A.     As I said repeatedly, you have our records. I have to refer to the documents.

(Ross Decl., Ex. 69 at 32:9-34:17).

In his declaration in support of the Shetel Parties' motion, Weitz asserts, *inter alia*, that "as of October 2012, [he] certainly believed that Shetel had spent at least $500,000 over the course of its first eight months," because: (i) "Shetel sold $571,419 worth of goods in that year[,]" and "[t]he vast majority of that amount reflects Shetel's purchase of implants from Adin Israel;" and, (ii) while neither he nor Frenkel "took any salary from Shetel—not in 2012, or in any subsequent year—by October 2012 Shetel had salaried salespeople and salaried office staff[,] [those] salaries amounted to an additional hundreds of thousands of dollars paid out annually[,] [and] Shetel also paid at least $245,000 in sales commissions to various salespeople." (Weitz Decl., ¶¶ 7-8 and Ex. A).

In an email sent to Amir Cahaner ("Cahaner"), Adin's Vice President of International Sales and Marketing, on January 14, 2013, which was copied to Weitz, Davidson, Hantman and Milman, Frenkel indicated, in relevant part, "It is unfortunate that you where [*sic*] unable to participate in our meeting at your factory a few weeks ago. You would have heard the tremendous investment of over $500,000 we have made in 'our' brand including trade shows, print advertising, conferences, representatives, social media. . . ." (Ross Decl., Ex. 82).

In an email sent to Adin on January 18, 2013, Weitz indicated, *inter alia*, "We have had a fantastic year in 2012 and we are willing to continue in our roles [*sic*] as your US distribution arm if our arrangement includes [certain terms set forth therein]. . . . We have demonstrated our commitment to you and our resolve to succeed as well as our monetary investment in our business and your corporation." (Declaration of Chen Porat in Support of the Adin Parties'

Opposition to the Shetel Parties' Motion ["Porat Decl."], Ex. 83). Attached to that email, *inter alia*, is a document with the heading, "Statistics, Notes and thoughts," which indicates, in relevant part:

> "For 2013, per our projections, we will require additional investment of $189,755 - $277,083 for a cumulative investment of $452,043 - $539,378 through 2013.
>
> * * *
>
> We have branded Adin Implants and have made tremendous investment of time and money.
>
> * * *
>
> We are willing to continue to distribute for Adin exclusively in the US and <u>make the necessary monetary and time related investments</u> to continue growth, development and branding the Adin Implant name –
> - with our existing arrangement of consignment, $[omitted]/implant package with 15% discount . . . and payment due net 90 of sales.
> - with your pledge that as long as we continue and pay you timely per the above arrangements, you will not cut off or threaten to cut off our supply.
> - with the hope that the research and development is underway and we will receive the products, packaging and delivery systems (mount-less) necessary for our expedited growth."

(*Id.* at 16591) (emphasis in original). Also attached to that email are Weitz's "projections for 2013, 2014 and 2015." (*Id.* at 16580-81, 16583).

The Adin Parties contend that Weitz and Frenkel "undercapitalized both Shetel and Osseogroup," (Adin 56.1, ¶ 56), and cite to K-1 forms produced by Shetel in discovery demonstrating that Frenkel and Weitz made a total capital contribution of two hundred dollars ($200.00) to Shetel between the formation of the company until the filing of the 2018 returns. (Ross Decl., Ex. 72). The Shetel Parties admit that "to the extent 'made a capital contribution' refers to personal investments of cash by Dr. Weitz," Weitz only made such a capital contribution totaling two hundred dollars ($200.00) as of January 2013. (Shetel 56.1, ¶ 17).

19

However, according to the Shetel Parties, "Shetel's tax returns indicate (i) that Shetel's profits were reinvested every year (neither Weitz nor Frenkel took a salary) and (ii) that Weitz's dental practice loaned approximately $33,000 to Shetel for its start up [*sic*] costs, which amount has not been repaid." (Shetel 56.1, ¶ 17). Moreover, Weitz asserts that Shetel's Form 1065s for the years 2012-2018, which report Shetel's annual income and assets, "indicate that it was well capitalized." (Weitz Decl., ¶ 16 and Ex. A).

Shetel's profit and loss statements indicate that in 2013, Shetel spent forty-three thousand two hundred fifty-one dollars and forty-seven cents ($43,251.47) on advertising, (Ross Decl., Ex. 85); in 2014, Shetel spent seventy-one thousand six hundred seventy-three dollars and fifty-seven cents ($71,673.57) on advertising, (*id.*, Ex. 86); and in 2015, Shetel spent sixty-four thousand one hundred forty-one dollars and thirty-three cents ($64,141.33) on advertising. (*Id.*, Ex. 87).

Although Adin repeatedly expressed interest in purchasing Shetel's business, a final agreement was never reached. (56.1, ¶ 8). Shetel alleges that "[o]n numerous occasions, Adin asked for Plaintiff's proprietary business information, including its compilation of customer information and order history;" and that Shetel "refused to provide the requested, highly confidential information absent executing a definitive purchase and sale agreement." (Am. Compl., ¶ 29). However, the Adin Parties assert: (i) that Shetel "agreed to report sales to Adin, which would have identified customer information and sales history, but . . . failed repeatedly to provide same; . . . [and] repeatedly refused to execute definitive distribution agreements with Adin;" and (ii) that "Adin repeatedly requested information from Plaintiff necessary for it to value the purchase of Plaintiff's business." (Ans., ¶ 29).

20

The Adin Parties allege that "[b]y the end of 2012, Plaintiff owed Adin over $300,000. Accordingly, Adin provided credit to Plaintiff for much of the products that Plaintiff attempted to market, sell and distribute during the first year of the relationship between Plaintiff and Adin." (CC, ¶ 26). According to the Adin Parties, by January 2013, Shetel owed Adin "more than $220,000," (*id.*, ¶ 29); and although Adin granted Weitz's request for a "temporary forbearance," Shetel "did not remit payment." (*Id.*, ¶ 30).

The Adin Parties further allege that after "Adin required Plaintiff to pay upfront for its next shipment of dental products[,] . . . Plaintiff retaliated by threatening to shut down its 'implant distribution business' in an effort to extract a concession from Adin so that Plaintiff could 'remain on a consignment net 90 basis'." (CC, ¶¶ 31-32). According to the Adin Parties, "[i]n February of 2013, Plaintiff did shut down its implant distribution business for a prolonged period[,]" during which, *inter alia*, Shetel "terminated at least two representatives, ceased filling orders from customers, ceased marketing to current and prospective customers, and ceased communicating with several customers." (*Id.*, ¶¶ 33-34). Moreover, the Adin Parties allege that "[i]n light of Plaintiff's willingness to terminate its marketing, distribution, and sales of Adin products in order to extract more favorable terms from Adin, representatives of Adin first expressed an interest in purchasing Plaintiff's business after the aforesaid February 2013 shut down of Plaintiff's business." (*Id.*, ¶ 36; *see also Id.*, ¶ 37 ["Adin first expressed interest in purchasing Plaintiff's business after Plaintiff threatened to and then did shut down its business in 2013"]). According to the Adin Parties, "Adin's interest in purchasing Plaintiff's business was intended to (in order of importance): (1) encourage Plaintiff to not solicit Adin's customers by, among other things, misrepresenting to customers that Adin was abandoning the United States'

market; (2) prevent Plaintiff from harming Adin's good will and reputation; (3) encourage Plaintiff to help increase the sales of Adin's products, thereby increasing the value of Plaintiff's business; and (4) prevent any damage to the services provided by Adin." (*Id.*, ¶ 38).

In addition, the Adin Parties allege that "Adin sought to limit the possibility of future threats by Plaintiff" by entering into a Letter of Understanding. (CC, ¶ 39).The Letter of Understanding, entitled "Letter of Understanding to continue the activity in USA – until December 31, 2013 or a signed and agreed contract is established," dated February 25, 2013 (the "Letter of Understanding"), is signed by Milman, on behalf of Adin, and Weitz, on behalf of Shetel. (Ans., Ex. A). Shetel is referred to therein as "Shetel Industries / Adin USA," and the Letter of Understanding provides, *inter alia*, that the "American distributor can market under it's [*sic*] own name." (*Id.*) Attached to the Letter of Understanding is a document with the heading, "Terms for transfer of assets," which includes the following provision: "Non-compete clause — with good will to continue the operation." (*Id.*)

Nonetheless, despite numerous proposals, counterproposals and discussions over the years, the business arrangements between Adin and Shetel were never reduced to a single integrated written contract. (56.1, ¶ 10).

Prior to the termination of Shetel's exclusive distributorship, Shetel discussed with Adin providing a CPK or "Tic-Tak" kit, *i.e.*, a kit containing multiple components, including an abutment, that a "doctor uses . . . for the restoration of the implant," to its customers. (Ross Decl., Ex. 61 at 252:19-254:2). Specifically, Weitz approached Adin asking if Shetel could manufacture such a multi-accessory CPK kit, (Shetel 56.1, ¶ 95); and in April 2014, Weitz requested that Milman email him "the OK to distribute the CPK kits [they] discussed . . . so that

[he could] order them." (Ross Decl., Ex. 98). Davidson sent Weitz an email on April 22, 2014, containing the subject, "Approval to sell CPK kits," and indicating that Milman had approved Shetel to sell the Tic-Tak kits. (*Id.*).

Adin did not provide those Tic-Tak kits to Shetel.[7] (Ross Decl., Ex. 61 at 254:3-4; Ex. 36 at 402:9-21; Ex. 35 at 146:14-18). Danzer testified that Shetel purchased the kits from a distributor who purchased them from a manufacturer in Israel, (Ross Decl., Ex. 36 at 530:6-11); and that Shetel labeled the kits itself once they were in the United States. (*Id.* at 530:23-14). However, Danzer did not know who in Shetel's office actually did the labeling, and he did not even work in Shetel's office.[8] (*Id.* at 531:15-21; Besdin Decl., Ex. D at 72:25-73:11).

Frenkel testified that he did not recall if the Tic-Tak kits were labeled when they arrived at Shetel from the supplier, and that he had no knowledge or recollection of anyone at Shetel's offices applying a label to a Tic-Tak kit. (Ross Decl., Ex. 35 at 146:19-147:5). Weitz also testified that he did not remember if the Tic-Tak kits arrived at Shetel with labels on them; nor if Shetel ever made labels for the kits. (Besdin Decl., Ex. H at 144:14-145:12).

A label on one of the Tic-Tak kits provides: "'TIC-TAK,' Total Implant Components, Temporary Abutment Kit, Collar= 3.0 mm, Height= 5.0 mm, REF[:] RS-TIC305, LOT[:] 6596,

---

[7] Chen Porat ("Porat"), Adin's General Director of Sales, does not have personal knowledge of the reason why Shetel was providing the kits to its customers because it "all happened before [his] time." (*See* Ross Decl., Ex. 61 at 254:5-21; *see also* Besdin Decl., Ex. F at 38:3-9).

[8] Danzer merely speculates that he "believe[s] that the . . . labels were either created, approved, or whatnot by Dr. Weitz." (Ross Decl., Ex. 36 at 531:15-21).

Production Date 2014.10, EC/REP [illegible] Brussels, Belgium, Nonsterile."[9] (Ross Decl., Ex. 103) (symbols and boxes omitted).

Documents Wollocko sent to Kseniya Shyrokava ("Shyrokava"), an employee of Shetel, on February 15, 2016 include, *inter alia*, an "Adin Implants 2016 Price List" for the Touareg-S product line (the "2016 Price List"), (Ross Decl., Ex. 100 at 0003693, 0003700-06), as well as an "NP Price List," which the email specifically indicates is "FOR INTERNAL USE ONLY – DO NOT SEND TO CUSTOMERS." (*Id.* at 0003693, 0003708-11). The 2016 Price List contains prices for Tic-Tak kits, which are identified with item codes containing an "RS" prefix and a space before the next digit, (*id.* at 0003703); and products for an "Overdenture System," which are specifically identified as "Zest Locators." (*Id.* at 0003705). The logos for both Adin and "Zest Anchors" are displayed on one of the documents, which also contains Shetel's name and contact information. (*Id.* at 0003707).

Danzer testified that while he was employed by Shetel, Shetel sold Adin implants with non-Adin abutments with the Tic-Tak kits. (Ross Decl., Ex. 36 at 391:20-392:6; *see also* Shetel 56.1, ¶ 94). According to Danzer, Adin knew Shetel was "selling something that was comparable to [a competitor's] kit." (*Id.* at 392:7-10). Moreover, Danzer testified that based upon his discussions with Hantman, so long as Adin approved the use of such non-Adin abutments, such use did not void Adin's lifetime warranty. (*Id.* at 392:11-21).

Hantman testified, in pertinent part, that Adin approved the use of certain non-Adin abutments which Adin did not have after Adin inspected them and ascertained that they were

---

[9] Weitz testified that he "would have no idea" if the label for the Tic-Tak kits was made in Belgium, and that he did not know who decided to use the "RS" prefix for the model number of the Tic-Tak kits. (Besdin Decl., Ex. H at 145:9-16).

compatible with Adin's connections. (Ross Decl., Ex. 38 at 422:9-423:17). According to

Hantman, absent such approval, the use of an Adin implant with a non-Adin abutment would

void the lifetime warranty displayed on Adin's website, (*id.* at 423:2-425:25), which provides, in

relevant part:

> "The Adin® dental implant and other Adin products are part of an overall concept and may be used only in conjunction with the corresponding original components and instruments according to Adin's instructions and recommendations. Use of products made by third parties, which are not distributed through Adin, in conjunction with the Adin® Dental Implant System will void any warranty or other obligation, expressed or implied, of Adin's instructions as to the application of our products take place verbally, in writing, by electronic media or in hands-on trainings corresponding to the state of the art at the time of introduction of the product."

(Ross Decl., Ex. 89).

Adin provided a copy of its lifetime warranty to Weitz and Frenkel in 2011, during

negotiations as to a distribution agreement. (Supp. 56.1, ¶ 52). Weitz testified that he did not

know whether he ever gave much thought to the warranty offered by Adin. (*Id.*, ¶ 55).

In addition, in 2013, Adin provided Shetel with copies of multiple documents entitled

"Instructions for Use" for multiple products sold by Adin to Shetel. (Supp. 56.1, ¶ 53). Those

documents included the following disclaimer:

> "These prosthetic components are part of an overall concept and may only be used in conjunction with the associated original products according to the instructions and recommendations of Adin Dental Implant Systems. Use of products made by third parties in conjunction with Adin Dental Implant Systems prosthetic components will avoid any warranty or other obligation, expressed or implied, of Adin Dental Implant Systems."

(*Id.*). Frenkel testified that he believed the "Instructions for Use" were routinely given out with

implants. (*Id.*, ¶ 54).

25

3.      Post-Termination of Distributorship Agreement

Adin "terminated Shetel's status as its exclusive distributor on or about September 21, 2016." (56.1, ¶ 32).

According to the Adin Parties, the Shetel Parties "repeatedly used Adin's marks in catalog and other communications, . . . [and] used Adin's proprietary catalog numbers and descriptions in their catalogs, invoices and communications issued to customers." (Adin 56.1, ¶ 36). Specifically, Shetel distributed catalogs featuring Adin products to some of its customers, both during the time it was Adin's exclusive distributor and afterward, (Shetel 56.1, ¶ 56); and after Shetel ceased being the exclusive distributor for Adin, it distributed catalogs identifying Adin's products by Adin's catalog numbers. (*Id.*, ¶ 57; Ross Decl., Ex. 43).

Wollocko testified that after the relationship between Shetel and Adin was terminated in September 2016, Shetel would tell its customers that a product was not from Adin if somebody asked about receiving a product from Shetel that was not marked Adin, or "if somebody asked for a specific product by name, then we would tell them, well, we don't have the Adin permanent abutment, we have the Osseogroup permanent abutment." (Ross Decl., Ex. 47 at 76:1-15). However, when asked if "any of that [was] in writing," Wollocko testified that Shetel "did not really communicate with [its] customers in writing. There were very few customers that exchanged emails with [Shetel]."[10] (*Id.* at 76:16-19). Wollocko further testified, in pertinent part, as follows:

> Q.      As a Long Island rep, if a problem arose, would you be the person that would then have to address it with the customer?
>
> A.      Not necessarily. If it was something the office could address, then no.

---

[10] Although the Adin Parties refer to six (6) emails Shetel sent to its customers, (*see* Adin Supp. 56.1, ¶ 76 [citing Ross Decl., Ex. 41-46]), such evidence does not, in fact, belie Wollocko's claim.

Q.     Were you responsible for telling the customers in the Long Island region or market that Shetel was no longer the exclusive distributor of Adin products?

* * *

A.     Only if it was asked. We didn't – it wasn't -- like I said before, we didn't advertise it, but we didn't hide it.

Q.     Under those circumstances then, it's feasible that there were physicians on Long Island who were never told that Shetel was sourcing its abutments from a third party. Correct?

* * *

A.     It's feasible.

(Ross Decl., Ex. 47 at 130:17-131:10).

In addition, Wollocko testified that two (2) of Shetel's employees, including Riservato, were told that "if somebody asked[,] to explain to them that the abutments were coming from other sources and if there was an option of one part versus another, to offer one part versus another," meaning that if Shetel "had an Osseogroup part and . . . still had an old Adin part, to offer both and see which one who would want." (Ross Decl., Ex. 47 at 135:10-136:2, 136:22-25). Furthermore, when asked if Riservato ever received "an instruction regarding what she should say or offer" when non-Adin components were sold "during the interim phase before Osseogroup received private label products," (*id.* at 136:12-137:11), Wollocko testified: "it was never an option. There was never -- we never had both parts in stock. The reason that those parts came to be was because we ran out of the Adin parts. . . . But if somebody called to ask about that part, they would call to ask and she would explain to them [the same thing]." (*Id.* at 137:13-23).

Riservato testified, in pertinent part:

Q.      And how did you learn that Shetel was distributing DiamoDent?

A.      We received the product. It was unavailable from Adin and we had to provide product, so we provided a product called DiamoDent.

          * * *

Q.      Was it your understanding that that was the only non-Adin product that Shetel was distributing?

          * * *

A.      I don't remember.

          * * *

Q.      . . . Was there ever a time where Shetel distributed non-Adin components like abutments that weren't from DiamoDent to its customers?

A.      I don't know.

Q.      Were you ever asked whether by any customer whether Shetel was distributing non-Adin components?

A.      I don't remember.

          * * *

Q.      Let's go from September 30, 2016, onward. Were you ever given instructions as to what to say if you were asked by a customer whether Shetel was distributing a non-Adin component?

A.      I don't remember.

Q.      Do you remember ever being told ever during the time in which you were employed by Shetel as to how to answer a question about the origin of a non-Adin product?

          * * *

A.      I was never told how to respond to a customer if they called. We would just simply say we have this DiamoDent part.

(Ross Decl., Ex. 70 at 23:4-25:23).

28

Weitz testified that Shetel's customers knew that it was no longer filling orders with products exclusively manufactured by Adin because, "[o]f course we told them," (Ross Decl., Ex. 69 at 181:3-13); and that Shetel filled orders with components that did not bear any brand names, but he did not know whether Shetel told its customers that those unbranded components were not manufactured by Adin. (*Id.* at 181:14-22).

Frenkel testified that he was "not sure" whether Shetel told its customers that it was filling orders for components with parts that came from third-party manufacturers, and that he was not aware of any "policy to tell customers prior to September 2016 that their orders for components were being filled with non-Adin components." (Ross Decl., Ex. 35 at 125:23-126:11)

Between September and November 2016, Wollocko sent four (4) emails to customers, *inter alia*, identifying his title as "Director of Development & Technology / Adin Implants," and providing information regarding Adin products.[11] (Ross Decl., Ex. 41-44; *see Id.*, Ex. 47 at 81:24-83:10). Two (2) of those emails referenced "Adin Implants Information" in the subject line, (*id.*, Ex. 42-43); and the September email referenced "Adin Implants Follow Up" in the

_____

[11] The first email was sent to Dr. Gandhi on September 15, 2016 and pre-dates Adin's notice terminating the exclusive distributorship arrangement with Shetel. There is also evidence indicating that Shetel sent information about Adin's products, including brochures and catalogs, to other customers prior to the termination of its exclusive distributorship. (*See* Ross Decl., Ex. 45-46, 48-52, 92-94). Indeed, three (3) of the emails which the Adin Parties cite in support of their contention that "after Shetel ceased being the exclusive distributor of Adin's products in the United States, [t]he Shetel Parties repeatedly held themselves out as 'Adin' to their customers," (Adin 56.1, ¶ 35), are dated October 8, 2015, October 15, 2015 and September 15, 2016, respectively, prior to the date that Adin allegedly terminated Shetel's status as its exclusive distributor in the United States. (*See* Ross Decl., Ex. 41, 45 and 46). Accordingly, those emails do not support the Adin Parties' contention. Similarly, several of the emails which the Adin Parties cite in support of their contentions that "after Shetel ceased being the exclusive distributor of Adin's products in the United States, [t]he Shetel Parties repeatedly used Adin's marks in catalog and other communications, . . . [and] used Adin's proprietary catalog numbers and descriptions in their catalogs, invoices and communications issued to customers," (Adin 56.1, ¶ 36), are dated prior to the date that Adin allegedly terminated Shetel's status as its exclusive distributor and, thus, do not support those contentions. (*See* Ross Decl., Ex. 41, 45, 46, 48-50).

29

subject line and "probably [did] not" reference Shetel anywhere. (*Id.*, Ex. 41 and Ex. 47 at 82:22-24). With respect to one of those emails, Wollocko testified, in pertinent part:

> Q.      And if a non-Adin product was being sold to a physician, the only document that would accompany -- to Dr. Gandhi, the only document that he would receive at any time would be this invoice. Correct?
>
>         * * *
>
> A.      Correct.
>
> Q.      And the only thing he had in writing then was something that reflected what you described as the Shetel item code or the Shetel code, which varied from the Adin code only by having a space between the two-character prefix and then the numerical code. Right?
>
> A.      Correct.
>
> Q.      And the only other thing you have is a recollection that at some point, you can't remember, you told Dr. Gandhi that non-Adin products were also going to be filling his orders. Correct?
>
>         * * *
>
> A.      Correct.
>
> Q.      All right. And you have no idea whether or not this actually had a non-Adin product. Right?
>
>         * * *
>
> A.      Based on what you've put in front of me, no.

(Ross Decl., Ex. 47 at 101:13-102:12). However, Wollocko further testified that he informed Dr. Gandhi that "Shetel was no longer selling exclusively Adin products," and that, although he could not recall when he so informed Dr. Gandhi or exactly what he said to him, he and Dr. Gandhi "meet with regularly [*sic*]," and he was "sure [he] said something along the lines of we're no longer an exclusive Adin distributor and we now have additional lines of product that

30

you will be getting in your orders." (*Id.* at 96:15-97:6). In addition, Wollocko testified that he told Dr. Gandhi that "he may get Osseogroup abutments," although he did not remember when, (*id.* at 97:7-25); and that, to his knowledge, he did not send Dr. Gandhi any further catalogs. (*Id.* at 96:8-14).

The Adin Parties also submit invoices from Shetel to a Dr. Sheldon Milo containing, in relevant part, "Item Codes" beginning with the prefix "RS," including: (i) an invoice dated June 21, 2017 ("Invoice No. 13503"), containing, *inter alia*, an order for twenty (20) components described as "RS Engaging Plastic Cylinder Casting Abutment" and identified by the Item Code, "RS 5000," (Ross Decl., Ex. 57); and (ii) an invoice dated February 20, 2017 ("Invoice No. 12837"), containing, *inter alia*, an order for thirty-seven (37) components described as "RS Healing Abutment 4.5mmD x 2mm" and identified by the Item Code, "RS 3022." (*Id.*, Ex. 56). The information regarding two (2) of the components identified by the prefix "RS" on Invoice No. 13503, *i.e.*, items RS 5000 and RS 5737, and regarding RS 3022 on Invoice No. 12837, was redacted on the spreadsheets produced by the Shetel Parties as pertaining to products that were not manufactured by Adin. (Ross Decl. Ex. 57, Ex. 97 and Ex. 47 at 117:22-17).

In addition, the Adin Parties submit photographs of plastic bags containing, *inter alia*, the following labels: "Plastic Cylinder, Casting Abutment, w/ Hex, Non Sterile [*sic*], STD Internal Hex, Lot PC02," (Porat Decl., Ex. 95); and "Healing Cap, 2mm, Non Sterile, STD Internal Hex, Lot 301-2."[12] (*Id.*, Ex. 96).

---

[12] The Adin Parties cite no evidence that would be admissible at trial to support their contention, *inter alia*, that the photographs depict the products shipped to Dr. Milo from Shetel pursuant to the February 20, 2017 and June 21, 2017 invoices referenced above. Danzer testified only that he "maybe" told a medical provider that certain products he saw "in the field" were not FDA compliant because he "had a suspicion on the packaging, not only because of the fact that they were in these little plastic Ziploc bags," but also because the labels did "not contain information other than a lot number. . . . [I]t's just a description of a part, which matches, I believe, the Adin catalog description, which we, by the way, register those descriptions with the FDA." (Ross Decl., Ex. 36 at 464:3-466:20).

31

Wollocko testified that "sometime in 2017" he had a conversation with Dr. Milo wherein he told him that Shetel was no longer filling orders with just Adin products. (Ross Decl., Ex. 47 at 120:5-12). According to Wollocko, Dr. Milo asked him "why he received non-Adin parts" in an order and Wollocko responded that since Shetel was "no longer an exclusive distributor, [it was] running out of certain part numbers and that [Shetel was] filling them from other manufacturers." (*Id.* at 120:13-24). Wollocko further testified, in pertinent part:

> A.      . . .He then asked me if the parts were still manufactured in Israel, to which I said yes, to which he was, I think, content.
> Q.      Did you have -- make any -- did he ask about whether or not they were compatible with Adin products?
>
> A.      Not that I recall.
>
> Q.      Did he ask about anything else regarding the physical makeup of the product?
>
> A.      Not that I can remember.
>
> Q.      Tolerances or materials or the like is what I'm getting at. Nothing like that?
>
> A.      No, not that I can remember.
>
> Q.      How did he react when he -- when you told him that it was still coming from somebody else, somebody -- still somebody in Israel, but it was somebody else?
>
> A.      Well, we had -- now that you're – I'm remembering a little bit, I had two conversations with him, one was in his office when I told him that we were no longer an exclusive distributor, then the second conversation was on the phone prior to him placing a substantial-ish order. When he asked where the parts were from, he said he would have to think about it, and then he did not call me back.

(*Id.* at 120:24-121:23).

Hantman testified that a customer receiving a document identifying a product with a catalog number containing the prefix "RS" would believe that the product was an Adin product because only Adin uses "RS" as a prefix. (Ross Decl., Ex. 38 at 400:7-401:23). However,

32

according to the Shetel Parties, at least one (1) other implant manufacturer uses "RS" as an indicator in their catalogs, *i.e.*, the European dental implant company called RS Implants, (Besdin Decl., Ex. I), although not necessarily as a prefix in the catalog numbers of their products. (*See Id.*).

Wollocko testified, in relevant part, as follows:

Q.   Would the fact that it was an Osseogroup abutment as you called it be reflected on an invoice?

A.   Yes.

Q.   How would it be reflected on an invoice?

A.   An Osseogroup abutment has a different part designation.

Q.   Was there ever a time where an invoice didn't reflect the Osseogroup abutment part designation but instead reflected an Adin part designation?

* * *

A.   There was a time when the -- some of the part numbers may have overlapped with Shetel's part numbering system.

Q.   What does that mean?

A.   That the part numbers were not changed prior to a product being sold from a rollout. For example, an analog.

Q.   From a what? First part. From a rollout?

A.   Yeah, when you roll out a new product.

Q.   So there was a time where Shetel was selling Osseogroup abutments or other parts manufactured by a third party –

A.   Correct.

Q.   -- to customers and the invoice would reflect an Adin part. Correct?

A.   The invoice would reflect a Shetel part.

33

Q.      How does a Shetel part differ from an Adin part?

A.      The part numbers are similar, they're not identical.

Q.      How do they vary?

A.      We have a space in our part number.

Q.      That's the difference is a space between?

A.      There's a space inside the part number, correct.

Q.      And was -- was Shetel's customers apprised that the space differentiated a Shetel part number from an Adin part number?

        * * *

A.      No.

Q.      So if I'm a dentist and I see RS5737 all together, Shetel hasn't told me that RS space 5737 means something different. Correct?

A.      Correct.

Q.      Okay. How long was that time where the rollout was happening?

A.      I'm not sure. A few weeks, a few months, I'm not positive.

(Ross Decl., Ex. 47 at 76:20-78:20). According to Wollocko, he "would assume" that Shetel "counted pieces of both an Adin product bearing RS5737, no space, and then the subsequent Shetel product that came from a third party, RS space 5737, in the same inventory." (*Id.* at 167:5-10).

In addition, Wollocko testified, in pertinent part, as follows:

Q.      So the 4-millimeter healing abutments, were those routinely described by Shetel as RS3024?

A.      Yes.

34

Q.     Okay. And was there a time where Shetel purchased from another manufacturer 4-millimeter healing abutments that it called RS3024?

A.     I don't recall, but I believe so.

Q.     Okay. By the way, the space is the difference between the character prefix for Shetel product and the lack of a space on an Adin product. Is that correct?

* * *

A.     The space -- yes.

Q.     Okay. On D-9, the catalogs, specifically, 3819, that uses a dash between the prefix and the number. Right?

A.     Those would be implants.

Q.     Right.

A.     Correct.

Q.     But –

A.     These are not – you're talking about abutments, you said the space is the difference. So here this is an RS3028. On our spreadsheets, it would come up as an RS space 3028. An implant has a different code to begin with, it's ISPS-1135.

Q.     So the difference is –

A.     And in our system, it's ISPS 1135.

Q.     With a space or a dash or nothing?

A.     With a space.

Q.     Okay. So the difference is there's a dash –

A.     I believe it's a space.

Q.     -- for implants and no space -- so Adin uses a dash for its implants and a space for its --and no space for its abutments.

* * *

35

> A.    No, Adin uses a dash.
>
> Q.    For it's implants?
>
> A.    And no space for its abutments.
>
> Q.    Got it. A dash for its implants –
>
> A.    Correct.
>
> Q.    -- and no space for its abutments. And this is the difference between an Adin code and a Shetel code, those are the differences.
>
> A.    On the invoices, correct.
>
> Q.    Anywhere else?
>
> A.    Yeah, invoices, the inventory.

(Ross Decl., Ex. 47 at 113:12-115:13).

Both while Shetel was the exclusive distributor of Adin's products in the United States and thereafter, Shetel provided customers with a two (2)-page marketing document that was either created by it or created for it, which listed Adin's products, identified Adin's products by Adin's catalog numbers and used the marks and logos of Adin, but contained Shetel's address, telephone number, facsimile number, customer service email address and website. (Adin Supp. 56.1, ¶ 67). According to the Shetel Parties, "customers procured Adin products from Shetel, which sold genuine Adin products accurately packaged as Adin products." (Shetel 56.1, ¶ 67).

Wollocko testified, in relevant part:

> Q.    Okay. What did the packaging look like on the products that were being sold during this period that were from non-Adin manufacturers? And the period of course is where there's the Shetel space model numbers are still appearing on invoices.
>
>                    *  *  *

A.    They were clear bags or they were sealed clear bags with a label on them.

Q.    What did the label say?

A.    It said what the part was and it said a lot number.

Q.    Did it say that it was a Shetel product?

A.    No.

Q.    Did it say that it was an Osseogroup product?

A.    No.

Q.    Did it identify the product by any other manufacturer?

A.    No.

Q.    Any other distributor?

A.    No.

Q.    Did it identify anything else on the label?

A.    No.

Q.    Okay. So –

A.    It did say that it was nonsterile.

Q.    Okay. And that's the extent of what was listed on the labels to your recollection?

A.    To my recollection.

(Ross Decl., Ex. 47 at 99:11-100:14).


4.    Registration and Use of Website

The Adin Parties allege that Shetel registered the website URL www.adinimplants.com in

2010 "and used that domain throughout the parties' business relationship (with Adin's

knowledge and acquiescence), but refused to turn over the website URL to Adin after the parties'

exclusive distributor relationship ceased." (56.1, ¶ 38).

In a July 26, 2014 email from Weitz to Adin, Weitz wrote, *inter alia*, "We own our phone

number and our website," and Adin wrote, "Agreed." (56.1, ¶ 40). Weitz also wrote, in relevant

part:

> "The below terms were for negotiation only during our meeting:
>
> * * *
>
> Shetel has a right t [*sic*] sell Adin Implants under our name which we own. (of
> course we will not cover the adin [*sic*] name in packaging .... As you've outlined...)
> Agreed[;]
>
> * * *
>
> Intellectual property — Adin owns what they develop. We own what we develop.
> Agreed[;]
>
> * * *
>
> . . . We all agreed that I own Adinimplants.com, not Adin Israel and that Adin Israel
> owns the trademark of their name. Adin Israel is allowing Shetel to use their name.
> Upon Termination, it is clear that Adin Israel will not allow Shetel to continue using
> their name."

(CC, Ex. C). The Adin Parties do not allege that the parties modified that agreement. (56.1, ¶ 41).

The Adin Parties allege that after the termination of the exclusive distributorship

agreement, Adin demanded that Shetel stop using the domain name, and that Shetel and Weitz

caused web browsers going to www.adinimplants.com to be redirected to Osseogroup's website,

and then changed the URL so it would not lead to an active website, but instead to a 404 "Not

Found" error message. (56.1, ¶ 42; CC, ¶¶ 178-179). Specifically, in an email sent to Weitz and

Frenkel on April 25, 2017, Cohen, *inter alia*, (i) demanded that they "[r]efrain from introducing

[themselves] as Adin's distributor and immediately remove any such reference from all promotional materials [they] may have, web sites [*sic*] etc. . . . [and] Immediately Stop using Adin's trade mark [*sic*] and trade name[;]" and (ii) reminded them that they "must not use" the domain www.adinimplants.com "as well as make no other use of Adin's name." (Besdin Decl., Ex. L).

Moreover, in a July 20, 2017 email, Frenkel wrote: "Should we create a new landing page /landing which will contain the message below and after 3 seconds redirect osseogroup.com?" (Ross Decl., Ex. 124). In response, Weitz sent Frenkel an email on July 20, 2017 stating, in relevant part: "I asked [Jack] to wrok [*sic*] on the landing/redirect page asap – hopefully up and running tomorrow. . . ." (*Id.*).

With respect to the issue of redirecting the website, Wollocko testified that he "more than likely" would have been the person at Shetel to make the change to redirect web browsers from www.adinimplants.com to Osseogroup's website, (Ross Decl., Ex. 47 at 151:16-25); and that "[i]f they asked [him] to do it, [he] did it," but he did not "remember the exact specifics." (*Id.*, at 152:1-7). Wollocko also testified that he "was told to take our current website and redirect it to say we are redirecting and then redirect it to . . . the Osseo," but he did not remember who instructed him to do so. (Besdin Decl., Ex. G at 148:16-149:5).

### 5.   Danzer's Employment

Danzer testified that he left his prior employment at MIS Implant Technologies Ltd. ("MIS") to join Shetel because Weitz and Frenkel "offered [him] ownership in the company."

(Ross Decl., Ex. 36 at 101:16-23, 116:16-117:14, 118:11-23, 120:9-25). Danzer testified, in

pertinent part:

> Q.      . . . [D]id you have conversations with Dr. Weitz and Jeremy Frenkel about ownership in Shetel starting in or about August 2010?
>
> A.      Yes.
>
> Q.      '11; I'm sorry.
>
> A.      No. 2011, yes.
>
> Q.      So in August 2011 what was the conversation?
>
> A.      It was that if I had agreed to come over from MIS, I would be getting up to 20 percent ownership in the company to be spanned out over four or five years, where I believe it was a 3 percent cash buy-in, but 2 percent I would get immediately – an additional 2 percent I would get immediately to start it off.
>
> Q.      So you were -- you were told you were going to get 2 percent when you started at Shetel in 2000 and –
>
> A.      '12.
>
> Q.      -- 12.
>
> A.      Yes.
>
>                  * * *
>
> Q.      And they didn't give that to you.
>
> A.      No.
>
> Q.      They didn't give it to you then or any time after that.
>
> A.      They had continually -- at some point, and I don't know when, they I almost want to say strong-armed me into saying that I would have to pay for 5 percent of the company and that would be it. They had -- I had been ready a few times to pay in that 5 percent and had been told don't pay it in now because we're going to have a cash call for taxes or for whatever it is and if you pay in the money now, you're going to be responsible for your percentage in that as well. So they told me to wait until they informed me that it was a good time to pay in.

(Ross Decl., Ex. 36 at 116:17-118:9).

On May 24, 2011, Danzer forwarded an email to Weitz with the subject "Shetel Industries Partnership," setting forth, *inter alia*, the following proposed terms of employment: "3% buy in/2% given at day 1;" "Up to 5% ownership at each year end in lieu of $$$ bonus for performance;" and "Up to 20% ownership in Shetel/Adin or same % as other partners plus 10 %." (Ross Decl., Ex. 71 and Ex. 69 at 150:3-23). Weitz acknowledged receipt of that email, but does not remember how he responded to it. (*Id.*, Ex. 69 at 150:24-151:2; *see also* Supp. 56.1, ¶ 34). Weitz also does not remember having Danzer draft his own offer letter. (Ross Decl., Ex. 69 at 151:3-5).

Danzer testified that he was also "supposed to get a laptop," which he did not get, (Ross Decl., Ex. 36 at 102:9-15); and that he was initially promised a "base salary with commission," but during a subsequent conversation in February 2012, "it was moved to essentially just a base salary as a 1099," with no commission, although the base salary was increased "to kind of compensate for what [he] would have made commissionwise." (*Id.* at 121:5-122:25; *see also* Supp. 56.1, ¶ 38). According to Danzer, "It was still less than what [he] was making at MIS, considerably; but, again, that was supposed to be the sweat equity that went into [his] ownership piece." (Ross Decl., Ex. 36 at 121:18-22). In addition, Danzer testified that in or around 2014, his base salary dropped when he "went to a W-2, the same time they added commission to the structure so that [he'd] be able to make more." (*Id.* at 122:9-25; *see also Id.*, Ex. 63).

Danzer testified that the Shetel Parties never provided him with, *inter alia*, health or dental insurance, a matching 401(k), or a laptop, as promised. (Ross Decl., Ex. 36 at 102:2-15). The Shetel Parties contend that Danzer fails to explain "why he apparently worked without

protest for over four years without the insurance and other fringe benefits he had allegedly been promised at the outset of his employment." (Shetel Parties' Memorandum of Law in Support of Motion to Dismiss ["Shetel MTD Mem."] at 7). However, an email Weitz sent to Danzer and Frenkel on April 4, 2014, *inter alia*, confirms discussions between Shetel and Danzer regarding an equity stake in the company, (Ross Decl., Ex. 63); an email Yoni Rubin ("Rubin"), Shetel's Director of Operations, sent to Frenkel on January 27, 2015 indicates, in relevant part, that Danzer "mentioned to [Rubin] that he talked to [Frenkel] in the past about granting him an equity stake," (Ross Decl., Ex. 64); and an email Danzer sent to Daniel Ellenberg, Shetel's director of corporate development, on March 8, 2016 contains the subject "Healthcare/401K" and states, "Where are we on this?" (*Id.*, Ex. 66).

In addition, Danzer testified that at the beginning of 2016, he received an e-mail from Shetel "with an escrow account for which to deposit $50,000 into while everything was supposed to have been drawn up and figured out and, you know, finalized," but he did not deposit the money because, "[m]ore than likely [he] had been told, as [he] had been told before, not to invest the money at that point, because . . . there was going to [be] a cash call[,] . . . [and he] would have been on the hook for a cash call for [his] percentage." (Ross Decl., Ex. 36 at 344:2-345:6; *see also Id.*, Ex. 65 [email sent from Frenkel to Danzer on April 8, 2016]).

With respect to Danzer obtaining an equity interest in Shetel, Weitz testified, in relevant part:

> Q.     Did you ever offer 5% to Jeremy Danzer in exchange, 5% equity in Shetel to Jeremy Danzer in exchange for 50,000?
>
> A.     I believe collectively we did.
>
> Q.     What did that mean?

A.      Jeremy Frenkel and I.

Q.      When was that?

A.      I think it was long standing. I don't think it was one time. I think it was from the beginning.

Q.      From the beginning before--from the beginning meaning when?

A.      I think it was an ongoing discussion and I think we were prepared to move forward when Jeremy Danzer was prepared to move forward.

Q.      When you say prepared to move forward, what do you mean?

A.      Giving him an interest in the business would require professional advice and that would require a monetary investment, monetary commitment and when he was ready withe [*sic*] monetary commitment to buy, we were ready to move forward.

Q.      Did Mr. Danzer tell you he was ready to move forward?

A.      He may have.

Q.      Did he, when you say he may have, what do you mean?

A.      I don't have an exact recollection of it. I have a recollection at some point of us asking him to escrow the money and then we would move forward.

Q.      What happened at that point?

A.      I don't believe he ever escrowed the money.

Q.      Was there ever a time when Mr. Danzer told you he was prepared to invest the money in Shetel?

A.      Possibly.

Q.      Was there ever a time when you or Mr. Frenkel dissuaded Mr. Danzer to invest the money at that time because there was a forthcoming cash call?

A.      Possible.

(Ross Decl., Ex. 69 at 154:21-156:13).

43

Similarly, Frenkel testified, in relevant part:

> Q.      Was Jeremy Danzer ever offered the opportunity to purchase 5 percent equity in Shetel for $50,000?
>
> A.      To my knowledge, yes.
>
> Q.      And when was that?
>
> A.      I don't specifically remember the times, but throughout our relationship.
>
> Q.      Do you remember anything specific about any of the offers?
>
> * * *
>
> A.      There was a period of time when I remember asking him to send $50,000 to an escrow account at a law firm of ours, and then we would draft up the agreement. Because leading up to that, we had said if you're interested in investing, you have to put the money up.
>
> Q.      Did he do that?
>
> A.      No.
>
> * * *
>
> Q.      If Jeremy invested the money, then he would be obligated to also provide funds in that cash call?
>
> * * *
>
> A.      Not to my knowledge.

(Besdin Decl., Ex. M at 26:6-27:8). Frenkel does not recall Danzer ever indicating that he was ready to pay the fifty thousand dollars ($50,000.00) to acquire an interest in Shetel or to invest in Shetel. (*Id.* at 160:4-24). Frenkel also did not believe that there were any cash calls at Shetel between its inception in 2011 and July 2016, when Danzer's employment ended. (*Id.* at 160:25-161:10).

The Adin Parties allege, *inter alia*, (i) that on July 20, 2016, Shetel demanded that Danzer "agree to a written agreement wherein he would agree not to compete with Plaintiff or solicit Plaintiff's customers for an unspecified period of time ('Non-Compete Agreement'),"[13] (CC, ¶ 104); (ii) that Danzer "responded that since he was a partial owner of Plaintiff, he did not believe that the Non-Compete Agreement was necessary[,]" (*id.*); (iii) that Weitz ignored his response and "threatened that Mr. Danzer could not remain with Plaintiff . . . if he did not execute the Non-Compete Agreement[,]" (*id.*); (iv) that "Plaintiff did not provide Mr. Danzer with a copy of the proposed Non-Compete Agreement[,]" (*id.*); (v) that Frenkel called Danzer on July 22, 2016 "and requested that he make a decision regarding the theretofore unseen Non-Compete Agreement[,]" (*id.*, ¶ 105); (vi) that Danzer "indicated that he would not agree to any agreement that he had no opportunity to review and consider, . . . that he considered Plaintiff to have terminated him, based on Dr. Weitz's threat of July 20, 2016[,] . . . [and] that he would place all of Plaintiff's property that had been in his possession on his front porch for collection[,]" (*id.*); (vii) that on July 25, 2016, Weitz contacted Danzer and "apologized for any miscommunication" and indicated that he would "ensure[] the proposed Non-Compete Agreement was sent to Mr. Danzer[,] . . . [and] that the deadline for Mr. Danzer to make a decision was extended to July 27, 2016[,]" (*id.*, ¶ 106); and (viii) that the following day, Danzer informed Weitz "that he would not execute the Non-Compete Agreement, because same lacked consideration." (*Id.*, ¶ 107). Danzer "does not allege that he objected to the tendered contract because it failed to acknowledge the

---

[13] Notwithstanding that the stated consideration for the purported "Non-Compete Agreement," which is dated July 21, 2016 and entitled "Confidentiality Agreement Containing Restrictive Covenant," is Danzer's "continued employment" with Shetel, the agreement expressly indicates that it "does not constitute an employment agreement and shall not confer any right to continue in the employ of the Company, or in any way impair, the right of the Company at any time to terminate your employment with or without cause." (Porat Decl., Ex. 106 at p. 1 and p. 4, ¶ 9).

fringe benefits he claims to have been promised years earlier, nor does he allege that he objected to the tendered contract because it failed to set forth the formula for his commissions that he now claims should have been reduced to writing." (56.1, ¶ 51).

Danzer's employment as Executive Director of Shetel ceased in late-July 2016. (56.1, ¶ 16). By that time, Shetel allegedly had "noticed that Danzer's work performance deteriorated [*sic*] significantly," insofar as "Danzer missed the performance targets he established and he became less communicative with Plaintiff's principals." (Am. Compl., ¶ 34).

Danzer testified that on July 29, 2016, he reached out to Hantman and Milman "to thank them for the last four and a half years, and . . . to just let . . . them know that [he] was no longer working with Dr. Weitz." (Ross Decl., Ex. 36 at 150:6-21). According to Danzer, "they were shocked and surprised" and indicated that they wanted to talk to him by phone. (*Id.* at 150:22-151:9). Danzer testified that he spoke with Hantman and Milman on Sunday, July 31, 2016, and they indicated that "they were shocked and surprised, they didn't know, they weren't told until [he] told them, and that they had an opportunity that they wanted to discuss with [him] in Israel." (*Id.* at 151:10-152:15). Danzer further testified that he informed Hantman and Milman that his employment with Shetel had been terminated, and that he understood at that point that his employment was over. (*Id.* at 152:16-21).

According to Shetel, "[o]n July 30, 2016, Plaintiff terminated Danzer's access to his work email account by changing the password," (Am. Compl., ¶ 35), but approximately six (6) weeks later, Danzer "hacked into the email account he used when he was Plaintiff's employee and Executive Director[,] . . . [and] proceeded to send eighteen (18) emails from his former work email account to his personal email account containing some of Plaintiff's most competitively-

46

sensitive information." (*Id.*, ¶ 36). Shetel asserts that such information "includes the sales history, account information and contact information for hundreds of Plaintiff's customers located throughout the United States, including customers with whom Danzer had no direct and/or independent relationship[,] . . . [as well as] Plaintiff's sales forecasts, information regarding sales leads, and Plaintiff's internal notes regarding communications with actual and potential customers." (*Id.*, ¶ 37). Danzer admits that he had access to information related to Plaintiff's customers while employed by Shetel. (Ans., ¶ 32).

Danzer testified that he was able to access his email at Shetel on September 13, 2016, merely by opening his laptop and opening up his email, (Ross Decl., Ex. 36 at 171:21-172:3); and that he "went into [his] e-mails and . . . started scrolling through all of [his] e-mails, it was kind of like cleaning out [his] inbox, . . . and [he] came across e-mails that [he] wanted to keep in the forefront of [his] mind," so he forwarded them to himself. (*Id.* at 175:24-176:7). When asked why he forwarded certain emails to himself, Danzer testified: "They were just to remind me . . . with the . . . multiple clients and relationships that I have – and . . . I'm talking in the thousands here – I can't possibly remember everybody . . . at every moment of the day. Having files with just even a name will kind of bring it to the forefront for me and say, oh, I've got to get in contact with that person, I need to speak to that person, I should talk to them, let me let them know what's going on, let me go to their office, I haven't been there in six years . . . ." (*Id.* at 176:8-25). Danzer further testified, "The lists that I downloaded, again, were to keep certain people in the front of my mind. They were not to be forwarded necessarily to Adin. They were for me to keep active in my mind so that I can at some point reference them and pursue those customers." (*Id.* at 315:9-16).

Danzer alleges that he was induced to work for Shetel in February 2012 on terms that

included a salary, commissions, and certain fringe benefits such as insurance and 401k

contributions that he never received, (56.1, ¶ 44; *see also* Ross Decl., Ex. 36 at 102:2-12, Ex. 62

[offer letter drafted by Danzer dated February 8, 2012], and Ex. 63 [email from Weitz to Danzer

and Frenkel dated April 4, 2014]); and that following his termination in July 2016 he did not

receive all commissions he was due. (56.1, ¶ 45). However, Danzer never had a written

employment contract with Shetel, and he does not identify the amount of commissions he is

allegedly owed or the sales that supposedly triggered the commissions; nor does he allege any

pre-litigation demand for such amounts that was refused. (*Id.*, ¶¶ 46-47, 49).

The Adin Parties allege that when Shetel hired Danzer in 2012, "he brought with him

customer lists (in the form of business cards and spreadsheets) and training materials from his

previous experience selling dental products[,] and that Shetel benefited economically from this

information." (56.1, ¶ 52). The Adin Parties further allege, *inter alia*, (i) that after Danzer's

employment was terminated, "Shetel 'retained' the customer lists he brought with him in 2012,"

(56.1, ¶ 53); (ii) that Danzer "was the owner of his assets and property, including . . . his

customer lists and records which were taken by Plaintiff without authorization[,] . . . is, and

continues to be, entitled to immediate possession of all such assets and property[,] . . . [and]

owns all business opportunities and customer lists that were developed by him prior to his hiring

by Plaintiff, including good will from the customers that [he] developed[;]" (CC, ¶¶ 288-290);

and (iii) that Shetel "has intentionally and unlawfully exercised ownership, dominion and control

over Mr. Danzer's assets and property, in denial and repudiation of his rights thereto." (*Id.*, ¶

291). However, the Adin Parties do not allege that Danzer "does not have his own copies of the

list, that Shetel ever agreed contractually to stop using such list if Danzer ceased to be employed there, or that Shetel ever agreed contractually to stop doing business with customers Danzer might have introduced to Shetel." (Shetel MTD Mem. at 8).

Adin USA Newco was incorporated on September 14, 2016. (56.1, ¶¶ 9, 19).

On or about September 16, 2016, Adin and Adin USA Newco hired Danzer as the Northeast Director of Sales to distribute Adin products in the United States. (56.1, ¶ 10). According to Shetel, "[o]ne of Danzer's tasks was to contact Plaintiff's customers and convince them to stop doing business with Plaintiff and to start doing business with Defendants." (Am. Compl., ¶ 44). Shetel also alleges that "[w]hile Danzer was still employed by Plaintiff, Danzer and Adin discussed the possibility of his employment;" and that "[a]t the time, Adin was aware that Danzer had access to Plaintiff's proprietary information, including its compilation of customer information, order history and specific customer sales terms (including pricing)." (*Id.*, ¶ 32). According to Shetel, "Adin and Danzer ultimately agreed to form a new company and target the business that Plaintiff had spent years developing." (*Id.*, ¶ 33).

According to Danzer, by October 2016 he was telling doctors that he "was with Adin" and "was informing them that [he] was with Adin Digital, that we were coming out with new products, that [he] had gone from Adin -- or from Shetel selling Adin to working for Adin direct corporate." (Ross Dec., Ex. 36 at 275:22-276:8). Danzer further testified that he "notified the customers that [he] had dealt with from the time [he] started working -- from the time that we started selling the implant products and components," that if they "want Adin products, this [Adin USA Newco] is now the new home where you can find them." (*Id.* at 314:2-16).

B.     Procedural History

On or about April 26, 2017, Shetel commenced this action against the Adin Parties asserting claims of unfair competition and false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), (fifth claim for relief in amended complaint); and under New York state law for unfair competition (sixth claim for relief in amended complaint), defamation *per se* (seventh claim for relief in amended complaint), tortious interference with contract (eighth claim for relief in amended complaint) and tortious interference with prospective business relationships (ninth claim for relief in amended complaint). On July 12, 2017, Shetel filed an amended complaint, *inter alia*, asserting additional claims against the Adin Parties for misappropriation of trade secrets under the DTSA and New York state law (first and second claims for relief, respectively), trespass to chattels (third claim for relief), and unjust enrichment (fourth claim for relief). Shetel seeks, *inter alia*, to recover "all gains, profits, savings and advantages realized by Defendants" for their allegedly wrongful conduct, (Am. Compl., ¶ 98 and at p. 23); damages, including exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and state law, punitive damages under New York state law, enhanced damages and "disgorgement of profits, loss of business, [and] corrective advertising damages" under the Lanham Act; and costs and attorneys' fees under 18 U.S.C. § 1836(b)(3)(D) and the Lanham Act.

Shetel alleges, *inter alia*, that it "incurred substantial expense developing and maintaining the United States market for Adin's products, as well as building the Adin brand in the United States[,]" including by "invest[ing] time and substantial sums in advertising, marketing, trade shows and equipment costs[;] . . . establish[ing] hundreds of business relationships with customers and other industry participants[;]" building and growing a customer base; "hir[ing] a

sales force to help increase and expand sales;" and developing and promoting the website
www.adinimplants.com. (Am. Compl., ¶ 22). The Adin Parties admit that Shetel "hired a sales
force, registered the domain name www.adinimplants.com and developed a website using said
domain name," but assert that Shetel "agreed to cease using the 'Adin' name and any of its
trademarks upon termination of the relationship, . . . [and] that Defendants repeatedly requested
ownership and custody of the domain name and website and offered Plaintiff payment for same,
yet Plaintiff refused." (Ans., ¶ 22).

Shetel further alleges, *inter alia*: (i) that in early February 2017, John White ("White"),
one of its former employees, fulfilled a customer order on behalf of Adin USA Newco that had
been placed with Shetel, (Am. Compl., ¶ 49); (ii) that the Adin Parties (A) "verbally and falsely
informed Plaintiff's customers and business contacts" that Shetel "is no longer in business" and
that "Adin had purchased" Shetel, (*id.*, ¶¶ 51-52, 54-55), and (B) "misled customers by telling
them that nothing has changed with respect to the seller or support provider of the products
when, in fact, Danzer, Shyrokava and White are selling on behalf of Adin and Adin USA Newco
rather than on behalf of Plaintiff[,]" (*id.*, ¶¶ 53, 57); and (iii) that "Shyrokava and White's
LinkedIn profiles are designed to give the false impression that they have been continuously
employed by the same company throughout the relevant time period." (*Id.*, ¶ 53).

On August 9, 2017, the Adin Parties filed an answer to the amended complaint, asserting
thirty-six (36) affirmative defenses and twenty-seven (27) counterclaims against Shetel,
including, *inter alia*, claims for: breach of contract (first and eighteenth counterclaims);
promissory estoppel (second and nineteenth counterclaims); fraud (third counterclaim); negligent
misrepresentation (fourth and twenty-fourth counterclaims); conversion (fifth and twenty-fifth

counterclaims); trademark infringement in violation of 15 U.S.C, § 1114 (sixth counterclaim); false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a) (seventh counterclaim); cybersquatting in violation of the ACPA (eighth counterclaim); injury to business reputation and trademark dilution in violation of Section 360-*l* of the New York General Business Law (ninth counterclaim); deceptive business acts and practices in violation of Section 349 of the New York General Business Law (tenth counterclaim); false advertising in violation of Section 350 of the New York General Business Law (eleventh counterclaim); use of name with intent to deceive in violation of Section 133 of the New York General Business Law (twelfth counterclaim); unjust enrichment (thirteenth and twenty-first counterclaims); tortious interference with a prospective economic advantage (fourteenth counterclaim); common law unfair competition (sixteenth counterclaim); quantum meruit (twentieth counterclaim); and commissions due and owing pursuant to Section 191(c) of the New York State Labor Law (twenty-second counterclaim). The counterclaims against Shetel seek, *inter alia*, damages, including punitive damages under the New York General Business Law and disgorgement of profits and enhanced damages under 15 U.S.C. § 1117; costs and attorneys' fees under 15 U.S.C. § 1117(a); and injunctive relief: (i) ordering plaintiff to "deliver up for destruction all goods, packaging, containers, literatures, brochures, business cards, labels, signs, prints, wrappers, receptacles and other advertising and promotional materials bearing or otherwise using the Adin Marks, the predominate ADIN portion of either or both of the Adin Marks, and/or other words, symbols, colors, or marks of any type, or any reproduction, counterfeit, copy or colorable imitation thereof, and all plates and models,"[14] pursuant to 15 U.S.C. § 1118, (CC at 84, ¶ 7), (ii)

---

[14] The Adin Parties' pleadings refer to "dental products using the ADIN DENTAL IMPLANT SYSTEMS mark and the ADIN DIGITAL mark" as the "Adin Marks." (CC, ¶¶ 10, 90-91).

directing plaintiff "to transfer the Internet web address of http://www.adinimplants.com and all other addresses incorporating the Adin Marks or substantial portions of same to Adin" pursuant to 15 U.S.C.  1125(d)(1)(C), (*id.* at 85, ¶ 12), and (iii) enjoining and restraining Shetel (A) "from using Mr. Danzer's customer lists and proprietary information," (*id.* at 85, ¶ 18); and (B) from:

> "a. Falsely associating the Adin Marks or the predominate ADIN portion of either or both of the Adin Marks with Plaintiff or its business or engaging in any act or series of acts which, either alone or in combination, constitutes unfair methods of competition with Adin and/or Adin USA and from otherwise interfering with or injuring the Adin Marks or the good will associated therewith; b. Licensing, offering to license, using, promoting, advertising, publicizing, distributing, and posting any of the Adin Marks, the predominate ADIN portion of either or both of the Adin Marks, and/or any other mark, designation, name, symbol, or logo that is a copy or colorable imitation of, incorporate, dilutes, or is confusingly similar to the Adin Marks for any good or service; c. Engaging in any act which is likely to dilute the distinctive quality of the Adin Marks and/or injures the business reputation of Adin and/or Adin USA; d. Representing or implying that Plaintiff is in any way related to, affiliated with, in contract with, connected with, associated, with, in partnership with, or retained by Adin and/or Adin USA; e. Applying to register the Adin Marks, the predominate ADIN portion of either or both of the Adin Marks, and/or any other reproduction, counterfeit, copy, or colorable imitation of the Adin Marks as a mark, business name, domain name, keyword, metatag, search term or any other designation with any governmental authority or Internet registry; and f. Knowingly assisting, inducing, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to [there]in."

(*Id.* at 82-84, ¶ 6). The counterclaims also seek an order: "Returning to Mr. Danzer his property wrongfully taken or being held by Plaintiff; . . . Granting Mr. Danzer the full amount of any underpayment of wages, liquidated damages under Section 198(1-a) of the New York State Labor Law in the amount of one hundred percent of the commissions and other wages ultimately found to be due, all reasonable attorneys' fees incurred in connection with his claim, prejudgment interest; . . . [and] Returning to Mr. Danzer his assets and property, including but not limited to money due and owing to him as fees, reimbursement or commissions from various

sales; his customer lists and records which were taken by Dr. Weitz and/or without authorization; and other personal property." (*Id.* at 85, ¶¶ 17, 19-20).

The Adin Parties also filed a third-party complaint against third-party defendants asserting claims, *inter alia*, for fraud (first and fifteenth third-party claims against Weitz); negligent misrepresentation (second and sixteenth third-party claims against Weitz); promissory estoppel (third and fourteenth third-party claims against Weitz); trademark infringement in violation of 15 U.S.C. § 1114 (fourth third-party claim against third-party defendants); false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a) (fifth third-party claim against third-party defendants); cybersquatting in violation of the ACPA (sixth third-party claim against third-party defendants); injury to business reputation and trademark dilution in violation of Section 360-*l* of the New York General Business Law (seventh third-party claim against third-party defendants); deceptive business acts and practices in violation of Section 349 of the New York General Business Law (eighth third-party claim against third-party defendants); false advertising in violation of Section 350 of the New York General Business Law (ninth third-party claim against Osseogroup); use of name with intent to deceive in violation of Section 133 of the New York General Business Law (tenth third-party claim against Osseogroup); unjust enrichment (eleventh third-party claim against third-party defendants and seventeenth third-party claim against Weitz); tortious interference with a prospective economic advantage (twelfth third-party claim against third-party defendants); common law unfair competition (thirteenth third-party claim against third-party defendants); and conversion (eighteenth third-party claim against third-party defendants). The Adin Parties' third-party claims seek essentially the same relief against third-party defendants as their counterclaims against Shetel.

The Adin Parties allege, *inter alia*, (i) "that Shetel was over the years variously late on paying for goods Adin had supplied, owed more money to Adin than the maximum of [*sic*] amount of credit Adin had agreed to extend it, and failed to fully and timely report its sales of Adin-supplied goods," (56.1, ¶ 31); (ii) "that it terminated Shetel's status as its exclusive distributor on or about September 21, 2016, and that Shetel has not yet paid it the balance allegedly due for products Adin sold to Shetel prior to that date," (*id.*, ¶ 32); (iii) that "it repeatedly demanded that Shetel 'cease and desist marketing and selling Adin products,' but . . . Shetel did not do so," (*id.*, ¶ 33); and (iv) that "Shetel has refused to 'cease [] holding itself out as a distributor of Adin products, and using Adin's trademarks.'" (*Id.*, ¶ 34).

The Adin Parties further allege, *inter alia*, that Shetel did not fulfill its obligations to serve as the exclusive distributor of Adin's products in the United States because it filled orders from its customers for genuine products from Adin with products manufactured by third parties. (Adin 56.1, ¶ 5; Ross Decl., ¶¶ 6, 8, Ex. 1-34, Ex. 35 at 125:12-22, Ex. 58-60). According to the Adin Parties, documents produced by Shetel "establish[] approximately 558 instances of Shetel, Osseogroup or Dr. Weitz filling orders for products from Adin with products manufactured by third-parties[,] . . . [and that] [t]he Shetel Parties used Adin's catalog numbers to identify both genuine products from Adin and the products manufactured by third-parties." (Adin Supp. 56.1, ¶ 61(e)).

Although the Shetel Parties admit that Shetel sold certain products and components that were manufactured by third-parties, they contend that all of those products "were genuine goods sold in packaging that did not contain any Adin Marks or otherwise suggested [*sic*] that Adin had manufactured them[,] . . . [and] that Shetel sold such third-party products with Adin's knowledge

55

and permission between 2012 and 2016, and with Adin's knowledge thereafter." (Shetel 56.1, ¶ 61; *see also Id.*, ¶ 90). The Shetel Parties cite to the deposition of the Adin Parties' witnesses indicating that they have no evidence, or independent knowledge, to support the allegation that Shetel ever sold fake, counterfeit or non-genuine Adin products.[15] (Besdin Decl., Ex. B at 91:4-92:14; Ex. E at 170:24-171:9, 234:12-235:25; and Ex. F at 302:4-8, 350:12-351:17; 321:2-322:8).

On September 25, 2017, the Shetel Parties filed a letter motion pursuant to the individual rules of Judge Wexler requesting a pre-motion conference with respect to filing a motion to dismiss the counterclaims and third-party claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[16] By electronic order entered November 15, 2017, Judge Wexler waived the pre-motion conference and directed the parties to submit a proposed briefing schedule with respect to such motion. By electronic order entered January 8, 2018, Judge Wexler approved the parties' briefing schedule.

On February 23, 2018, the Shetel Parties filed a motion to dismiss twenty-three (23) of the twenty-seven (27) counterclaims against Shetel, *i.e.*, all except for the breach of contract counterclaims (first and eighteenth counterclaims); one of Adin's conversion counterclaims (fifth counterclaim); and the counterclaim seeking to recover commissions due and owing pursuant to Section 191(c) of the New York State Labor Law (twenty-second counterclaim), and the third-

---

[15] According to the Shetel Parties, Adin now bases its trademark infringement claims on claims that Shetel sent customers different components, which were accurately labeled as such, when its inventory was out of Adin components and/or with Adin's permission "to sell certain components manufactured by other companies (often because Adin itself made no such product of its own)." (Shetel 56.1, ¶ 61).

[16] The case was originally assigned to the Honorable Leonard D. Wexler. On April 5, 2018, the case was reassigned to the Honorable Arthur D. Spatt. By order dated October 3, 2018, Judge Spatt recused himself and this case was reassigned to the undersigned.

party claims in their entirety, with prejudice pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. By order dated February 12, 2019, *inter alia*, this Court granted the Adin Parties' letter motion seeking leave to supplement their submission on the motion to dismiss with "further evidence" obtained during discovery, to the extent of converting the motion to dismiss, pursuant to Rule 12(d) of the Federal Rules of Civil Procedure, to a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure and setting a briefing schedule for the submission of supplemental materials and the final submission of such motion. By order dated March 8, 2019, *inter alia*, the deadline for the completion of discovery and the briefing schedule for the final submission of any summary judgment motion were extended.

The Shetel Parties now move, following the close of discovery, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing all but four (4) of the Adin Parties' counterclaims against Shetel, and the third-party claims in their entirety, with prejudice.

III.    Discussion[17]

A.    Standard of Review

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018) (quoting Fed. R. Civ. P. 56(a)); *accord Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to

---

[17] Unless otherwise noted, case quotations omit all internal quotation marks, citations, footnotes, and alterations.

a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007); *see also Ricci v. DeStefano*, 557 U.S. 557, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) ("On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (emphasis added)). "A fact is material if it 'might affect the outcome of the suit under the governing law[.]'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the non-moving party," *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017), and "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019); *see also Hancock v. County of Rensselaer*, 882 F.3d 58, 64 (2d Cir. 2018) ("In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party.") "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505); *accord Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci*, 557 U.S. at 586, 129 S. Ct. at 2677 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *accord Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013); *accord Jaffer*, 887 F.3d at 114. "[W]hen the moving party has carried its burden[,] . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [,]" *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (quoting *Matsushita Elec.*, 475 U.S. at 586-87, 106 S. Ct. 1348), and must offer "some hard evidence showing that its version of the events is not wholly fanciful[.]" *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008). The nonmoving party can only defeat summary judgment "by adduc[ing] evidence on which the jury could reasonably find for that party." *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56 (2d Cir. 2012). "'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat a summary judgment motion[,]" *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505); and "[a] court cannot credit a plaintiff's merely speculative or conclusory assertions." *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012); *see also Federal Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."); *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) ("While we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the non-moving party, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]"). Since "there is no issue for trial unless there is sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party[,] . . . [i]f the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505.

Summary judgment is warranted, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) ("[W]here the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden [of showing the absence of a genuine dispute as to any material fact] by pointing to an absence of evidence to support an essential element of the nonmoving party's case"). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23, 106 S. Ct. 2548; *accord Crawford*, 758 F.3d at 486; *see also Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) ("Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment.") "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548. Accordingly, when "the burden of persuasion at trial would be on the non-moving party . . . the

party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage*, 875 F.3d at 114; *see also DeRogatis v. Bd. of Trs. of Welfare Fund of Int'l Union of Operating Eng'rs Local 15, 15A, 15C & 15D, AFLCIO ("In re DeRogatis")*, 904 F.3d 174, 187 (2d Cir. 2018) (holding that when the ultimate burden of proof at trial would be on the non-moving party, the moving party "may satisfy their burden of production under Rule 56 by negating an essential element of the [non-moving party's] claim, whether by submitting undisputed evidence to that effect or by demonstrating the insufficiency of the [non-moving party's] own evidence.")

B.      Fraud Claims

The Adin Parties allege, *inter alia*, that Shetel and Weitz made the following misrepresentations in order to induce Adin to "enter[] into [a] relationship wherein Plaintiff served as Adin's exclusive distributor in the United States" and to provide products to Adin to market and sell: (i) that it was ordering products for sale on consignment when, instead, it sold such products without reporting the sales to Adin and kept the proceeds thereof, (CC, ¶ 135); and (ii) that it had sufficient connections, funds, time and effort, and would use same, to develop a business selling Adin's dental implants throughout the United States. (*Id.*, ¶¶ 135-138; TPC, ¶¶ 18-20). The Adin Parties further contend that Weitz made the following misrepresentations: (i) "that he would invest in a U.S. distributorship to induce Adin to obtain both an exclusive distributor and substantial discounts," (Adin Supp. 56.1 at 20); and (ii) that "he would be

personally responsible for the amounts owed to Adin." (*Id.* at 27).

In addition, the Adin Parties allege that Weitz misrepresented to Danzer that Shetel "would pay him $180,000.00 per year as well as commissions greater than Mr. Danzer's commission rate at his prior employer, and benefits, including health and dental insurance, matching contributions to Mr. Danzer's 401k account, and ownership of a percentage of Plaintiff's stock," in order to induce him to leave his prior employment and to accept Weitz's offer of employment at Shetel. (TPC, ¶¶ 120-124).

Under New York law, which the parties seemingly agree applies to the Adin Parties' state law claims[18], "[t]he required elements of a common-law fraud claim are a misrepresentation or a material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury[.]" *Ambac Assur. Corp. v. Countrywide Home Loans*, 31 N.Y.3d 569, 578-79, 81 N.Y.S.3d 816, 106 N.E.3d 1176 (N.Y. 2018); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015) ("Under New York law, fraud requires proof of (1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages.") "Justifiable reliance is a fundamental precept of a fraud cause of action, . . . as is resulting injury." *Ambac*, 31 N.Y.3d at 579, 81 N.Y.S.3d 816.

In order to maintain a fraudulent inducement claim that is sufficiently distinct from a breach of contract claim, "a plaintiff must either: (i) demonstrate a legal duty separate from the

---

[18] "[I]mplied consent [] is sufficient to establish choice of law." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000); *see also Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) ("Under New York choice-of-law rules, where the parties agree that a certain jurisdiction's law controls, this is sufficient to establish choice of law.")

duty to perform under the contract, . . . (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, . . . or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996); *accord Mariano v. CVI Invs. Inc.*, 809 F. App'x 23, 26 (2d Cir. Apr. 20, 2020) (summary order). The Adin Parties do not allege, much less establish, that Weitz owed them any legal duty separate from Shetel's alleged contractual duty to perform.

"Misrepresentations made to induce a party to enter a contract are not actionable as fraud . . . unless they are 'collateral' to the contract induced." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 209 (2d Cir. 2018); *see also FPP, LLC v. Xaxis US, LLC*, 764 F. App'x 92, 94 (2d Cir. Apr. 10, 2019) (summary order) ("A fraud claim is tenable only when the fraud alleged is collateral or extraneous to the contract."); *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) ("New York law specifically recognizes causes of action for fraud in the inducement when the misrepresentation is collateral to the contract it induced.") "A fraud claim may be considered collateral to a contract if the contract, including its representations and warranties, does not address the factual bases of the fraud claim." *FPP*, 764 F. App'x at 94; *see, e.g. Sassoon v. CDx Diagnostics, Inc.*, 172 A.D.3d 617, 618-19, 102 N.Y.S.3d 179 (N.Y. App. Div. 2019). "Where a plaintiff alleges, by contrast, that the defendant simply misrepresented its intent to perform under a contract, no separate claim for fraud will lie, and the plaintiff must instead bring an action for breach of contract." *Spinelli*, 903 F.3d at 209; *see also NRW, Inc. v. Bindra*, 775 F. App'x 22, 24 (2d Cir. June 4, 2019) (summary order) ("[W]here a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never

63

intended to perform the precise promises spelled out in the contract between the parties, the fraud

claim is redundant and plaintiff's sole remedy is for breach of contract."); *Wall*, 471 F.3d at 416

("[A]s a general matter, a fraud claim may not be used as a means of restating what is, in

substance, a claim for breach of contract. Thus, general allegations that defendant entered into a

contract while lacking the intent to perform it are insufficient to support a fraud claim.")

However, "a promise to take some future action which is collateral to the contract can be

considered a 'misrepresentation' for purposes of a fraud in the inducement cause of action."

*Wall*, 471 F.3d at 416. Moreover, "a representation of present fact, not of future intent . . .

collateral to, but which was the inducement for the contract," is not duplicative of a breach of

contract claim. *Deerfield Commc'ns Corp. v. Chesebrough-Ponds*, 68 N.Y.2d 954, 956, 510

N.Y.S.2d 88, 502 N.E.2d 1003 (N.Y. 1986); *see also Merrill Lynch & Co. Inc. v. Allegheny

Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007) ("New York distinguishes between a promissory

statement of what will be done in the future that gives rise only to a breach of contract cause of

action and a misrepresentation of a present fact that gives rise to a separate cause of action for

fraudulent inducement.") Thus, "a relatively concrete representation as to a company's future

performance, if made at a time when the speaker knows that the represented level of performance

cannot be achieved, may ground a claim of fraud." *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir.

1994).

       1.    Adin's Fraud Claims

The Adin Parties contend "that the false statements about Weitz's financial ability and

the operation of Shetel induced Adin to provide the exclusive distributorship, provide goods on

consignment and provide deep discounts to Shetel." (Adin SJ Mem. at 17). Specifically, the Adin

Parties contend, *inter alia*, (i) that "Weitz falsely told Adin he would sufficiently capitalize his

new entity to induce Adin to award an exclusive distributorship to his proposed (but as of then

unformed) entity," (*id.* at 15); (ii) that "Weitz and Frenkel misrepresented to Adin that they had

invested $500,000 or more in Shetel in order to induce Adin to continue the exclusive

distributorship, to provide a line of credit, and to continue offering goods to Shetel at significant

discounts," (*id.*); and (iii) that "Weitz represented to Adin that he would be personally

responsible for all debts owed by Shetel to Adin in order to induce Adin to continue to supply

products to Shetel." (*Id.* at 16).[19]

　　With respect to the first and third alleged misrepresentations, the essence of Adin's

fraudulent inducement claims against the Shetel Parties is that Weitz allegedly misrepresented to

them his future intentions with respect to investing in Shetel and repaying the debts of Shetel.

However, the Adin Parties' claims that Weitz allegedly misrepresented that he would sufficiently

capitalize Shetel, and that he would be personally responsible for the debts of Shetel, in order to

---

[19] The Adin Parties also contend, for the first time in their memorandum of law in response to the Shetel Parties' motion for summary judgment, (i) that "Weitz did not disclose to Adin that the multi-component ('Tic-Tak') kits for which he sought approval from Adin to sell had not been registered with the F.D.A.[,] . . .that Shetel was marketing said kits as Adin products[,] . . . [or] that the Tic-Tak kits were being mislabeled to appear to be Adin's products," (Adin SJ Mem. at 16); and (ii) that "neither Weitz nor Shetel disclosed to Adin that during the exclusive relationship, Shetel was filling orders for components manufactured by Adin with components manufactured by third-parties." (*Id.*, ¶ 17). However, the Adin Parties do not assert, much less establish, that any such statements were made by Shetel or Weitz for the purpose of inducing Adin to rely upon them; nor that Adin justifiably relied upon any such representations to its detriment. The Adin Parties also have not alleged, much less established, that the Shetel Parties had a duty to disclose the purportedly concealed facts. *See generally Merrill Lynch*, 500 F.3d at 181; *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 90-91 (2d Cir. 2005) ("Under New York law, fraudulent concealment requires proof of: (1) failure to discharge a duty to disclose; (2) an intention to defraud, or scienter; (3) reliance; and (4) damages. . . . In the context of a business transaction, the duty to disclose arises where a party, with a duty to be complete, has made only a partial or ambiguous statement, or where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge. . . . However, the intention to breach does not give rise to a duty to disclose. Instead, the duty to disclose must exist separately from the duty to perform under the contract.")

induce them to make Shetel their exclusive distributor in the United States, and to provide Shetel

with better discounts, goods on consignment and a line of credit, allege no more than that Weitz

misrepresented a future intent to perform, rather than a misrepresentation of presently existing or

past fact, "which is not sustainable as a cause of action separate from breach of contract."[20]

*Financial Structures Ltd. v. UBS AG*, 77 A.D.3d 417, 419, 909 N.Y.S.2d 45 (N.Y. App. Div.

2010); *see also Maricultura Del Norte v. World Bus. Cap., Inc.*, 159 F. Supp. 3d 368, 378

(S.D.N.Y. 2015), *aff'd*, 769 F. App'x 44 (2d Cir. May 7, 2019) ("[A] plaintiff cannot, with a

naked assertion that defendants had no intention of complying with the terms of the agreement

with plaintiffs, shoehorn a claim of fraud into a basic breach of contract dispute."); *cf. Man

Advisors v. Selkoe*, 174 A.D.3d 435, 101 N.Y.S.3d 843, 844 (N.Y. App. Div. 2019) (finding that

the complaint stated a claim for fraudulent inducement, which was not duplicative of the

plaintiff's claim for breach of the guarantee, because the plaintiff did not merely allege that the

defendant misrepresented the intent to perform on the guarantee, which would render the fraud

claim duplicative; but also alleged that the defendant misrepresented his ability to perform).

　　With respect to the Adin Parties' claim that Weitz and Frenkel allegedly misrepresented

that Shetel was ordering products for sale on consignment when, instead, it sold such products

without reporting the sales to Adin and kept the proceeds thereof, the record is bereft of any

---

[20] The record is devoid of any evidence to support the Adin Parties' allegation that Shetel and/or Weitz "lacked sufficient connections, funds, time and effort to develop" the business as promised, (*see* CC, ¶¶ 136-136; TPC, ¶ 19); rather than failed to use the connections, funds, time and effort they promised. Indeed, although the Adin Parties contend that "Weitz made multiple representations as to his financial wherewithal before Adin agreed to make Shetel its exclusive distributor in the U.S.," (Adin SJ Mem. at 15), the Adin Parties do not even contend that such representations were false. Thus, the record is bereft of any evidence suggesting that Shetel and/or Weitz made a material misrepresentation of fact, *i.e.*, that they were not presently able to perform as promised or carry out their contractual commitments at the time those representations were made. Nor is there any evidence indicating that the representations in question were knowingly false when made, or that Shetel and Weitz made those representations with the then-present intent not to perform as promised.

evidence that would be admissible at trial from which a rational finder of fact could reasonably find that Shetel and Weitz knew when they purportedly made those statements that such representation was false. *See*, *e.g. Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 224 (S.D.N.Y. 2007), aff'd, 354 F. App'x 496 (2d Cir. Nov. 25, 2009) ("The relevant period for determining whether a person had a 'present intent' to defraud is the time the allegedly false statements in question were made.") Nothing in the record suggests that the Shetel Parties knew when they entered into an exclusive distributorship with Adin, or at any time when they ordered products from Adin, that such products would not be sold on consignment, or that they would not report the sale of such products to Adin and instead would keep the proceeds thereof themselves, yet told the Adin Parties that they would with the present intent to deceive them.

Furthermore, the record is devoid of any evidence from which a rational factfinder could reasonably find, *inter alia*, that Weitz and Frenkel knew when they allegedly represented to Adin that they had invested $500,000 or more in Shetel that such representation was false, or that they made such representation in reckless disregard of its falsity;[21] nor that any such representation was made with the intent of inducing Adin to continue the exclusive distributorship or provide a line of credit.

Since, for the reasons set forth above, Adin has not sufficiently established the essential

---

[21] The Adin Parties cite, *inter alia*, to the email Weitz sent to Milman and Davidson on October 23, 2012 indicating, in relevant part, "In our 8 months, we have spent over $500,000 and made Adin a recognizable name in the markets we have targeted," (Ross Decl., Ex. 81); and the email Frenkel sent to Cahaner on January 14, 2013 indicating, in relevant part, that if Cahaner had participated in a recent meeting at Adin's factory, he "would have heard the tremendous investment of over $500,000 we have made in 'our' brand including trade shows, print advertising, conferences, representatives, social media[.]" (*Id.*, Ex. 82). The statement in the latter email regarding what may have been heard at a meeting is clearly not a misrepresentation of material fact. With respect to the statement in the former email, Weitz asserts that, for various reasons, at the time he made such statement, he "certainly believed that Shetel had spent at least $500,000 over the course of its first eight months," as represented therein. (Weitz Decl., ¶¶ 7-8). Moreover, there is evidence in the record corroborating that by the end of 2012, Shetel "spent over $500,000," as represented in Weitz's October 23,2 012 email. (*See Id.*, Ex. A).

elements of its fraud claims against Shetel and Weitz, the branches of the Shetel Parties' motion seeking summary judgment dismissing Adin's fraud claims against them are granted and the Shetel Parties are granted judgment as a matter of law dismissing Adin's fraud claims against Shetel and Weitz (third counterclaim and first third-party claim) in their entirety with prejudice.

### 2.  Danzer's Fraud Claim

Although Danzer has withdrawn his fraud counterclaim against Shetel (twenty-third counterclaim), he has not withdrawn his third-party claim against Weitz for fraud (fifteenth third-party claim), which alleges, *inter alia*, (i) that "[i]n the first quarter of 2012, Dr. Weitz misrepresented to Mr. Danzer that Plaintiff would pay him $180,000.00 per year as well as commissions greater than Mr. Danzer's commission rate at his prior employer, and benefits, including health and dental insurance, matching contributions to Mr. Danzer's 401k account, and ownership of a percentage of Plaintiff's stock[;]" (ii) that Weitz made those misrepresentations "in order to induce Mr. Danzer's reliance on the oral offer" of employment; and (iii) that Danzer justifiably relied upon Weitz's representations to his detriment by quitting his prior job and starting to work for Shetel. (TPC, ¶¶ 120-125).

In actions for fraud under New York law, "corporate officers and directors may be held individually liable if they participated in or had knowledge of the fraud, even if they did not stand to gain personally." *Pludeman v. N. Leasing Sys.*, 10 N.Y.3d 486, 491, 860 N.Y.S.2d 422, 890 N.E.2d 184 (N.Y. 2008); *see also Cohen*, 25 F.3d at 1173 (holding that although "officers and directors of a corporation cannot be held individually liable for their company's obligations[,] . . . [and] are not generally liable for their corporation's debts or its breach of a

contract, . . . [they] may be held liable for fraud if they participate in it or have actual knowledge of it.")

However, as set forth above, "where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." *NRW*, 775 F. App'x at 24. The essence of Danzer's fraudulent inducement claim against Weitz is that Weitz allegedly misrepresented to him Shetel's intentions with respect to the manner in which Danzer would be compensated for his employment with Shetel in order to induce him to commence employment with Shetel, which alleges nothing more than that Weitz misrepresented a future intent to perform under the alleged oral employment agreement and "is not sustainable as a cause of action separate from breach of contract." *Financial Structures*, 77 A.D.3d at 419, 909 N.Y.S.2d 45. Accordingly, the branch of the Shetel Parties' motion seeking summary judgment dismissing Danzer's third-party claim against Weitz is granted and the Shetel Parties are granted judgment as a matter of law dismissing Danzer's fraud claim against Weitz (fifteenth third-party claim) in its entirety with prejudice.

   C.  Quasi-Contractual Claims

    1.  Adin and Adin USA Newco's Claims

The Shetel Parties contend that Adin's and Adin USA Newco's promissory estoppel claims (second counterclaim and third third-party claim) and unjust enrichment claims (thirteenth counterclaim and eleventh third-party claim) "are impermissibly duplicative of the

breach of contract claim." (Shetel MTD Mem. at 10; *see also Id.* at 11).

With respect to their unjust enrichment claim, Adin and Adin USA Newco allege, *inter alia*, that Osseogroup and Weitz have "received and taken sales," and that the Shetel Parties have "received and taken customers, business contacts, intellectual property, fees, property and other things of value from Adin and Adin USA [Newco] to which [they were] not entitled, and received the benefit of credit and goods advanced without repaying same, and from which [the Shetel Parties have] wrongfully benefitted." (CC, ¶ 214; TPC, ¶ 96). The Adin Parties contend that "[g]iven the uncertainty of the enforceability of *any* agreement in this matter, [they] have sufficiently pled their unjust enrichment claims." (Adin Parties' Brief in Response to Motion to Dismiss ["Adin MTD Mem."] at 9).

With respect to their promissory estoppel claims against Shetel and Weitz, Adin and Adin USA Newco allege, *inter alia*, (i) that Weitz and Shetel "made a clear and definite promise to develop a business to distribute Adin's dental products throughout the United States," pursuant to which they made various promises to which they failed to adhere, (CC, ¶¶ 127, 129; TPC, ¶¶ 34, 36); (ii) that "Adin reasonably relied on the aforesaid promises" to its detriment "by, among other things: a) providing its products to Plaintiff" for sale, or at reduced prices for sale, throughout the United States, "b) foregoing selling its products through [or to] any other distributor in the United States[,] c) extending Plaintiff a significant line of credit[,] and d) agreeing to indemnify Plaintiff and warranty Adin's products[,]" (CC, ¶ 128; TPC, ¶ 35); and (iii) that "Adin suffered economic losses as a result of the amounts it expended to produce and deliver its products to Plaintiff[,] . . . also lost out on business opportunities because of its allocation of markets and opportunities to Plaintiff because of its reasonable expectation and

70

reliance that Plaintiff would distribute, market and sell Adin's products throughout the United States[,] . . . suffered definite and substantial detriment when Plaintiff [and Weitz] ultimately lacked the . . . resources, capabilities, or financing [and commitment]" they had promised, and suffered "diminished sales, lost opportunities, . . . the alienation of customers [and other reputational injuries] as a result of its reliance" upon the promises of Shetel and Weitz. (CC., ¶¶ 129-130; TPC, ¶¶ 36-38). Specifically, the Adin Parties allege: (i) that during Weitz's conversations with Adin in 2010 and 2011, he represented that "he possessed and would invest sufficient money, time and effort to develop . . . a business" to distribute Adin's dental products throughout the United States, "he had sufficient connections to develop a distribution business throughout the United States[,] and [] he had the ability to invest the money required to establish a business selling dental implants throughout the United States[,]" (CC, ¶¶ 19, 127(a)-(c); *see also* Adin MTD Mem. at 4-5); and (ii) that Weitz also represented that he would "provide Adin with a letter of credit for $150,000.00[,] . . . return to Adin 'unused, failed, traded goods[,]' . . . provide Adin with an accounting of 'free goods,' . . . report timely to Adin monthly sales[,] . . . remit payment to Adin on a 30-day basis[,] . . . use 'best efforts to reach' minimum annual purchase volumes of implants[,] and . . . cease using the 'Adin' name and the Adin Marks upon termination of the parties' relationship." (CC, ¶ 127(d)-(j); TPC, ¶ 34). With respect to the former representations, the Adin Parties initially contended that their promissory estoppel claims are cognizable because there is no enforceable written contract since Weitz's promises were made "before any agreement between Plaintiff and Adin was reached[,]" and "before Plaintiff was even incorporated," and such promises "are not contained in any purported written contract." (Adin MTD Mem. at 4-5). With respect to the latter promises, the Adin Parties

71

initially contended, as they did with respect to their unjust enrichment claims, that since the enforceability of the purported contractual agreements was "in question," their promissory estoppel claims should not be dismissed on the pleadings. (*Id.* at 5).

However, after the Shetel Parties' motion was converted to a motion for summary judgment, the Adin Parties did not renew their initial arguments, nor address their promissory estoppel or unjust enrichment claims, except to assert that "a material issue of fact precludes summary judgment" as to such claims, insofar as "Hantman, Cohen, and Milman each testified that Weitz represented on separate occasions that he would be personally responsible for Shetel's debts," while Weitz disputes such testimony. (Adin SJ Mem. at 10-11).[22]

Theories of promissory estoppel, unjust enrichment and quantum meruit lie as quasi-contractual claims. *See Georgia Malone & Co. v Rieder*, 19 N.Y.3d 511, 516, 950 N.Y.S.2d 333, 973 N.E.2d 743 (N.Y. 2012) ("[T]he theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties."); *IDT Corp. v Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142, 879 N.Y.S.2d 355, 907 N.E.2d 268 (N.Y. 2009) ("The theory of unjust enrichment lies as a quasi-contract claim. . . . It is an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned."); *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (holding that under New York law, quantum meruit and unjust enrichment claims may be

---

[22] The Adin Parties' conclusory and unsupported assertions that "[u]nless specifically withdrawn by Defendants, questions of fact exist, making summary judgment as to the remaining counts inappropriate," (Adin SJ mem. at 1); that the Shetel Parties' "motion to dismiss the promissory estoppel claim is premature, since they have denied the existence of a contract," (*id.*); and that "[t]he material issue of fact as to whether Weitz made material misrepresentations, and the equitable nature of Defendants' causes of action make summary judgment inappropriate as to the[] [unjust enrichment and promissory estoppel] causes of action," (*id.* at 11), are insufficient to defeat summary judgment.

analyzed "together as a single quasi contract claim.") Thus, under New York law, "[w]here the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded." *IDT*, 12 N.Y.3d at 142, 879 N.Y.S.2d 355; *see also United States for Use & Benefit of Five Star Elec. Corp. v. Liberty Mut. Ins. Co.*, 758 F. App'x 97, 100-101 (2d Cir. Dec. 18, 2018) (summary order) (affirming denial of leave to amend the quantum meruit claim because the parties did not dispute the validity or enforceability of the agreement governing the same subject matter); *Pappas v Tzolis*, 20 N.Y.3d 228, 234, 958 N.Y.S.2d 656, 982 N.E.2d 576 (N.Y. 2012) ("A party may not recover in [] unjust enrichment where the parties have entered into a contract that governs the subject matter."); *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. Nov. 30, 2011) (summary order) ("Under New York law, when a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual; attempts to repackage them as sounding in fraud, conversion, and other torts, as well as unjust enrichment, implied and quasi contract, and quantum meruit, are generally precluded, unless based on a duty independent of the contract.") As explained by the New York Court of Appeals:

> "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter. . . . A 'quasi contract' only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment. . . . Briefly stated, a quasi-contractual obligation is one imposed by law where there has been no agreement or expression of assent, by word or act, on the part of either party involved. . . ."

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388-89, 521 N.Y.S.2d 653, 516 N.E.2d 190 (N.Y. 1987); *accord Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of*

*N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006).

Moreover, since "there is no distinction between agreements made by words and those made by conduct, and implied-in-fact contracts are just as binding as express contracts arising from declared intention, . . . *Clark–Fitzpatrick* precludes unjust enrichment claims whenever there is a valid and enforceable contract governing a particular subject matter, whether that contract is written, oral, or implied-in-fact." *Beth Israel*, 448 F.3d at 587; *see also A. Montilli Plumbing & Heating Corp. v. Valentino*, 90 A.D.3d 961, 962, 935 N.Y.S.2d 647 (N.Y. App. Div. 2011) ("The existence of an express agreement, whether oral or written, governing a particular subject matter precludes recovery in quasi-contract for events arising out of the same subject matter.")

However, although quasi-contractual claims are generally precluded where valid, enforceable contracts governing the particular subject matter of the case exist between the parties, *see Beth Israel*, 448 F.3d at 587; *A. Montilli*, 90 A.D.3d at 962, 935 N.Y.S.2d 647, where "a bona fide dispute exists as to the existence of the contract, the plaintiff may proceed on both breach of contract and quasi-contract theories."[23] *Nakamura v. Fujii*, 253 A.D.2d 387, 390, 677 N.Y.S.2d 113 (N.Y. App. Div. 1998); *see, e.g. MacIntyre v. Moore*, 335 F. Supp. 3d 402, 413 (W.D.N.Y. 2018) ("New York law precludes unjust enrichment claims whenever there is a valid and enforceable contract governing a particular subject matter, whether that contract is written, oral, or implied-in-fact. . . . However, an unjust enrichment claim can survive, even in the face of a written agreement, if a dispute exists concerning the validity of the underlying contract.") "Nonetheless, in order to avoid dismissal, there must be a *bona fide dispute* regarding the

---

[23] The principle also does not apply "where the contract does not cover the dispute in issue," *Poplar Lane*, 449 F. App'x at 59, but the Adin Parties have not established that that factor applies in this case.

validity or enforceability of a contract." *MacIntyre*, 335 F. Supp. 3d at 415-16 (emphasis in

original); *Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 751 (S.D.N.Y. 2017) ("Only

where a bona fide dispute exists as to the existence of the contract, the plaintiff may proceed on

both breach of contract and quasi-contract theories.")

The Adin Parties allege the existence of valid and enforceable agreements between Shetel

and Adin, (CC, ¶¶ 114, 117); and that Shetel "materially breached its agreements by: a. failing to

report sales of implants and/or accessories to Adin; b. failing to meet the minimum annual

purchase volumes; c. failing to pay Adin all of the products that Plaintiff purchased on credit; d.

failing to pay Adin for all of the products that Plaintiff sold on consignment; e. failing to return

to Adin all of the products that Plaintiff was to sell on consignment, but failed to sell; and f.

failing to expend the time, money and effort necessary to expand Plaintiff's sales and marketing

activities throughout the United States." (*Id.*, ¶ 115). In addition, the Adin Parties allege that

Shetel "has violated the agreement memorialized in Dr. Weitz's July 26, 2014 email," by, *inter*

*alia*, continuing to use the Adin Marks. (*Id.*, ¶¶ 117-120). There is no dispute that there existed

an agreement for Shetel to serve as Adin's exclusive distributor in the United States, and that

Shetel "agreed to establish and maintain a distribution, sales, marketing and technical support

system to promote the sale and support of Adin's products in the United States." (Am. Compl., ¶

20). Accordingly, there is no "bona fide dispute" regarding the existence of valid and enforceable

agreements regarding such matters.

Thus, Adin's and Adin USA Newco's quasi-contractual claims "are precluded by the fact

that a simple breach of contract claim may not be considered a tort unless a legal duty

independent of the contract—i.e., one arising out of circumstances extraneous to, and not

75

constituting elements of, the contract itself—has been violated." *Brown v. Brown*, 12 A.D.3d
176, 176, 785 N.Y.S.2d 417 (N.Y. App. Div. 2004); *see, e.g. Martin Greenfield Clothiers, Ltd. v.
Brooks Bros. Grp., Inc.*, 175 A.D.3d 636, 637-38, 107 N.Y.S.3d 83 (N.Y. App. Div. 2019)
(affirming dismissal of the plaintiff's promissory estoppel claim on the basis that it was
"impermissibly predicated on allegations that the defendant violated the same promise it made
under the oral agreement."); *Underdog Trucking, LLC, Reggie Anders v. Verizon Servs. Corp.*,
No. 09 Civ. 8918, 2010 WL 2900048, at *6 (S.D.N.Y. July 20, 2010) ("To state a claim for
promissory estoppel, a plaintiff must allege: 1) a clear and unambiguous promise; 2) reasonable
and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the
reliance. . . . Where a plaintiff also alleges breach of a contract, a promissory estoppel claim is
duplicative of a breach of contract claim unless the plaintiff alleges that the defendant had a duty
independent from any arising out of the contract.") Accordingly, the branches of the Shetel
Parties' motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure dismissing Adin's and Adin USA Newco's quasi-contractual claims against them is
granted and the Shetel Parties are granted judgment as a matter of law dismissing Adin's and
Adin USA Newco's promissory estoppel and unjust enrichment claims against them (second and
thirteenth counterclaims and third and eleventh third-party claims, respectively) in their entirety
with prejudice.

2. Danzer's Claims

Similarly, the Shetel Parties are entitled to summary judgment dismissing Danzer's
promissory estoppel, quantum meruit and unjust enrichment counterclaims against Shetel

(nineteenth, twentieth and twenty-first counterclaims) on the basis that they are impermissibly predicated on allegations that Shetel violated the same promises made under its oral employment agreement with Danzer and, thus, are duplicative of Danzer's breach of contract counterclaim against Shetel. Specifically, the Adin Parties' eighteenth counterclaim for breach of contract alleges, *inter alia*, (i) that Shetel and Weitz promised Danzer a written contract of employment; (ii) that "contractual terms arose out of a combination of the oral representations made by Dr. Weitz to Mr. Danzer and his wife in the first quarter of 2012 and the subsequent course of conduct of Plaintiff and Mr. Danzer," pursuant to which "Plaintiff was obligated to pay commissions to Mr. Danzer for all sales by Plaintiff, provide health and dental insurance, make matching contributions to Mr. Danzer's 401k account, and provide Mr. Danzer with ownership of a percentage of Plaintiff's stock[;]" (iii) that in "[]reliance on the promises of Dr. Weitz and Plaintiff as well as the resulting contract with Plaintiff, Mr. Danzer left his prior employment and worked exclusively for Plaintiff[;]" and (iv) that Shetel breached its agreement with Danzer by "having failed to pay him amounts owed for commissions, provide health and dental insurance, make matching contributions to Mr. Danzer's 401k account, and provide Mr. Danzer ownership of a percentage of Plaintiff's stock." (CC, ¶¶ 244-50).

Likewise, the Adin Parties' nineteenth counterclaim for promissory estoppel alleges, *inter alia*, that Shetel and Weitz "unambiguously promised Mr. Danzer that Plaintiff would pay commissions to Mr. Danzer for all sales by Plaintiff, provide health and dental insurance, make matching contributions to Mr. Danzer's 401k account, and provide Mr. Danzer with ownership of a percentage of Plaintiff's stock[;]" and that "[i]n reasonable and foreseeable reliance on the promises of Plaintiff and Dr. Weitz, Mr. Danzer quit his prior employment and worked

exclusively for the benefit of Plaintiff, originating extensive sales and significant revenue for the benefit of Plaintiff." (CC, ¶¶ 253-54).

The Adin Parties' twentieth and twenty-first counterclaims asserting theories of quantum meruit and unjust enrichment, respectively, allege, *inter alia*, that "Danzer performed services, in good faith, on behalf of Plaintiff[,] . . . [which] were accepted by Plaintiff." (CC, ¶¶ 257-58, 262-63). Additionally, the quantum meruit counterclaim alleges that "Danzer had a reasonable expectation that he would be compensated for the services rendered on behalf of Plaintiff, based on, inter alia, express promises made by Plaintiff and Dr. Weitz, and on the course of conduct between the parties," (*id.*, ¶ 259); and the unjust enrichment counterclaim alleges: (i) that "Plaintiff is unfairly benefitting from the services provided by Mr. Danzer, in that it has failed to pay commissions to Mr. Danzer for all sales by Plaintiff, provide health and dental insurance, make matching contributions to Mr. Danzer's 401k account, and provide Mr. Danzer with ownership of a percentage of Plaintiff's stock[,]" and (ii) that "Danzer would not have acted to make or assist in the making of the sales at issue but for the understanding that Plaintiff would pay him appropriate consideration." (*Id.*, ¶ 264).

Similar to their contentions regarding the quasi-contractual claims asserted by Adin and Adin USA Newco, the Adin Parties contend that Danzer sufficiently pleads, *inter alia*, quantum meruit, unjust enrichment and promissory estoppel claims against Shetel and Weitz "in light of the uncertainty as to the existence of an enforceable agreement," (Adin MTD Mem. at 12); and because "the terms and enforceability of the agreement governing Mr. Danzer's employment is very much in question," (*id.* at 11); as well as because "there remain material questions as to the terms of Mr. Danzer's employment and the enforceability of any oral agreement." (*Id.* at 12).

However, after the Shetel Parties' motion was converted to a motion for summary judgment, the Adin Parties did not renew their initial arguments, nor otherwise address Danzer's promissory estoppel, quantum meruit or unjust enrichment claims.

Since, for the reasons set forth above, Danzer asserts a breach of contract claim against Shetel based upon Shetel's purported failure to appropriately compensate him for the services he provided, his quasi-contractual claims against Shetel are precluded. Accordingly, the branches of the Shetel Parties' motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing Danzer's quasi-contractual claims against them is granted to the extent that the Shetel Parties are granted judgment as a matter of law dismissing Danzer's promissory estoppel, quantum meruit and unjust enrichment claims against Shetel (nineteenth, twentieth and twenty-first counterclaims, respectively) in their entirety with prejudice.

The Adin Parties' fourteenth and seventeenth third-party claims for promissory estoppel and unjust enrichment, respectively, are asserted by Danzer against Weitz, personally, based upon the same allegations as his counterclaims against Shetel, (*see* TPC, ¶¶ 116-117, 132-134), but Danzer does not assert a breach of contract claim against Weitz, personally. Even assuming, without deciding, that Weitz may be personally liable for the unjust enrichment of Shetel, *see, e.g. MerchDirect LLC v. Cloud Warmer, Inc.*, No. 17-cv-4860, 2019 WL 4918044, at * 7 (E.D.N.Y. Sept. 30, 2019) (holding that a principal of a corporation may be individually liable for the unjust enrichment of the corporation where it is appropriate to pierce the corporate veil), or under a theory of promissory estoppel, Danzer seeks only damages with respect to those equitable causes of action, (*see* TPC, ¶¶ 118 and 135), and has not demonstrated that he has no adequate remedy at law. Accordingly, he cannot maintain a claim in equity. *See Fed. Treasury*

79

*Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613 (2d Cir. Nov. 24, 2010) (summary order) ("Unjust enrichment is an equitable claim that is unavailable where an adequate remedy at law exists."); *Samiento v. World Yacht Inc.*, 10 N.Y.3d 70, 81, 854 N.Y.S.2d 83, 883 N.E.2d 990 (N.Y. 2008) (affirming dismissal of the plaintiffs' unjust enrichment claim because such an action does not lie where the plaintiffs have an adequate remedy at law); *Brown v. Sandimo Materials*, 250 F.3d 120, 127 (2d Cir. 2001) ("[B]efore equitable relief will be granted, plaintiffs must show that they have no adequate remedy at law."); *R.B. Dev. Co., Ltd. v. Tutis Cap. LLC*, No. 12-cv-1460, 2015 WL 10567830, at * 6 (E.D.N.Y. Nov. 6, 2015), *report and recommendation adopted*, 2016 WL 1271033 (E.D.N.Y. Mar. 29, 2016) ("Unjust enrichment is an equitable remedy . . . and a plaintiff must demonstrate that it lacks an adequate remedy at a law before equitable relief may be granted."); *Lowinger v. Lowinger*, 287 A.D.2d 39, 45, 733 N.Y.S.2d 33 (N.Y. App. Div. 2001), *lv. denied*, 98 N.Y.2d 605, 746 N.Y.S.2d 279, 773 N.E.2d 1017 (N.Y. 2002) (recognizing that promissory estoppel is an equitable doctrine); *Arias v. Women in Need, Inc.*, 274 A.D.2d 353, 354, 712 N.Y.S.2d 103 (N.Y. App. Div. 2000) (promissory estoppel is an equitable claim).

D.    Negligent Misrepresentation Claims

1.    Adin's and Adin USA Newco's Claims

The Adin Parties allege, *inter alia*, (i) that Shetel and Weitz "made representations to Adin regarding the contributions [they] would make to develop a business to distribute Adin's dental implants and accessories throughout the United States," (CC, ¶ 141; TPC, ¶ 23); and (ii) that Shetel and Weitz were "negligent in making false, incomplete, and misleading statements

regarding its resources, capabilities, and willingness to develop a business to distribute Adin's dental implants and accessories throughout the United States." (CC, ¶ 143; TPC, ¶ 25). Moreover, the Adin Parties conclusorily allege that "[a] special relationship of trust and confidence existed between Plaintiff and Dr. Weitz, and Adin due to the purported specialized expertise of Plaintiff and Dr. Weitz as to the nature and requirements of the dental products market within the United States." (CC, ¶ 142; *see also* TPC, ¶ 24).

The Shetel Parties contend that Adin's negligent misrepresentation claims "must be dismissed for failure to allege a false representation of present fact, without even addressing the lack of a plausible basis for the requisite 'special relationship.'" (Shetel MTD Mem. at 11). In response, the Adin Parties cite only to their allegation that Weitz "either lacked sufficient connections, funds, time and effort to develop a business selling Adin's dental implants throughout the United States or he did not use sufficient connections, funds, time and effort to develop a business selling Adin's dental implants throughout the United States." (CC, ¶ 19; *see* Adin MTD Mem. at 7). However, as set forth above, the record is devoid of any evidence indicating that Weitz, in fact, "lacked sufficient connections, funds, time and effort;" only that he may not have used the connections, funds, time and effort as promised. Furthermore, in their memorandum of law in response to the Shetel Parties' motion for summary judgment, the Adin Parties contend, in relevant part, only that "Adin awarded an exclusive distributorship to Shetel after Weitz made numerous representations regarding the investment he would make in the distributorship he intended to form." (Adin SJ Mem. at 19).

"Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the

defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000); *see also Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) ("[M]isstatements are actionable only if the defendant is under a duty to the plaintiff to exercise reasonable care in giving the information, and plaintiffs' reliance upon the information is foreseeable. . . . There 'must be knowledge or its equivalent' on the defendant's part 'that the information is desired for a serious purpose,' that the plaintiff intends to 'rely and act upon it,' and that if the information 'is false or erroneous,' he will suffer injury.") "Because 'casual' statements and contacts are prevalent in business, liability in the commercial context is imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Eternity Global*, 375 F.3d at 187; *accord Crawford*, 758 F.3d at 490. Generally, "a simple commercial relationship, such as that between a buyer and seller or franchisor and franchisee, does not constitute the kind of 'special relationship' necessary to support a negligent misrepresentation claim." *FLB, LLC v. 5Linx*, 821 F. Supp. 2d 548, 561 (W.D.N.Y. 2011), *aff'd sub nom FLB, LLC v. Cellco P'ship*, 536 F. App'x 132 (2d Cir. Oct. 21, 2013). Moreover, "the alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition." *Hydro Inv'rs*, 227 F.3d at 20-21; *see also Cacchillo v. Insmed, Inc.*, 551 F. App'x 592, 596 (2d Cir. Jan. 7, 2014) (summary order) ("The alleged misrepresentation cannot be a promise of future conduct,

which are not actionable as negligent misrepresentations under New York law.")

Even assuming, *arguendo*, that the Adin Parties can establish the requisite special relationship, their negligent misrepresentation claims nonetheless fail because, *inter alia*, the alleged representations were mere expectations or promises of future events as opposed to present representations of existing fact. *See, e.g. Stokes v. Lusker*, 425 F. App'x 18, 21-22 (2d Cir. May 27, 2011) (summary order) (affirming the district court's conclusion that the defendant's alleged assurance that he could secure a commercial tenant for the plaintiff was not actionable under New York law because "[a]n alleged misrepresentation cannot be promissory or relating to future events that might never come to fruition. . . . Nor can it be conclusory or constitute mere puffery."); *Eternity Global*, 375 F.3d at 188 (finding that the defendant's "representations as to (i) Eternity's ability to liquidate the credit default swaps at some future time, and (ii) Morgan's ability to assist Eternity in such a liquidation, cannot support a claim for negligent misrepresentation because they are promissory representations about future events."); *Pacnet Network Ltd. v. KDDI Corp.*, 78 A.D.3d 478, 479, 912 N.Y.S.2d 178 (N.Y. App. Div. 2010) (affirming dismissal of the plaintiff's negligent misrepresentation claims because they did "not allege an intentional misrepresentation of any material existing facts, . . . but only statements of prediction or expectation."); *Transit Mgmt., LLC v. Watson Indus., Inc.*, 23 A.D.3d 1152, 1155, 803 N.Y.S.2d 860 (N.Y. App. Div. 2005) (affirming dismissal of the negligent misrepresentation counterclaim on the basis, *inter alia*, that *"*the representation that Professional would loan money to Watson Industries in exchange for 49% ownership relate[d] solely to future expectations[,] . . . [and that] the Sauberan defendants established that they had indeed considered investing in Watson Industries, and Watson Industries and Okwumabua failed to . . .

raise an issue of fact with respect thereto."); *Greenberg v. Chrust*, 198 F. Supp. 2d 578, 584

(S.D.N.Y. 2002) (finding that the defendant's alleged "misrepresentations regarding his future

plans for Worlds.com, namely that he would locate and help install a new president, chief

executive officer and chief financial officer, and that he would raise the capital necessary to

permit Worlds.com to pursue its business plan and objectives, . . . cannot serve as the basis for a

negligent misrepresentation claim" because they are promissory rather than factual); *Bango v.*

*Naughton*, 184 A.D.2d 961, 962-63, 584 N.Y.S.2d 942 (N.Y. App. Div. 1992) (affirming

dismissal of the plaintiffs' negligent misrepresentation claims on the basis, *inter alia*, that the

defendant's representations that "she had started a new business in which she and another partner

would produce hand-painted apparel overseas and market the product in the United States

through a home party network, that defendant intended to develop the new business into a

nationwide company, and that the new business would establish plaintiffs as the exclusive area

outlet for its 'unique apparel inventory' and 'complement' plaintiffs' business by providing wide

exposure to such apparel through its planned nationwide market network, . . . were mere

expressions of future expectation.")

The sole misrepresentation of present fact asserted by the Adin Parties relates to the

amount of Shetel's expenditures in 2012. (*See* Adin SJ Mem. at 17). However, as set forth above,

nothing in the record indicates that Weitz and Frenkel knew or should have known at the time

they made the statements regarding the amount that was spent and/or invested in Shetel, (*see*

Adin SJ Mem. at 17 [citing Ross Decl., Ex. 72, 81-83]), that such representations were incorrect.

Indeed, Shetel's tax return for 2012 supports the accuracy of Weitz's and Frenkel's statements.

(*See* Weitz Decl., Ex. A). Accordingly, the branches of the Shetel Parties' motion seeking

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing Adin's and Adin USA Newco's negligent misrepresentation claims against them is granted and the Shetel Parties are granted judgment as a matter of law dismissing Adin's and Adin USA Newco's negligent misrepresentation claims against them (fourth counterclaim and second third-party claim) in their entirety with prejudice.

### 2.      Danzer's Claims

Danzer's negligent representation claims (twenty-fourth counterclaim against Shetel and sixteenth third-party claim against Weitz) allege, *inter alia*, (i) that Shetel and Weitz: (A) "materially misrepresented" to him that they would pay him one hundred eighty thousand dollars ($180,000.00) "as well as commissions greater than Mr. Danzer's commission rate at his prior employer, and benefits, including health and dental insurance, matching contributions to Mr. Danzer's 401k account, and ownership of a percentage of Plaintiff's stock," (B) "failed to exercise reasonable care or competence in communicating the amount of compensation and the benefits to Mr. Danzer" when they made such offer, and (C) made those misrepresentations "with the intent to induce Mr. Danzer's reliance;" and (ii) that Danzer "suffered damages" as a result of his justifiable reliance on those misrepresentations. (CC., ¶¶ 283-286; TPC, ¶¶ 127-130).

The Adin Parties make the same argument in support of their contention that Danzer sufficiently pleads negligent representation claims against Shetel and Weitz as they did with respect to his quasi-contractual claims, *i.e.*, that his negligent representation claims are sufficiently pled "in light of the uncertainty as to the existence of an enforceable agreement."

85

(Adin MTD Mem. at 12). However, after the Shetel Parties' motion was converted to a motion for summary judgment, the Adin Parties did not renew that contention, nor specifically address Danzer's negligent misrepresentation claims.

Even assuming, *arguendo*, that the Adin Parties can establish the requisite special relationship, Danzer's negligent misrepresentation claims fail because, *inter alia*, they are impermissibly duplicative of his claim against Shetel for breach of contract and the alleged representations were mere expectations or promises of future events, as opposed to present representations of existing fact, which are not actionable as negligent misrepresentations. *See, e.g. Murray v. Xerox Corp.*, 811 F.2d 118, 123 (2d Cir. 1987) (affirming summary judgment dismissing the plaintiff's negligent misrepresentation claims based upon his superior's promises of promotions and job transfers because breach of promises of future conduct are not actionable as negligent misrepresentations); *Campbell v. Thales Fund Mgmt., LLC*, No. 10 Civ. 3177, 2010 WL 4455299, at * 6 (S.D.N.Y. Oct. 12, 2010) (dismissing the negligent misrepresentation claims based upon the defendants' alleged promises about the plaintiffs' deferred compensation because such claims were "impermissibly duplicative of the claim for breach of contract" and constituted promises of future conduct, which "are not actionable as negligent misrepresentations."); *Bower v. Atlis Sys., Inc.*, 182 A.D.2d 951, 953, 582 N.Y.S.2d 542 (N.Y. App. Div. 1992), *lv. denied*, 80 N.Y.2d 758, 589 N.Y.S.2d 309, 602 N.E.2d 1125 (N.Y. 1992) (holding that a prospective employer's assurance of employment to a prospective employee was merely an expression of future expectation which did not give rise to claim of negligent misrepresentation). Accordingly, the branches of the Shetel Parties' motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing Danzer's negligent misrepresentation claims against

them is granted and the Shetel Parties are granted judgment as a matter of law dismissing Danzer's negligent misrepresentation claims (twenty-fourth counterclaim and sixteenth third-party claim) in their entirety with prejudice.

> E.    Conversion

Danzer's conversion claims against the Shetel Parties (twenty-fifth counterclaim and eighteenth third-party claim, respectively) allege, *inter alia*, that (i) "[a]t all times relevant, Mr. Danzer was the owner of his assets and property, including but not limited to money due and owing to him as fees, reimbursement or commissions from various sales; his customer lists and records which were taken by Plaintiff [and/or Weitz] without authorization; and other personal property that belongs to Mr. Danzer[;]" (ii) that Danzer "is, and continues to be, entitled to immediate possession of all such assets and property[,] . . . [and] owns all business opportunities and customer lists that were developed by him prior to his hiring by Plaintiff, including good will from the customers that Mr. Danzer developed[;]" and (iii) that the Shetel Parties have "intentionally and unlawfully exercised ownership, dominion and control over Mr. Danzer's assets and property, in denial and repudiation of his rights thereto." (CC, ¶¶ 288-291; TPC, ¶¶ 137-140).

The Shetel Parties seek dismissal of Danzer's conversion only insofar as asserted against Shetel, (*see* Shetel MTD Mem. at 14-15 [seeking dismissal of the twenty-fifth counterclaim for conversion only and referring only to allegations of that counterclaim]); and only on the grounds that such claim: (i) "is at least in part duplicative of his contract claim insofar as it seeks payment of money allegedly due him as commissions or otherwise;" (ii) that, in any event, "Danzer fails

to allege 'specific and identifiable funds;'" and (iii) that, with respect to the alleged conversion of the customer list and business records, Danzer does not allege "that because Shetel 'retained' this information he does not have his own copy[,] . . . [nor] that Shetel is under any legal duty, contractual or otherwise, to refrain from making business use of the customer list Danzer claims to have shared with it once Danzer ceased to be its employee." (*Id.*).

The Adin Parties initially contended that "dismissal of the Twenty-Fifth Counterclaim as it applies to the customer lists, training material, and other documents and data Mr. Danzer supplied to Plaintiff is inappropriate" because "the terms of Mr. Danzer's employment (inclusive of the scope of use and ownership of the customer lists developed by Mr. Danzer) were never reduced to an enforceable, written agreement[;] . . . the ownership of the customer lists, training materials, and other documents and data Mr. Danzer supplied were never the subject of nor governed by any enforceable, written agreement[;] . . . [and the Shetel Parties] fail to cite to any authority establishing that to sustain a conversion claim, a litigant must allege that it does not possess a complete or partial copy of the information." (Adin MTD Mem. at 12-13). However, after the Shetel Parties' motion was converted to a motion for summary judgment, the Adin Parties did not renew those contentions, nor specifically address Danzer's conversion claims.

Under New York law, "[i]n order to establish a cause of action to recover damages for conversion, the plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question to the exclusion of the plaintiff's rights." *World Ambulette Transp. v. Kwan Haeng Lee*, 161 A.D.3d 1028, 1030-31, 78 N.Y.S.3d 137 (N.Y. App. Div. 2018); *accord Law Offices of K.C. Okoli, P.C. v. BNB Bank, N.A.*, 481 F. App'x 622, 627 (2d

Cir. May 9, 2012) (summary order); *see also Petrone v. Davidoff Hutcher & Citron, LLP*, 150

A.D.3d 776, 777, 54 N.Y.S.3d 25 (N.Y. App. Div. 2017) ("A conversion takes place when

someone, intentionally and without authority, assumes or exercises control over personal

property belonging to someone else, interfering with that person's right of possession.") "Two

key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2)

defendant's dominion over the property or interference with it, in derogation of plaintiff's right."

*Pappas*, 20 N.Y.3d at 234, 958 N.Y.S.2d 656; *accord Colavito v. N.Y. Organ Donor Network,*

*Inc.*, 8 N.Y.3d 43, 50, 827 N.Y.S.2d 96, 860 N.E.2d 713 (N.Y. 2006).

"Interference with a right of possession is the essence of a conversion," *Meese v. Miller*,

79 A.D.2d 237, 242, 436 N.Y.S.2d 496 (N.Y. App. Div. 1981), and "[t]angible personal property

or *specific money* must be involved." *Nat'l Ctr. for Crisis Mgmt. v. Lerner*, 91 A.D.3d 920, 921,

938 N.Y.S.2d 138 (N.Y. App. Div. 2012) (emphasis in original); *see also Petrone*, 150 A.D.3d at

777, 54 N.Y.S.3d 25 ("Money, if specifically identifiable, may be the subject of a conversion

action.") "Any use of such property beyond the authority which an owner confers upon a user or

in violation of instructions given is a conversion[,] . . . [and] [t]he test for conversion is whether a

party exercises dominion or actually interferes with the property to the exclusion or in defiance

of the plaintiff's rights." *Meese*, 79 A.D.2d at 243, 436 N.Y.S.2d 496.

"Conversion occurs when funds designated for a particular purpose are used for an

unauthorized purpose." *World Ambulette*, 161 A.D.3d at 1031, 78 N.Y.S.3d 137. "Where the

property alleged to have been converted is money, it must be specifically identifiable and be

subject to an obligation to be returned or to be otherwise treated in a particular manner." *E.*

*Schodack Fire Co. v. Milkewicz*, 140 A.D.3d 1255, 1256, 34 N.Y.S.3d 640 (N.Y. App. Div.

2016); *see also LoPresti v. Terwilliger*, 126 F.3d 34, 41-42 (2d Cir. 1997) ("It is well-settled that an action will lie under New York law for conversion of money where there is an obligation to return or otherwise treat in a particular manner the specific money in question.")

"[W]here the original possession is lawful, a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property," *Rentrak Corp. v. Handsman*, No. 12-cv-1576, 2014 WL 1342960, at *7 (E.D.N.Y. Mar. 31, 2014); *see also In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 327-28 (S.D.N.Y. 2010) ("New York makes a distinction between the wrongful taking of another's property and the wrongful detention of that property. . . . In a wrongful detention case, the original possession of another's property may well be lawful, but the conversion occurs when the owner makes a demand for the return of the property and the person in possession of the property refuses to return it"), "except in a case where the lawful custodian of property commits an overt and positive act of conversion by an unlawful [] disposition of the same." *Chunn v. Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019). "Where one is rightfully in possession of property, one's continued custody of the property and refusal to deliver it on demand of the owner until the owner proves his or her right to it does not constitute a conversion." *Green Complex v. Smith*, 107 A.D.3d 846, 849, 968 N.Y.S.2d 128 (N.Y. App. Div. 2013); *accord Trans-World Trading, Ltd. v. N. Shore Univ. Hosp. at Plainview*, 64 A.D.3d 698, 700-701, 882 N.Y.S.2d 685 (N.Y. App. Div. 2009).

Generally, "a plaintiff need not demonstrate wrongful intent in order to prevail on a conversion claim," *Rentrak*, 2014 WL 1342960, at *7; *see also LoPresti*, 126 F.3d at 42 ("The tort of conversion does not require defendant's knowledge that he is acting wrongfully, but merely an intent to exercise dominion or control over property in a manner inconsistent with the

rights of another. . . . Wrongful intent simply is not an element of an otherwise valid conversion

claim"); and "[a] corporate officer or employee who participates in a conversion in the course of

his employment may be held personally liable for his acts, notwithstanding innocent intent."

*Rentrak*, 2014 WL 1342960, at \*7; *see also LoPresti*, 126 F.3d at 42 ("[B]ecause it has long been

established, [] that a corporate officer who commits or participates in a tort, even if it is in the

course of his duties on behalf of the corporation, may be held individually liable, the district

court mistakenly relied upon the fact that [the officer] was acting on behalf of the Company to

exonerate him from liability for conversion.")

"However, even if a plaintiff meets all of the elements of a conversion claim, the claim

cannot be validly maintained where damages are merely being sought for breach of contract."

*Rentrak*, 2014 WL 1342960, at \*8; *see also In re Refco Sec. Litig.*, 759 F. Supp. 2d at 327 ("A

claim for conversion will not lie where damages are merely sought for breach of contract.")

Thus, "where a conversion claim is grounded in a contractual dispute, the plaintiff must show

acts that were unlawful or wrongful as opposed to mere violations of contractual rights." *OTG*

*Brands, LLC v. Walgreen Co.*, No. 1:13-cv-09066, 2015 WL 1499559, at \*9 (S.D.N.Y. Mar. 31,

2015); *accord Rentrak*, 2014 WL 1342960, at \* 8.

"New York law is clear, seeking to enforce an 'obligation to pay' does not raise a claim

for conversion. . . . Such claims are to be dismissed if a plaintiff is essentially seeking

enforcement of the contract terms." *Heap v. CenturyLink, Inc.*, No. 18 Civ. 1220, 2020 WL

1489801, at \*17 (S.D.N.Y. Mar. 27, 2020); *see also Fantozzi v. Axsys Techs., Inc.*, No. 07 Civ.

02667, 2008 WL 4866054, at \* 9 (S.D.N.Y. Nov. 6, 2008) ("Under New York State law, an

action for conversion of money is insufficient as a matter of law unless it is alleged that the

money converted was in specific tangible funds of which claimant was the owner and entitled to immediate possession. An action of conversion does not lie to enforce a mere obligation to pay money. . . . New York law recognizes an action for conversion of money, but requires the Plaintiff to have 'ownership, possession or control of the money' before its conversion.") "[A] conversion claim for money only survives if plaintiff had 'ownership, possession or control of the money' prior to the conversion . . . [and] [a]n obligation to be paid does not equate to a plaintiff's ownership, possession or control of the money in question." *Heap*, 2020 WL 1489801, at *18.

Since Danzer's conversion claim against Shetel based upon "money due and owing to him as fees, reimbursement or commissions from various sales" is merely an obligation to pay pursuant to the oral employment agreement, Danzer cannot show that he was in ownership, possession or control of such funds and, thus, cannot establish a conversion claim based upon such funds as a matter of law. *See, e.g. Heap*, 2020 WL 1489801, at * 18 (holding that the plaintiff could not bring a conversion claim for commission payments owed pursuant to her contractual agreement with the defendants absent an "assertion that the monies owed stem from any obligation other than Defendants' 'obligation to pay' under the Compensation Agreement."); *Komlossy v. Faruqi & Faruqi, LLP*, No. 15 Civ. 9316, 2017 WL 722033, at * 10 (S.D.N.Y. Feb. 23, 2017), *aff'd*, 714 F. App'x 11 (2d Cir. Oct. 18, 2017) (dismissing the plaintiff's conversion claim based upon a future fee commission because she did not have ownership, control of possession of those funds); *Gould Paper Corp. v. Madisen Corp.*, 614 F. Supp. 2d 485, 493 (S.D.N.Y. 2009) (dismissing the conversion counterclaim alleging that the plaintiff unlawfully withheld unpaid commissions that the defendant had rightfully earned as being duplicative of the

breach of contract claim); *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d 883, 884, 452 N.Y.S.2d 599 (N.Y. App. Div. 1982) (holding that the plaintiff could not maintain a cause of action for conversion because it "never had ownership, possession or control of the money constituting the June commissions.")

Moreover, the record is devoid of any evidence, *inter alia*, indicating that the Shetel Parties exercised unauthorized dominion and control over the purported customer list, training materials or other business records Danzer allegedly supplied to them in a manner inconsistent with Danzer's rights thereto. The Adin Parties have not established that any of the Shetel Parties did anything to exclude Danzer from exercising his rights over the information contained in the customer list, *i.e.*, from accessing or using the information therein; merely that the Shetel Parties retained the information in question and were still able to use it, which is insufficient to support a conversion claim. *See, e.g. American Lecithin Co. v. Rebmann*, No. 12-cv-929, 2020 WL 4260989, at * 21 (S.D.N.Y. July 24, 2020) (finding that since the plaintiffs admitted that the defendant's possession of certain software and its data after his employment was terminated did not interfere with their ability to use either, no claim for conversion could lie because the defendant did not exclude the plaintiffs from exercising their rights over such property); *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 536 (S.D.N.Y. 2011) (finding that the conversion claim with respect to business documents, including a client list, failed as a matter of law where, although the defendant assumed or exercised control over the plaintiff's client list to the extent that he accessed the client list from the plaintiff's computer and downloaded it onto a thumb drive, he possessed only a copy of the client list and did not, in any way, limit or otherwise deprive the plaintiff of possession or use of

that list); *Chefs Diet Acquisition Corp. v. Lean Chefs, LLC*, No. 14-cv-8467, 2016 WL 5416498, at * 7 (S.D.N.Y. Sept. 28, 2016) (finding that the conversion claim failed as a matter of law because the defendants' possession of the customer data did not prevent the plaintiff from simultaneously accessing or using that data). Accordingly, the branch of the Shetel Parties' motion seeking summary judgment dismissing Danzer's conversion claim against Shetel is granted and the Shetel Parties are granted judgment as a matter of law dismissing Danzer's conversion claim against Shetel (twenty-fifth counterclaim) in its entirety with prejudice.

F.     Claims relating to Shetel's Purported Unauthorized Use of the Adin Marks

The Adin Parties' trademark infringement and false designation of origin claims (sixth and seventh counterclaims and fourth and fifth third-party claims, respectively) allege, *inter alia*, that the Shetel Parties have knowingly, and without the consent of either Adin or Adin USA Newco, after the notice of termination from Adin and Adin USA Newco and repeated cease and desist letters, used, and continue to use, in commerce the Adin Marks, the predominate ADIN portion of either or both of the Adin Marks, and/or counterfeits, copies, reproductions, or colorable imitations thereof "in connection with the sale, offering for sale, distribution, and/or advertising of goods and services," (CC, ¶ 155; TPC, ¶ 40), and "in connection with the goods and services that [the Shetel Parties] advertise, promote, and sell." (CC, ¶ 163; TPC, ¶ 48).

The Adin Parties' claims under the New York General Business Law (ninth, tenth, eleventh and twelfth counterclaims and seventh, eighth, ninth and tenth third-party claims) allege, *inter alia*, that the Shetel Parties' unauthorized use of the Adin Marks "blur and dilute Adin's trademarks," in violation of N.Y. Gen. Bus. Law § 360-*l*, (CC, ¶ 187; TPC, ¶ 70);

"constitute deceptive acts or practices in the conduct of a business, trade or commerce and/or in the furnishing of services in violation of N.Y. Gen. Bus. Law § 349, as they are likely to deceive the public," (CC, ¶ 194; TPC, ¶ 76); constitute false advertising in violation of N.Y. Gen. Bus. Law § 350, (CC, ¶ 201; TPC, ¶ 83); and "is likely to deceive or mislead the public as to the identity of [Shetel and Osseogroup] and/or the connection of [Shetel and Osseogroup] with Adin and Adin USA [Newco], in violation of N.Y. Gen. Bus. Law § 133."[24] (CC, ¶ 209; TPC, ¶ 91).

In addition, the Adin Parties' claims for tortious interference with prospective business advantage (fourteenth counterclaim and twelfth third-party claim) allege, *inter alia*, that the Shetel Parties' unauthorized use of the Adin Marks "have disrupted or are intended to disrupt the business of Adin and Adin USA [Newco] by, among other things, diverting customers away from genuine authorized services and products that use the Adin Marks and Adin goods to market, distribute, and sell unauthorized services and products of [the Shetel Parties] using the same," (CC, ¶ 223; *see also* TPC, ¶ 107); and their common law claims for unfair competition (sixteenth counterclaim and thirteenth third-party claim) allege, *inter alia*, that the Shetel Parties have been, and are, "engaged in acts of unfair competition in violation of the common law." (CC, ¶ 231; TPC, ¶ 112).

"Under the Lanham Act, a plaintiff alleging trademark infringement must demonstrate that (1) 'it has a valid mark that is entitled to protection' and that (2) the defendant's actions are

---

[24] The Adin Parties' claims alleging violations of N.Y. Gen. Bus. Law §§ 133 and 350 are asserted against Shetel and Osseogroup only; not against Weitz.

likely to cause confusion with that mark."[25] *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020).

1.      Likelihood of Confusion

"A plaintiff does not have to show necessarily that consumers would believe that the defendant's goods or services are from the same source as those of the plaintiff. . . . Rather, a defendant may also be liable for trademark infringement if its actions are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of the defendant's goods or services with those of the plaintiff." *Tiffany & Co.*, 971 F.3d at 84. However, "the mere possibility of confusion is not enough. To prevail in a trademark infringement action, a plaintiff must prove a probability of confusion [] affecting numerous ordinary prudent purchasers." *Id.*

The Second Circuit evaluates the question of consumer confusion "using the test articulated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961) ("*Polaroid*"), which balances the following eight factors: (1) the strength of the trademark; (2) the degree of similarity between the plaintiff's mark and the defendant's allegedly imitative use; (3) the proximity of the products and their competitiveness with each other; (4) the likelihood that the plaintiff will 'bridge the gap' by developing a product for sale in the defendant's market; (5)

---

[25] "[C]ourts employ substantially similar standards when analyzing claims for trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a); false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a); trademark infringement under New York common law; and unfair competition under New York common law." *Lacura, Inc. v. Masas U.S.A., Inc.*, No. 15-cv-3101, 2016 WL 11481722, at * 8 (E.D.N.Y. Feb. 9, 2016), *report and recommendation adopted*, 2016 WL 843291 (E.D.N.Y. Mar. 1, 2016); *see also MyPlayCity, Inc. v. Conduit Ltd.*, No. 10 Civ. 1615, 2012 WL 1107648, at *17 (S.D.N.Y. Mar. 30, 2012) ("The elements required to succeed on these [trademark infringement and unfair competition] claims are substantially the same and are examined together. . . . In addition, the standards for trademark infringement are essentially the same under the Lanham Act, New York law, and the common law.")

evidence of actual consumer confusion; (6) evidence that the defendant adopted the imitative term in bad faith; (7) the respective quality of the products; and (8) the sophistication of the relevant population of consumers." *Tiffany & Co.*, 971 F.3d at 84-85. "The evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Id.* at 85. "[I]f a factual inference must be drawn to arrive at a particular finding on a *Polaroid* factor, and if a reasonable trier of fact could reach a different conclusion, the district court may not properly resolve that issue on summary judgment." *Id.* at 86.

The Shetel Parties contend that the Adin Parties' trademark infringement, General Business Law and common law unfair competition claims fail because the unauthorized sale of genuine trademarked goods that do not differ in quality from those sold through authorized channels does not create any likelihood of consumer confusion.

In their initial memorandum of law in opposition to the Shetel Parties' motion to dismiss, the Adin Parties argued only that their trademark claims are based upon the "unauthorized sale of Adin products," (*see* Adin Opp. at 15-16), and asserted that the existence of a purported restrictive covenant, specifically the July 26, 2014 email Weitz sent to Davidson, precludes the Shetel Parties from continuing to sell products bearing Adin's Marks after the termination of the parties' relationship.[26] (*See* Ans., Ex. C).

 "[A] defendant may lawfully use a plaintiff's trademark where doing so is necessary to

---

[26] The Shetel Parties also refer to one of the "Terms for transfer of assets" attached to the Letter of Understanding which provides: "Non-compete clause – with good will to continue the operation." (Ans., Ex. A).

describe the plaintiff's product and does not imply a false affiliation or endorsement by the plaintiff of the defendant." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102-03 (2d Cir. 2010). "While a trademark conveys an exclusive right to the use of a mark in commerce in the area reserved, that right generally does not prevent one who trades a branded product from accurately describing it by its brand name, so long as the trader does not create confusion by implying an affiliation with the owner of the product." *Tiffany (NJ)*, 600 F.3d at 103; *accord Dow Jones & Co. v. Int'l Sec. Exch., Inc.*, 451 F.3d 295, 308 (2d Cir. 2006); *see also Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61-62 (2d Cir. 1992) ("As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner. . . . Thus, a distributor who resells trademarked goods without change is not liable for trademark infringement. . . . In addition, even repackaging of goods is not trademark infringement if it does not deceive the public or damage the mark owner's goodwill.")

The Adin Parties do not dispute as much; instead they rely upon an exception to the general rule set forth by the Second Circuit in *Polymer Tech.* which provides:

> "A distributor's failure to observe a restrictive condition on the type or class of customers with whom it may deal can constitute trademark infringement, but more is required than unauthorized sales standing alone. . . . The element of consumer confusion must also be present."

*Polymer Tech.*, 975 F.2d at 63. Although the Lanham Act generally "does not impose liability for the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner because such a sale does not inherently cause confusion or dilution, . . . goods are not genuine if they do not conform to the trademark holder's quality control standards, . . . or if they differ materially from the product authorized by the trademark holder for sale." *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009).

To the extent the Adin Parties' claims are based solely on the unauthorized sale of Adin products after the termination of the parties' relationship, as alleged in the counterclaims and third-party complaint, they have not established that there were any material differences in the Adin products that the Shetel Parties sold after the termination of the exclusive distributorship agreement. Rather, the alleged unauthorized sales are merely sales of the same products in the same packaging to the same customers to whom Shetel had been selling when it was the authorized distributor of Adin. Thus, the Adin Parties' claims allege nothing more than breach of contract as to authentic goods, for which no claim for trademark infringement or unfair competition will lie. *See, e.g. Kitty Walk Sys., Inc. v. Midnight Pass Inc.*, 431 F. Supp. 2d 306, 310 (E.D.N.Y. 2006).

Moreover, contrary to the Adin Parties' contention, the Shetel Parties do not concede that their actions in continuing to sell Adin products after the termination of the exclusive distributorship agreement, have caused, or are likely to cause, customer confusion. (*See* Adin Opp. at 17). Rather, the Shetel Parties allege customer confusion caused by the allegedly false statements the Adin Parties made about them in the marketplace, (*see* Am. Compl., ¶ 103), which is irrelevant for the purposes of the Adin Parties' trademark and unfair competition claims.

Moreover, to the extent that the Adin Parties have failed to establish that the products the Shetel Parties sold after the termination of the parties' relationship were not genuine, they cannot establish a claim under Sections 349, 350 or 360-*l* of the New York General Business Law.[27]

---

[27] "To make out a prima facie case under Section 349, a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020). "The standards for deceptive business practices under section 349 of the General Business Law are substantively identical to those for false advertising under section 350." *Krasnyi Oktyabr, Inc. v. Trilini Imports*, 578 F. Supp. 2d 455, 470 (E.D.N.Y. 2008).

*See, e.g. Krasnyi Oktyabr, Inc. v. Trilini Imports*, 578 F. Supp. 2d 455, 470-71 (E.D.N.Y. 2008) (dismissing the plaintiff's Section 349 and 350 claims for failure to show consumer harm; and its Section 360-*l* claim on the basis that it could not "argue blurring has occurred because it has not demonstrated any differences in the quality or quality control standards of defendants' goods, and thus cannot argue that the goods are dissimilar. Similarly, tarnishment cannot occur because if there are no differences in quality or quality control standards of defendants' goods, they cannot be of 'shoddier quality' than plaintiff's goods.")

Nor does the evidence presented support a claim of tortious interference with business advantage. Even assuming, *arguendo*, that the Adin Parties lost some business because of the Shetel Parties' unauthorized sale of Adin products, under the circumstances of this case, such conduct can hardly be considered "extreme and unfair." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192-93, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (N.Y. 2004); *see, e.g. Krasnyi Oktyabr*, 578 F. Supp. 2d at 471-72. Accordingly, to the extent the Adin Parties' Lanham Act claims (sixth and seventh counterclaims and fourth and fifth third-party claims, respectively); New York General Business Law claims (ninth, tenth, eleventh and twelfth counterclaims and seventh, eighth, ninth and tenth third-party claims); common law claims for unfair competition (sixteenth counterclaim and thirteenth third-party claim); and claims for tortious interference with prospective business advantage (fourteenth counterclaim and twelfth third-party claim) are based solely upon the Shetel Parties' unauthorized sale of Adin products after the termination of the exclusive distributorship agreement, the branches of the Shetel Parties' motion seeking summary judgment dismissing those claims is granted and the Shetel Parties are granted judgment as a matter of law dismissing those claims against them with prejudice.

However, during court proceedings before the Honorable Arlene R. Lindsay, United States Magistrate Judge, on May 3, 2019, counsel for the Adin Parties represented that the issue is that: "Shetel marketed, filled orders for Adin products with third party products and then invoiced physicians for those products using Adin's model numbers which included a proprietary prefix and the verbatim descriptions from Adin's catalog and explanations for each product. Physicians thought they were getting Adin products when they were not. Now, it's not a registered mark. The model isn't a registered mark. But under the Lanham Act, 43(a), we are entitled to bring civil causes of action for false designation of origin and false advertising. . . ."[28] (Besdin Decl., Ex. O at 8:12-21).

Similarly, in their memorandum in opposition to the Shetel Parties' motion for summary judgment, the Adin Parties contend that "[s]ince the termination of the exclusive distributorship agreement, Adin has identified over 500 instances of [the Shetel Parties] marketing and selling non-Adin manufactured component parts and accessories as Adin's dental products either through outright lies or deceptive trade practices that caused the purchasers to believe the provenance of the goods," (Adin SJ Mem. at 21); and that, "[a]s an example of the former, Shetel marketed and sold so-called 'Tic-Taks,' a kit of component parts manufactured by a third-party,

---

[28] Magistrate Judge Lindsay found, *inter alia*, that "the communications with the FDA have nothing to do with" the Adin Parties' Lanham Act counterclaims, (Besdin Decl., Ex. O at 8:22-23); and that the Adin Parties are: "not making this a health concern. . . [and] can file a complaint with the FDA. As far as this case is concerned, Adin has made a claim that Shetel is out there selling a product and claiming it's Adin. . . . We're not going to follow up on whether or not the FDA give them some permission to sell some other product. . . . [W]hether or not it was a proper product, an implant that works or doesn't work or is licensed by the FDA, very separate issue, you can bring your cause to the FDA." (*Id.* at 9:7-18; *see also Id.* at 18:17-18 [indicating that the Court was "not going to permit" the Adin Parties to "circl[e] back to the FDA stuff"]). The Shetel Parties did not timely object to Magistrate Judge Lindsay's decision pursuant to Rule 72(a) of the Federal Rules of Civil Procedure.

as Adin's products."[29] (*Id.*). According to the Adin Parties, "[t]he Tic-Taks were falsely described in [the Shetel Parties'] product catalogs as manufactured by Adin, while other products manufactured by third-parties were clearly delineated as such." (*Id.*). The Adin Parties further contend that "Shetel used Adin's marks and proprietary model numbers to both market and invoice [non-Adin manufactured] products[,] . . . [and] [e]ven after the end of the parties' business relationship and exhaustion of [the Shetel Parties'] inventory of Adin-manufactured component parts, [the Shetel Parties] did not circulate new catalogs, but rather, filled customer orders with third-party products, while continuing to reference Adin model numbers in the catalogs and invoices." (*Id.*).

"To prevail in a trademark infringement action, a plaintiff must prove a probability of confusion [] affecting numerous ordinary prudent purchasers." *Tiffany & Co.*, 971 F.3d at 84. "[T]he mere possibility of confusion is not enough." *Id.*; *see also Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 383 (2d Cir. 2005) ("To prevail in a trademark infringement action under the Lanham Act, a plaintiff must prove, in addition to protectability of the mark, a probability of confusion, not a mere possibility, affecting numerous ordinary prudent purchasers.")

The Adin Parties have not proffered sufficient evidence to raise a genuine dispute regarding whether customers or potential customers were actually confused by the Shetel Parties' purported use of the Adin Marks and Adin's allegedly "proprietary model numbers" in product

---

[29] The Adin Parties address only their sixth and seventh counterclaims for trademark infringement and false designation of origin, respectively, against Shetel in their supplemental memorandum of law in opposition to summary judgment. (*See* Adin SJ Mem. at 20). Thus, they have seemingly abandoned their claims against Osseogroup and Weitz for trademark infringement and false designation of origin (fourth and fifth third-party claims, respectively); and their New York General Business Law claims (ninth, tenth, eleventh and twelfth counterclaims and seventh, eighth, ninth and tenth third-party claims); common law claims for unfair competition (sixteenth counterclaim and thirteenth third-party claim); and claims for tortious interference with prospective business advantage (fourteenth counterclaim and twelfth third-party claim) against the Shetel Parties.

catalogs and on invoices. Indeed, they refer only to evidence of possible confusion, *i.e.*, "that there are possibly customers who still have not learned that [the Shetel Parties] filled orders with component parts manufactured by third-parties [*sic*]," (Adin SJ Mem. at 21), which is insufficient to establish a likelihood of confusion. Nor does the evidence presented demonstrate, *inter alia*, that the Shetel Parties acted in bad faith; that the Adin Marks and "proprietary model numbers" are particularly strong; or that the non-Adin manufactured products differed in quality from the Adin-Parties' products. Indeed, balancing all of the *Polaroid* factors, the Adin Parties have not demonstrated a probability of confusion, *i.e.*, that consumers are likely to be confused by the Shetel Parties' alleged use of the Adin Marks and "proprietary model numbers" in product catalogs and on invoices. Accordingly, the branches of the Shetel Parties' motion seeking summary judgment dismissing the Adin Parties' Lanham Act claims (sixth and seventh counterclaims and fourth and fifth third-party claims, respectively); New York General Business Law claims (ninth, tenth, eleventh and twelfth counterclaims and seventh, eighth, ninth and tenth third-party claims); common law claims for unfair competition (sixteenth counterclaim and thirteenth third-party claim); and claims for tortious interference with prospective business advantage (fourteenth counterclaim and twelfth third-party claim) are granted and the Shetel Parties are granted judgment as a matter of law dismissing those claims in their entirety with prejudice.

### G.     Cybersquatting Claims

 The ACPA provides, in relevant part, that "[a] person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section,

if, without regard to the goods or services of the parties, that person--(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and (ii) registers, traffics in, or uses a domain name that-- (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; [or] (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark. . . ." 15 U.S.C. § 1125(d)(1)(A).

The ACPA was enacted "to protect consumers and holders of distinctive trademarks from 'cybersquatting,' which 'involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners." *Webadviso v. Bank of Am. Corp.*, 448 F. App'x 95, 97 (2d Cir. Oct. 26, 2011) (summary order) (quoting *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 493 (2d Cir. 2000)). "To successfully assert a claim under the ACPA, a plaintiff must demonstrate that (1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) the infringer has a bad faith intent to profit from that mark." *Webadviso*, 448 F. App'x at 97.

Initially, the Shetel Parties contend that the Adin Parties' cybersquatting claims (eighth counterclaim and sixth third-party claim) "are materially contradicted by Adin's own pleading and should be dismissed" in light of the July 26, 2014 email Weitz sent to Adin indicating Adin's agreement to Weitz's claim that Shetel owns the website at issue. (Shetel MTD Mem. at 19). The Shetel Parties argue that "[h]aving agreed in 2014 that Shetel owns its own website, www.adinimplants.com, Adin should not be permitted to completely reverse course and now

104

claim that Shetel's use of that website constitutes cybersquatting or is otherwise actionable." (*Id.*).

The Shetel Parties further contend, *inter alia*, that the Adin Parties have not sufficiently alleged, or established, the "bad faith intent to profit" element of an ACPA claim since "[i]t is undisputed that Shetel used the URL for several years with Adin's full knowledge and consent, and a defendant's 'prior use … of the domain name in connection with the bona fide offering of any goods or services,' is one of the statutory factors enumerated in section 1125(d)(1)(B)(i) that cuts against any inference of bad faith." (Shetel MTD Mem. at 20). Nor, according to the Shetel Parties, is there any "allegation that Shetel made any offer to 'transfer, sell, or otherwise assign the domain name to the mark owner … for financial gain without having used … the domain name in the bona fide offering of any goods or services,' the statutory factor which is the classic hallmark of a bad-faith 'cybersquatter.'" (*Id.*).

"A 'bad faith intent to profit' is a term of art in the [ACPA] and cannot be equated with 'bad faith' in other contexts (such as trademark infringement)." *Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*, 104 F. Supp. 3d 371, 382 (S.D.N.Y. 2015) (citing *Sporty's Farm*, 202 F.3d at 499 n. 13); *accord NYP Holdings v. New York Post Publ'g, Inc.*, 63 F. Supp. 3d 328, 339 (S.D.N.Y. 2014). "A plaintiff must show that the defendant's use of the domain name is an attempt to profit specifically from 'squatting' on the domain name with bad faith, rather than simply [] another aspect of the alleged trademark infringement." *Flat Rate Movers*, 104 F. Supp. 3d at 382; *see also Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 437 (S.D.N.Y. 2013) ("The requirement of bad faith intent to profit imposes an important limit that

cabins the statute's scope and ensures that the ACPA targets only the specific evils that Congress

sought to prevent.")

"With respect to the 'bad faith' element, the ACPA lists nine [9] non-exclusive factors

for courts to consider in determining whether a domain name registrant has acted in bad faith."

*Webadviso*, 448 F. App'x at 97 (citing 15 U.S.C. § 1125(d)(1)(B)(i)); *see also Sporty's Farm*,

202 F.3d at 498. Those factors are:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
>
> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
>
> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous

marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B)(i). "[T]he first four factors suggest circumstances tending to indicate an absence of bad faith intent to profit from the goodwill of the mark, the next four tend to indicate that such bad faith does exist and the last factor points in either direction, depending on the degree of distinctiveness and fame of the mark." *McAllister Olivarius v. Mermel*, 298 F. Supp. 3d 661, 672-73 (S.D.N.Y. 2018). Courts "need not [] march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive[,]" *American Lecithin*, 2020 WL 4260989, at *8, and "courts are not limited to considering just the listed factors when making a determination of whether the statutory criterion has been met[;]" they may also consider "[a]ny unique circumstances [] which do not fit neatly into the specific factors enumerated." *McAllister*, 298 F. Supp. 3d at 673.

In addition, the ACPA "sets forth a 'bad-faith safe harbor' provision[,]" *Webadviso*, 448 F. App'x at 97, n. 2, which provides that "[b]ad faith intent described under subparagraph (A) [of 15 U.S.C. § 1125(d)(1)] shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use *or otherwise lawful*." 15 U.S.C. § 1125(d)(1)(B)(ii) (emphasis added).

"[A] court must analyze each case based on its unique circumstances to determine how close a defendant's conduct falls to the ACPA's heartland[,]" *New World Sols.*, 150 F. Supp. 3d at 325, examples of which include situations "where a defendant registers an established entity's domain name in bad faith and offers to sell it to the entity for an exorbitant price[,] . . . [or]

107

where a defendant intends to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those customers would purchase the defendant's products or services." *Id.*; *see also Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 351 (S.D.N.Y. 2014) (dismissing the plaintiff's cybersquatting claim where the allegations in the complaint did not "suggest that defendants perpetrated the core activities that threaten to result in the paradigmatic harm that the ACPA was enacted to eradicate, that is, the proliferation of cybersquatting– the Internet version of a land grab."); *Gioconda*, 941 F. Supp. 2d at 437 ("The ACPA is designed principally for cases where a defendant either forces a markholder to purchase a domain name at an extortionate price or diverts customers from the markholder's website to the defendant's own website.")

The record evidence does not establish that the Shetel Parties ever had any bad faith intent to profit from any goodwill associated with Adin's mark by registering or using the domain name at issue. Although the domain name does not consist of a name commonly used to identify any of the Shetel Parties, there is evidence that the Shetel Parties owned the website and associated URL at issue, and it is undisputed that they previously used the domain name in connection with the bona fide offering of goods and services. The remaining factors are either neutral or weigh in the Shetel Parties' favor since, *inter alia*, the record is devoid of any evidence indicating that they registered multiple domain names[30]; attempted to transfer, sell, or otherwise

---

[30] The Adin Parties refer, for the first time in their supplemental brief in opposition to the summary judgment motion, to the Shetel Parties' registration of a different domain, www.adindigital.com, which was purportedly the mark of non-party Adin Digital, Ltd., a subsidiary of Adin, in May 2016, approximately six (6) years after their registration of the domain name at issue. (*See* Adin SJ Mem. at 23). That domain was registered approximately four (4) months prior to the termination of the parties' exclusive distributorship agreement and, under the circumstances of this case, does not support a finding of a bad faith intent to profit. Indeed, according to the Shetel Parties, that domain was never activated, and the record is bereft of any evidence indicating that it was ever used by the Shetel Parties, for profit or otherwise.

assign the domain name to the Adin Parties or any third party for potential gain "without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services,"[31] 15 U.S.C. 1125(d)(1)(B)(i)(VI); or provided misleading false contact information in registering for the domain name. Nor is there evidence from which a rational fact finder could reasonably find that the Shetel Parties ever intended to divert consumers from the Adin Parties' official website or online location "to a site accessible under the domain name that could harm the goodwill represented by the mark . . . by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." 15 U.S.C. § 1125(d)(1)(B)(i)(V). Indeed, although there is evidence indicating that the Adin Parties may have been concerned about certain elements of the Shetel Parties' website, there is no evidence of any consumer confusion, nor of any intent to divert consumers. The February 2016 email from Cohen to Weitz, upon which the Adin Parties rely, expressly indicates Adin's certainty that the purportedly confusing elements of the website "were done without any intention to harm the Adin's brand name or negatively reflect on it in any way," (Ross Decl., Ex. 122); and a July 29, 2014 email from Cahaner to Danzer reflects Adin's concern only that the website was causing Shetel damages, not that it was creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of the site.

Furthermore, under the circumstances of this case, particularly the Adin Parties' apparent agreement that the Shetel Parties owned the website and associated URL at issue and the fact that

---

[31] Even assuming that Shetel "prepared a proposed agreement for the sale of its business to Adin, which included the website domain name[,]" (Adin MTD Mem. at 20), it did not "offer to transfer, sell, or otherwise assign the domain name . . . for financial gain *without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services*," as required by the relevant factor. 15 U.S.C. § 1125(d)(1)(B)(i)(VI). In addition, the allegation that Shetel sold genuine products at comparative prices, (*see* Adin MTD Mem. at 20), even if true, is not indicative of a "bad faith intent to profit" within the meaning of the ACPA.

the Shetel Parties had been doing business as Adin USA and using the domain name at issue with the Adin Parties' knowledge and consent during the term of the exclusive distributorship agreement, (*see, e.g.* Besdin Decl., Ex. J and K), the Shetel Parties had at least reasonable grounds to believe that the registration and use of the domain name at issue was lawful. Accordingly, the branches of the Shetel Parties' motion seeking summary judgment dismissing the Adin Parties' cybersquatting claims under the ACPA (eighth counterclaim and sixth third-party claim) are granted and the Shetel Parties are granted judgment as a matter of law dismissing those claims against them in their entirety with prejudice.

> H.   Third-Party Claims against Weitz

The Shetel Parties seek dismissal of the Adin Parties' claims against Weitz, individually, on the basis, *inter alia*, that they "fail to adequately allege facts that give rise to veil piercing or any other theory of individual liability against Weitz." (Shetel MTD Mem. at 20). Specifically, the Shetel Parties contend that the Adin Parties do not allege "any actions by Weitz acting on his own behalf rather than as a principal or agent of Shetel[;] . . . any specific facts . . . regarding a disregard of corporate formalities or any other actions inconsistent with the ordinary behavior of a principal or agent of a limited liability company[;]. . . [or] that a personal guarantee by Weitz of Shetel's contractual obligations to either Adin or Danzer was ever requested or discussed, much less agreed to." (Shetel MTD Mem. at 8).

With the exception of Danzer's promissory estoppel, unjust enrichment and conversion claims against Weitz (fourteenth, seventeenth and eighteenth third-party claims), the Adin

Parties' claims against Weitz are dismissed on the merits for the reasons set forth above[32].

Danzer's promissory estoppel claim against Weitz alleges, *inter alia*, that Weitz "unambiguously promised" him that Shetel would pay him commissions, provide him with health and dental insurance and "an ownership of a percentage of Plaintiff's stock," and make matching contributions to his 401k account; and that Danzer "quit his job [and] worked exclusively for the benefit of Plaintiff," in reasonable and foreseeable reliance on such promises. (TPC, ¶¶ 116-117).

Similarly, Danzer's unjust enrichment claim against Weitz alleges, *inter alia*, that "Danzer performed services, in good faith, on behalf of Dr. Weitz[;]" that Weitz accepted such services and unfairly benefitted therefrom "in that he has failed to pay commissions to Mr. Danzer for all sales by Plaintiff, provide health and dental insurance, make matching contributions to Mr. Danzer's 401k account, and provide Mr. Danzer with ownership of a percentage of Plaintiff's stock[;]" and that Danzer "would not have acted to make or assist in the making of the sales at issue but for the understanding from Dr. Weitz that Plaintiff would pay him appropriate consideration." (TPC, ¶¶ 132-134).

Danzer's conversion claim against Weitz alleges, *inter alia*, (i) that at all relevant times, Danzer "was the owner of his assets and property, including but not limited to money due and owing to him as fees, reimbursement or commissions from various sales," "all business opportunities and customer lists that were developed by him prior to his hiring by Plaintiff, including good will from the customers that Mr. Danzer developed," and "other personal property that belongs to Mr. Danzer;" and (ii) that Weitz "intentionally and unlawfully exercised ownership, dominion and control over Mr. Danzer's assets and property, in denial and

---

[32] Accordingly, the Court need not, and does not, address the parties' remaining contentions with respect to those claims.

repudiation of his rights thereto." (TPC, ¶¶ 137-140).

Under New York law, "[t]he general rule [] is that a corporation exists independently of its owners, who are not personally liable for its obligations, and that individuals may incorporate for the express purpose of limiting their liability." *Sky-Track Tech. Co. Ltd. v HSS Dev., Inc.*, 167 A.D.3d 964, 91 N.Y.S.3d 119 (N.Y. App. Div. 2018); *see also Walkovszky v. Carlton*, 18 N.Y.2d 414, 417, 276 N.Y.S.2d 585, 223 N.E.2d 6 (N.Y. 1966) ("The law permits the incorporation of a business for the very purpose of enabling its proprietors to escape personal liability.") "The concept of piercing the corporate veil is an exception to this general rule, permitting, in certain circumstances, the imposition of personal liability on owners for the obligations of their corporation." *Sky-Track*, 167 A.D.3d at 964, 91 N.Y.S.3d 119; *see also New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 229 (2d Cir. 2014) ("Courts will pierce the corporate veil to prevent fraud or achieve equity by imposing a corporate obligation upon a parent."); *Walkovszky*, 18 N.Y.2d at 417, 276 N.Y.S.2d 585 ("Broadly speaking, the courts will disregard the corporate form, or, to use accepted terminology, 'pierce the corporate veil', whenever necessary to prevent fraud or to achieve equity.")

"In order for a plaintiff to state a viable claim against a shareholder of a corporation in his or her individual capacity for actions purportedly taken on behalf of the corporation, plaintiff must allege facts that, if proved, indicate that the shareholder exercised complete domination and control over the corporation and abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice." *E. Hampton Union Free Sch. Dist. v Sandpebble Builders*, 16 N.Y.3d 775, 776, 919 N.Y.S.2d 496, 944 N.E.2d 1135 (N.Y. 2011); *see also Cortlandt St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 47, 73 N.Y.S.3d 95, 96 N.E.3d 191 (N.Y. 2018)

("Generally, a plaintiff seeking to pierce the corporate veil must show that (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury.") "[D]omination by itself is not enough to justify veil piercing-- it must be accompanied by a showing of wrongful or unjust action toward the plaintiff." *FirstEnergy*, 766 F.3d at 229; *see also MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 64 (2d Cir. 2001) ("Without a finding that the domination occurred for the purpose of committing a wrong, the second element of a veil-piercing analysis has not been met.")

"Since, by definition, a corporation acts through its officers and directors, to hold a shareholder/officer . . . personally liable, a plaintiff must do more than merely allege that the individual engaged in improper acts or acted in 'bad faith' while representing the corporation." *E. Hampton*, 16 N.Y.3d at 776, 919 N.Y.S.2d 496; *accord Bonderman*, 31 N.Y.3d at 47, 73 N.Y.S.3d 95. "Determining that veil-piercing is appropriate is a fact specific inquiry, and courts consider many factors, including: (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms [*sic*] length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporations debts by the dominating entity, and (10) intermingling of property between the entities." *MAG Portfolio*, 268 F.3d at 63; *see also JGK Indus., LLC v. Hayes NY Bus., LLC*, 145 A.D.3d 979, 980-81, 45 N.Y.S.3d 479 (N.Y. App. Div. 2016) ("Factors to be considered in determining whether the owner has 'abused

113

the privilege of doing business in the corporate form' include whether there was a failure to adhere to corporate formalities, inadequate capitalization, commingling of assets, and use of corporate funds for personal use.")

The plaintiff must demonstrate that the shareholder or officer exercised domination and control over the corporation "which is so complete that the corporation has no separate mind, will, or existence of its own." *Sky-Track*, 167 A.D.3d at 965, 91 N.Y.S.3d 119. "Mere conclusory statements that a corporation is dominated or controlled by a shareholder are insufficient to sustain a cause of action against a shareholder in its individual capacity." *Sky-Track*, 167 A.D.3d at 965, 91 N.Y.S.3d 119; *see also Taizhou Zhongneng Import & Export Co., Ltd. v. Koutsobinas*, 509 F. App'x 54, 56-57 (2d Cir. Jan. 30, 2013) (summary order) ("Under New York law, a plaintiff must plead and prove two elements to establish veil-piercing liability: (1) that the parent exercised such complete domination in respect to the transaction attacked that the subsidiary had at the time no separate will of its own, and (2) that this domination was used to commit fraud or wrong' against the plaintiff, which proximately caused the plaintiff's injury. . . . Conclusory allegations on one or both of these points are insufficient; a complaint must plead specific facts or circumstances supporting them.")

The evidence in the record is insufficient to demonstrate either that at the time of Weitz's alleged conduct vis-à-vis Danzer, Shetel was so dominated by Weitz that it had no separate identity, or that any such corporate domination was used to commit a fraud or wrong that proximately caused harm to Danzer, particularly since, *inter alia*, it is undisputed that Frenkel was an equal cofounding owner of Shetel who managed and controlled the daily operations of the corporation. *See, e.g. Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 135 (2d

114

Cir. 1997) (holding that one factor which weighed "strongly against a finding of domination" by a corporate officer was the fact that another individual "actively participated in [the corporation's] business and had at least as much involvement in, and control over, the company as did [the officer].") Indeed, in their supplemental brief in opposition to the motion for summary judgment, the Adin Parties seemingly recognize Frenkel's involvement in and control over Shetel. For example, Danzer sent his email purportedly "memorializ[ing] the promises Weitz made [to him] prior to the formation of Shetel" to both Weitz and Frenkel; and both Weitz and Frenkel allegedly asked Danzer to draft an offer letter on Shetel letterhead, "unilaterally changed the promise of equity, and offered a five percent equitable interest in consideration for a payment from Mr. Danzer of $50,000[,] . . . [and] repeatedly dissuaded Mr. Danzer from investing [in Shetel]." (Adin SJ Mem. at 9). Nor is there any evidence, *inter alia*, that Weitz ever used Shetel's funds for personal matters or intermingled corporate funds with his own.

Nonetheless, "[u]nder New York law, a corporate officer who commits or participates in a tort, even if it is in the course of his duties on behalf of the corporation, may be held individually liable." *Bano v. Union Carbide Corp.*, 273 F.3d 120, 133 (2d Cir. 2001); *accord Taizhou Zhongneng*, 509 F. App'x at 57. Thus, with respect to Danzer's conversion claim against Weitz, "[a] corporate officer or employee who participates in a conversion in the course of his employment may be held personally liable for his acts, notwithstanding innocent intent." *Rentrak*, 2014 WL 1342960, at *7; *see also LoPresti*, 126 F.3d at 42 ("[B]ecause it has long been established, [] that a corporate officer who commits or participates in a tort, even if it is in the course of his duties on behalf of the corporation, may be held individually liable, the district court mistakenly relied upon the fact that [the officer] was acting on behalf of the Company to

115

exonerate him from liability for conversion."); *Starr Indem. & Liab. Co. v. Global Warranty Grp., LLC*, 165 A.D.3d 1308, 1309, 87 N.Y.S.3d 635 (N.Y. App. Div. 2018) ("A corporate officer, although acting for the benefit of a corporation, may be held liable for conversion, if he or she participated in the commission of the tort.") Where, as here, a corporate officer is alleged to have personally participated in the tort at issue, the principle of veil piercing is not relevant. *See, e.g. Samad v. Goldberg*, No. 12-cv-5459, 2016 WL 6678923, at * 8 (S.D.N.Y. Nov. 14, 2016); *Rajeev Sindhwani, M.D., PLLC v. Coe Bus. Serv., Inc.*, 52 A.D.3d 674, 677, 861 N.Y.S.2d 705 (N.Y. App. Div. 2008). Accordingly, to the extent the Shetel Parties' motion seeks summary judgment dismissing Danzer's conversion claim against Weitz (eighteenth third-party claim), that branch of the motion is denied in its entirety.

Nonetheless, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, the Adin Parties are ordered to show cause, **by filing a memorandum of law and any materials in support thereof <u>by no later than October 30, 2020</u>**, why summary judgment should not be granted dismissing Danzer's conversion claim against Weitz (eighteenth third-party claim) in its entirety with prejudice for the same reasons, set forth above, why the Shetel Parties are entitled to summary judgment dismissing Danzer's conversion claim against Shetel. The Shetel Parties may file a response thereto **<u>by no later than November 16, 2020.</u>**

Nor have the Shetel Parties established their entitlement to judgment as a matter of law dismissing Danzer's quasi-contractual promissory estoppel and unjust enrichment claims against Weitz. *See, e.g. Bradkin v. Leverton*, 26 N.Y.2d 192, 309 N.Y.S.2d 192, 257 N.E.2d 643 (N.Y. 1970) (finding a corporate officer to be individually liable on the plaintiff's quasi-contractual unjust enrichment claim). Accordingly, to the extent the Shetel Parties' motion seeks summary

116

judgment dismissing Danzer's promissory estoppel and unjust enrichment claims against Weitz (fourteenth and seventeenth third-party claims), that branch of the motion is denied in its entirety.

Nonetheless, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, the Adin Parties are ordered to show cause, **by filing a memorandum of law and any materials in support thereof <u>by no later than October 30, 2020</u>**, why summary judgment should not be granted dismissing Danzer's promissory estoppel and unjust enrichment claims against Weitz (fourteenth and seventeenth third-party claims) in their entirety with prejudice for the reason, set forth above, that Danzer cannot maintain equitable claims since he has not demonstrated that he lacks an adequate remedy at a law. The Shetel Parties may file a response thereto **<u>by no later than November 16, 2020.</u>**

I.      Third-Party Claims against Osseogroup

With the exception of Danzer's conversion claim against Osseogroup (eighteenth third-party claim), the Adin Parties' claims against Osseogroup are dismissed for the reasons set forth above.

In addition, the Shetel Parties contend, *inter alia*, that the third-party complaint does not allege any facts that could support liability against Osseogroup, as "[t]he only factual allegation specific to Osseogroup is that the www.adinimplants.com URL, after it stopped directing users to Shetel's website, redirected users to Osseogroup's website and later to a 'Not Found' error message on Osseogroup's top-level domain name (www.osseogroup.com/aaa.html)." (Shetel MTD Mem. at 22-23).

The Adin Parties essentially concede as much, since the only factual allegations to which they refer in their initial brief in opposition to the motion are: (i) that as of July 13, 2017, after Shetel was served with a cease and desist letter demanding that it immediately cease cybersquatting, whenever "an internet user typed the domain name, the user's browser would be redirected to the website of Third-Party Defendant, Osseogroup," (CC, ¶ 89); and (ii) that as of August 4, 2017, after Shetel received multiple cease and desist letter, "Plaintiff had only slightly modified its use of the domain name, which now points to a '404 error' page under Osseogroup's top-level domain name."[33] (*Id.*, ¶¶ 85, 89, 180). The Adin Parties do not specifically address the liability of Osseogroup in their supplemental brief in opposition to summary judgment, and thus have seemingly abandoned their claims against Osseogroup.[34]

Since the Adin Parties have not alleged, much less established, any facts from which a rational finder of fact could reasonably impose liability upon Osseogroup, for conversion or otherwise, the branch of the Shetel Parties' motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the Adin Parties' claims against Osseogroup is granted and the Shetel Parties are granted judgment as a matter of law dismissing the third-party claims against Osseogroup in their entirety with prejudice.

---

[33] The Adin Parties also refer to conclusory allegations in connection with their trademark infringement claim against Osseogroup and Weitz alleging, *inter alia*, that Osseogroup's and Weitz's continued use of the Adin Marks "in connection with the sale, offering for sale, distribution, and/or advertising of their competing goods and services" diverted sales of the Adin Parties' products to Osseogroup and Weitz "as a result of consumer confusion." (TPC, ¶¶ 43-44). Such conclusory allegations are insufficient to defeat summary judgment. In any event, for the reasons set forth above, the Shetel Parties are granted summary judgment dismissing the Adin Parties' trademark infringement claims against them on the merits.

[34] Although not specifically addressing the issue of Osseogroup's liability, in the section of their supplemental brief addressing their cybersquatting claims, the Adin Parties cite to evidence in the record indicating that on or about July 20, 2017, after receiving a cease and desist notice from the Adin Parties, Shetel "caused web-browsers going to www.adinimplants.com to be redirected to www.osseogroup.com" (Adin SJ Mem. at 25 [citing Ross Decl., Ex. 47 at 149:6-152:3]); and that "Osseogroup used its page to sell dental implants; in fact, the webpage that advertised Osseogroup's implants was www.osseogroup.com/adin." (*Id.*).

IV.     Conclusion

For the reasons set forth above, the Shetel Parties' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is granted to the extent that the Shetel Parties are granted summary judgment dismissing the Adin Parties': (i) second, third, fourth, sixth through fourteenth, sixteenth, nineteenth through twenty-first, twenty-fourth and twenty-fifth counterclaims against Shetel, (ii) first through eighth, eleventh through thirteenth, fifteenth and sixteenth third-party claims against Weitz, and (iii) third-party claims against Osseogroup in their entirety, with prejudice; and the motion is otherwise denied. For the sake of clarity, the following counterclaims and third-party claims remain in this action: (i) Adin's and Danzer's breach of contract counterclaims against Shetel (first and eighteenth counterclaims, respectively), Adin's conversion counterclaim against Shetel (fifth counterclaim), and Danzer's counterclaim against Shetel alleging a violation of Section 191(c) of the New York State Labor Law (twenty-second counterclaim); and (ii) Danzer's promissory estoppel, unjust enrichment and conversion claims (fourteenth, seventeenth and eighteenth third-party claims) against Weitz.

There being no just reason for delay, the Clerk of the Court shall enter judgment in favor of Osseogroup pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

SO ORDERED.

_/s/ Sandra J. Feuerstein_
Sandra J. Feuerstein
United States District Judge

Dated: September 30, 2020
        Central Islip, New York

119